## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANTA FE DREAMERS PROJECT<br>1213 Mercantile Road<br>Santa Fe, New Mexico 87507,<br><br>SPANISH COMMUNITY CENTER<br>309 N. Eastern Avenue<br>Joliet, Illinois 60432,<br><br>     and<br><br>AMERICAN GATEWAYS<br>314 E. Highland Mall Boulevard<br>Suite 501<br>Austin, Texas 78752,<br><br>    *Plaintiffs*,<br><br>  vs.<br><br>CHAD F. WOLF, in his purported official capacity<br>as Acting Secretary of Homeland Security<br>c/o Office of the General Counsel<br>U.S. Department of Homeland Security<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, DC 20528-0485,<br><br>KENNETH T. CUCCINELLI, in his purported<br>official capacities as Senior Official Performing the<br>Duties of Deputy Secretary of Homeland Security<br>and Acting Director of U.S. Citizenship and<br>Immigration Services<br>c/o Office of the Chief Counsel<br>U.S. Citizenship and Immigration Services<br>20 Massachusetts Ave, NW<br>Room 4210<br>Washington, DC 20529,<br><br>MATTHEW T. ALBENCE, in his purported official<br>capacities as Deputy Director and Senior Official<br>Performing the Duties of Director of U.S.<br>Immigration and Customs Enforcement<br>500 12th St., SW<br>Washington, DC 20536, | Case No.<br><br><br>**COMPLAINT FOR INJUNCTIVE<br>AND DECLARATORY RELIEF** |

1

JOSEPH EDLOW, in his purported official capacity
as Deputy Director of Policy of U.S. Citizenship and
Immigration Services
c/o Office of the Chief Counsel
U.S. Citizenship and Immigration Services
20 Massachusetts Ave, NW
Room 4210
Washington, DC 20529,

MARK A. MORGAN, in his purported official
capacity as Senior Official Performing the Duties of
Commissioner of U.S. Customs and Border
Protection
1300 Pennsylvania Ave, NW
Washington, DC 20229,

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485,

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES
c/o Office of the Chief Counsel
U.S. Citizenship and Immigration Services
20 Massachusetts Ave, NW
Room 4210
Washington, DC 20529,

UNITED STATES CUSTOMS AND
IMMIGRATION ENFORCEMENT
500 12th St., SW
Washington, DC 20536,

and

UNITED STATES CUSTOMS AND BORDER
PROTECTION
1300 Pennsylvania Ave, NW
Washington, DC 20229

*Defendants*.

**INTRODUCTION**

1.      Plaintiffs Santa Fe Dreamers Project, Spanish Community Center, and American Gateways ("Plaintiffs") bring this action to enjoin and vacate the unlawful July 28, 2020 memorandum (the "Wolf Memorandum" or "Memorandum") issued by Defendant Chad Wolf, in his purported capacity as the Acting Secretary of the U.S. Department of Homeland Security ("DHS"), imposing draconian changes to the Deferred Action for Childhood Arrivals ("DACA") initiative.[1]  Because Defendant Wolf assumed the position of Acting Secretary in violation of the Homeland Security Act ("HSA") and the Federal Vacancies Reform Act ("FVRA"), he lacked statutory authority to issue the Memorandum, rendering it *ultra vires*, without force or effect, and void.  Alternatively, even if Defendant Wolf had statutory authority to assume the position of Acting Secretary, his purported accession to office violated the Appointments Clause of the United States Constitution, and he consequently had no authority to issue the Memorandum.

2.      DHS has already begun to implement the restrictions purportedly set forth in the Wolf Memorandum, including by issuing directives from Defendant United States Citizenship and Immigration Services ("USCIS") that, among other items, require all initial applications for DACA participation and work authorization to be rejected; cap any DACA or related work-authorization renewals for current recipients at one year rather than two; and require all pending and future applications for advance parole to be rejected absent "exceptional circumstances" (the "USCIS Directives").[2]  These actions, which are *ultra vires* and unlawful, have directly and

---

[1] *See* Chad F. Wolf, Reconsideraton of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (July 28, 2020), https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf.

[2] *See* Joseph Edlow, Implementing Acting Secretary Chad Wolf's July 28 Memorandum, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial

irreparably disrupted the DACA-application and -renewal processes and impeded the ability of immigrant-services organizations like Plaintiffs to carry out their core missions, which require them to offer free or substantially subsidized legal services to every eligible undocumented person who walks through their doors.

3.      As a direct consequence of Defendant Wolf's unlawful changes to the DACA initiative, Plaintiffs have been and will continue to be forced to divert a large portion of their resources—much of which had been earmarked for non-DACA issues and clients—to advising DACA recipients and applicants, their families, and their employers on the impact of these new restrictions.  Moreover, by reducing the length of DACA renewals from two years to one year, the Wolf Memorandum will force Plaintiffs to double the resources they expend assisting DACA recipients with renewing their participation in the initiative.  These resources, too, will come at the expense of Plaintiffs' ability to assist clients with other immigration-related proceedings and issues.

4.      These lost financial and staffing resources are unrecoverable.  Plaintiffs have no means of recouping funds to make up for the unexpected shortfall in money and manpower because humanitarian-grant opportunities are scarce and the COVID-19 public-health crisis has dramatically limited Plaintiffs' ability to fundraise and recruit volunteers.

5.      The ensuing shortfall also threatens to tarnish Plaintiffs' reputations as effective advocates for immigrants.  Plaintiffs have been in operation for many years—over five decades in the case of Plaintiff Spanish Community Center—and have built up reputations in their respective communities as compassionate providers of quality legal services.   The Wolf Memorandum threatens to substantially undermine the goodwill Plaintiffs have worked hard to

---

Discretion with Respect to Individuals Who Came to the United States as Children'" (Aug. 21, 2020), https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf.

build by forcing them to choose which clients to prioritize in light of the substantial changes to DACA.

6.      Absent immediate injunctive relief and, ultimately, vacatur of the Wolf Memorandum, Plaintiffs will continue to suffer these irreparable injuries, as will similar immigrant-services organizations across the country.

7.      Accordingly, this Court should vacate the Wolf Memorandum on the grounds that it is *ultra vires*, has no force or effect, and violates the APA.  Alternatively, the Court should vacate the Wolf Memorandum on the ground that it was issued by an official purporting to hold office in violation of the Appointments Clause.  Either way, because the Wolf Memorandum was unlawfully issued, the Court should immediately enjoin enforcement and implementation of its terms against any person.

## PARTIES

### *Plaintiffs*

8.      Plaintiff Santa Fe Dreamers Project is a non-profit organization based in Santa Fe, New Mexico that provides free legal services to immigrants to promote economic empowerment, community development, family unity, and liberation from detention.  Santa Fe Dreamers Project "gets its name from our country's Dreamers: the undocumented immigrant youth who, through tireless campaigning and bottomless courage, are shaping immigration policy in the US."  Its mission is to represent every eligible immigrant who walks through its doors, to use service strategies that expand vulnerable peoples' access to legal counsel, and to elevate the voices and narratives of immigrants in our community to support positive reform.

9.      Santa Fe Dreamers Project provides immigration legal services, including individual legal representation and assistance with DACA applications and renewals, to all people who qualify for immigration relief.  Before the Wolf Memorandum, Santa Fe Dreamers

Project assisted approximately 500 clients per year with DACA-renewal applications.  It does so through one-on-one sessions via telephone and in-person at Santa Fe Dreamers Project's office and, before the COVID-19 public-health crisis, through weekly in-person clinics that it hosts. Santa Fe Dreamers Project continues to host virtual clinics every week and will resume hosting weekly in-person clinics as soon as it is again safe to do so.

10.     Having faithfully and reliably served the Santa Fe immigrant community at no cost since 2015, Santa Fe Dreamers Project has cultivated substantial goodwill with that community.  Many of Santa Fe Dreamers Project's clients have come to rely on and trust its quality, no-cost immigration services and return to seek those services as the need arises.  Many of Santa Fe Dreamers Project's clients refer members of their family or friends who need no-cost immigration services to Santa Fe Dreamers Project.  Santa Fe Dreamers Project has cultivated and maintained this goodwill largely by adhering to its core mission of providing high-quality, no-cost immigration services to all eligible immigrants who seek them.

11.     Santa Fe Dreamers Project does not charge any fees for its services.  Clients using its services pay any application- or biometric-processing fees directly to immigration authorities and for postage, where applicable.

12.     The Wolf Memorandum and USCIS Directives have already forced Santa Fe Dreamers Project to devote a greater portion of its limited staff and volunteer hours to advising clients, their families, and the clients' employers about the clients' eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA.  In the few weeks since the Memorandum was issued, approximately sixty-five clients or prospective clients have contacted Santa Fe Dreamers Project regarding the Memorandum's effects on their eligibility for the DACA initiative, the availability of advance parole, and the financial burden of applying for DACA renewal annually rather than bi-annually.  Santa Fe

Dreamers Project's staff have had to spend at least thirty additional hours fielding telephone calls and correspondence from these clients and advising them about the changes wrought by the Wolf Memorandum and USCIS Directives, hours the staff would not have had to expend but-for the Memorandum and Directives.  Santa Fe Dreamers Project anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

13.     Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of Santa Fe Dreamers Project's clients will need to submit DACA renewals every year instead of every other year.  Santa Fe Dreamers Project anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon need to assist with at least twice as many DACA-renewal applications per year compared to past years.  As a result, Santa Fe Dreamers Project will need to expend a substantially greater portion of its limited financial, staffing, and volunteer resources on assisting DACA recipients with renewal applications, including by increasing the duration and frequency of in-person DACA-renewal clinics that it hosts.

14.     Santa Fe Dreamers Project already plans to spend more of its operating budget to hire at least one additional staff member to help handle the increased workload.  This and other, similar expenditures will substantially deplete the resources Santa Fe Dreamers Project is able to expend assisting other clients with other immigration-related proceedings or issues.  Santa Fe

Dreamers Project has already earmarked much of its resources to assisting clients with these other types of proceedings and issues and will have to divert those resources to handle its increased DACA-related workload.

15.     Santa Fe Dreamers Project will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers, particularly because the COVID-19 public-health crisis has substantially impeded in-person fundraising events and the recruitment of volunteers.

16.     The substantially increased workload caused by the Wolf Memorandum and USCIS Directives and the resulting shortfall in Santa Fe Dreamers Project's resources puts at grave risk the goodwill that Santa Fe Dreamers Project has carefully built with the Santa Fe immigrant community by providing high-quality services to all qualified immigrants who seek them.  This goodwill advances Santa Fe Dreamers Project's core organizational mission because it causes recurring clients to return and new clients to seek Santa Fe Dreamers Project's services for the first time.  By forcing Santa Fe Dreamers Project to pick and choose which clients to serve in a timely manner and which to turn away or place on months-long waitlists for services, however, or by substantially increasing the length of waitlists for Santa Fe Dreamers Project's services, the Memorandum and Directives will substantially undermine this goodwill and, consequently, Santa Fe Dreamers Project's reputation.  This in turn will impede Santa Fe Dreamers Project's ability to carry out its core mission.

17.     These ongoing and imminent harms negatively affect Santa Fe Dreamers Project's ability to fulfill its core mission, an essential part of which is to offer free, quality legal services to each and every eligible person who walks through the door.  The Wolf Memorandum and USCIS Directives have made it substantially more costly for Santa Fe Dreamers Project to serve

8

the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

18.     These harms to Santa Fe Dreamers Project also directly harm its clients.  If Santa Fe Dreamers Project is forced to expend a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse or human trafficking obtain specialized humanitarian visas; offer periodic legal workshops to recently arrived families seeking asylum in the United States; or assist youths who have been abused, abandoned, or neglected obtain permanent residency, among other vital services.  Without no-cost legal assistance from Santa Fe Dreamers Project, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

19.     Plaintiff Spanish Community Center is a non-profit organization based in Joliet, Illinois that provides low- or no-cost legal and social services to immigrants, among other populations.  Spanish Community Center's mission is to help improve the quality of life for Latinos, immigrants, and low-income people through educational and social services.

20.     Spanish Community Center provides immigration legal services, including assistance with DACA applications and renewals, to all individuals who seek its services. Historically, Spanish Community Center has assisted approximately eighty clients per year with DACA-renewal applications.  It does so through one-on-one, in-person sessions at Spanish Community Center's offices and, before the COVID-19 public-health crisis, through monthly in-person workshops that it hosts.  Spanish Community Center will resume hosting these workshops as soon as it is again safe to do so.

21.    Spanish Community Center is the only organization in Will County, Illinois that provides low-cost immigration services.  Because several other immigrant-services organizations in the surrounding area have closed during the COVID-19 public-health crisis, Spanish Community Center has seen an influx of new clients from outside Will County.

22.    Having faithfully served the immigrant community of Joliet and surrounding areas at low cost since 1969, Spanish Community Center has cultivated substantial goodwill with that community.  Many of Spanish Community Center's clients have come to rely on and trust its quality, low-cost immigration services and return to seek those services as the need arises.  Many of Spanish Community Center's clients refer members of their family or friends who need low-cost immigration services to Spanish Community Center.  Spanish Community Center has cultivated and maintained this goodwill largely by adhering to its core mission of providing high-quality, low-cost immigration services to all immigrants who seek them.

23.    Spanish Community Center charges no more than $50 per DACA-renewal application, though it waives that fee for clients who cannot afford to pay it and for clients who seek DACA-renewal assistance at one of Spanish Community Center's in-person workshops. Although clients using Spanish Community Center's services pay any application- or biometric-processing fees directly to immigration authorities, Spanish Community Center pays the costs of shipping necessary documents to those authorities, and its staff translate documents from Spanish to English or vice versa as necessary and at no cost to clients.

24.    The Wolf Memorandum and USCIS Directives have already forced Spanish Community Center to devote a greater portion of its limited staff and volunteer hours to advising clients on the clients' eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA.  In the weeks between the U.S. Supreme Court's June 2020 decision invalidating the Trump Administration's first effort to rescind DACA

and the issuance of the Wolf Memorandum, Spanish Community Center had assisted approximately forty clients with preparing and finalizing first-time DACA applications for submission to USCIS.  Spanish Community Center staff spent at least eighty hours preparing those applications.  Since the Wolf Memorandum was issued, however, Spanish Community Center has had to expend substantial, additional staff time and resources contacting those approximately forty clients individually to explain that they once again are unable to apply for DACA and creating and managing a waitlist to serve those clients in the event USCIS again begins accepting first-time DACA applications.  Spanish Community Center would not have had to expend these resources but-for the Wolf Memorandum and USCIS Directives.  Spanish Community Center anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

25.    Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of Spanish Community Center's clients will need to submit DACA renewals every year instead of every other year.  Spanish Community Center anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon need to assist with at least twice as many DACA-renewal applications per year compared to past years.  As a result, Spanish Community Center will need to expend a substantially greater portion of its limited financial and staffing resources on assisting DACA recipients with renewal applications,

including the amount of staff time that Spanish Community Center's staff must spend translating documents.

26.     Spanish Community Center has already earmarked much of its resources to assisting clients with immigration proceedings and issues not related to DACA and will have to divert those resources to handle its increased DACA-related workload.  Spanish Community Center cannot afford to hire any additional staff members to help handle the increased workload. Instead, Spanish Community Center will have to divert the limited time of its small staff from assisting clients with, for example, applications for U-visas, Violence Against Women Act benefits, and asylum to assisting clients with DACA-renewal applications.  This will substantially deplete the resources Spanish Community Center is able to expend assisting clients with immigration-related proceedings or issues unrelated to DACA.

27.     Spanish Community Center will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers.  If budget or resource shortfalls caused by the Memorandum and Directives become too great, Spanish Community Center will likely have to increase the modest fee it ordinarily charges for immigration services or else limit or discontinue those services.

28.     The substantially increased workload caused by the Wolf Memorandum and USCIS Directives, the resulting shortfall in Spanish Community Center's resources, and any necessary increase in the fee it charges for its services will put at grave risk the goodwill that Spanish Community Center has carefully built with the immigrant community in Joliet and surrounding areas by providing high-quality services to all immigrants who seek them.  This goodwill advances Spanish Community Center's core organizational mission because it causes recurring clients to return and new clients to seek Spanish Community Center's services for the

first time.  By forcing Spanish Community Center to pick and choose which clients to serve and which to turn away, however, or by substantially increasing the length of waitlists for Spanish Community Center's services, the Wolf Memorandum and USCIS Directives will substantially undermine this goodwill, which in turn will impede Spanish Community Center's ability to carry out its core mission.

29.     These ongoing and imminent harms negatively affect Spanish Community Center's ability to fulfill its core mission, an essential part of which is to offer low-cost, quality legal services to each and every undocumented person who walks through the door.  The Wolf Memorandum and USCIS Directives have made it substantially more costly for Spanish Community Center to serve the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

30.     These harms to Spanish Community Center also directly harm its clients.  If Spanish Community Center is forced to expend a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse obtain specialized visas; defend clients who are in removal proceedings; or assist victims of persecution obtain asylum in the United States, among other vital services.  Without low-cost legal assistance from Spanish Community Center, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

31.     Plaintiff American Gateways is a non-profit organization based in Austin, Texas and with additional offices in San Antonio and Waco, Texas.  It provides low- or no-cost legal education and advocacy to immigrants in twenty-three central Texas counties whose incomes are at or below 200% of the federal poverty guidelines and is the only organization in Texas that does so.  American Gateways' mission is to champion the dignity and human rights of

immigrants, refugees, and survivors of persecution, torture, conflict, and human trafficking through exceptional immigration legal services at no or low cost, education, and advocacy.

32.     American Gateways provides immigration legal services, including assistance with DACA applications and renewals, to as many financially qualified people as its resources allow.  Historically, American Gateways has assisted at least 130 clients per year with DACA-renewal applications.  It does so through one-on-one, in-person sessions at its offices and, before the COVID-19 public-health crisis, through periodic in-person clinics that it hosts.  American Gateways will resume hosting these clinics as soon as it is again safe to do so.

33.     American Gateways charges a $100 fee for its DACA-renewal services but waives that fee for clients who cannot afford it.  Clients using American Gateways' services pay any application- or biometric-processing fees directly to immigration authorities.

34.     The Wolf Memorandum and USCIS Directives have already forced American Gateways to devote a greater portion of its limited staff and volunteer hours to advising clients on their eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA.  In the weeks between the U.S. Supreme Court's June 2020 decision invalidating the Trump Administration's first effort to rescind DACA and the issuance of the Wolf Memorandum, American Gateways staff had spent substantial time advising and educating the public and potential and current clients about DACA and the renewed viability of first-time DACA applications; contacting forty-nine clients in preparation for a virtual legal clinic at which American Gateways would assist those clients with first-time DACA applications; and assisting several clients with preparing and finalizing first-time DACA applications for submission to USCIS.  Since the Wolf Memorandum was issued, however, American Gateways staff have had to expend substantial, additional time contacting these clients individually to explain that they once again are unable to apply for DACA; creating and

managing a waitlist to serve those clients in the event USCIS again begins accepting first-time DACA applications; and researching and advising those clients on whether other avenues of immigration relief are available to them.  American Gateways would not have had to expend these additional resources but-for the Wolf Memorandum and USCIS Directives.  American Gateways anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

35.     Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of American Gateways' clients will need to submit DACA renewals every year instead of every other year.  American Gateways anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon be called upon to assist with at least twice as many DACA-renewal applications per year compared to past years.  As a result, American Gateways will need to expend a substantially greater portion of its limited financial and staffing resources on assisting DACA recipients with renewal applications.

36.     Because many of its current and prospective clients are not aware of changes wrought by the Wolf Memorandum and USCIS Directives, American Gateways has, consistent with its core mission, spent significant staff hours and resources on additional public education and outreach regarding the changes to DACA eligibility and renewal terms.  American Gateways' management and legal staff have spent substantial time drafting and translating social-media communications regarding the changes wrought by the Wolf Memorandum and

USCIS Directives and preparing to give information sessions on this topic to students and staff at local schools and community colleges.  American Gateways is scheduled to give one of these information sessions in mid-September 2020.

37.     American Gateways must devote much of its resources to assisting clients—at least some of whom would be eligible for DACA benefits were it not for the Wolf Memorandum and USCIS Directives—with immigration proceedings and issues not related to DACA. American Gateways cannot afford to hire any additional staff members to help handle the increased DACA-renewal workload.  Instead, to deal with the resources shortfall, American Gateways will have to choose between (a) diverting the limited time of its staff from assisting clients with, for example, applications for U-visas, Violence Against Women Act benefits, removal defense, and asylum, to assisting clients with DACA-renewal applications, thereby substantially depleting the resources American Gateways is able to expend assisting clients with immigration-related proceedings or issues unrelated to DACA; (b) placing more clients seeking assistance with DACA-renewal applications on waitlists; or (c) refraining from assisting some clients with DACA-renewal applications altogether.  Any one of these outcomes is contrary to American Gateways' mission of providing exceptional legal services to immigrants at no or low cost.

38.     American Gateways will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers.

39.     These ongoing and imminent harms negatively affect American Gateways' ability to fulfill its core mission, an essential part of which is to offer no- or low-cost, quality legal services to as many low-income undocumented people as its resources allow.  The Wolf Memorandum and USCIS Directives have made it substantially more costly for American

Gateways to serve the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

40.     These harms to American Gateways also directly harm its clients.  Under the Wolf Memorandum and USCIS Directives, USCIS has already rejected first-time DACA applications submitted by at least two of American Gateways' clients.  If American Gateways expends a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse obtain specialized visas; defend clients who are in removal proceedings; or assist victims of persecution obtain asylum in the United States, among other vital services.  Without no- or low-cost legal assistance from American Gateways, and if American Gateways is unable to find other immigration-services organizations in the area to assist them, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

*Defendants*

41.     Defendant Chad F. Wolf purports to serve as Acting Secretary of Homeland Security and therefore as the "head" of the Department of Homeland Security with "direction, authority, and control over it."  *See* 6 U.S.C. § 112(a)(2).  He purports to exercise the duties and functions of the Secretary of Homeland Security and issued the Wolf Memorandum in that purported capacity.  Plaintiffs sue Defendant Wolf in his purported official capacity.

42.     Defendant Kenneth T. Cuccinelli purports to serve as the "Senior Official Performing the Duties of Deputy Secretary of Homeland Security" and as Acting Director of U.S. Citizenship and Immigration Services.  On information and belief, Defendant Cuccinelli is, or soon will be, implementing and enforcing the Wolf Memorandum, as Defendant Edlow has already done.  Plaintiffs sue Defendant Cuccinelli in his purported official capacity.

43.     Defendant Matthew T. Albence purports to serve as Deputy Director and "Senior Official Performing the Duties of Director" of U.S. Immigration and Customs Enforcement.  The Wolf Memorandum was addressed to Defendant Albence.  On information and belief, Defendant Albence is, or soon will be, implementing and enforcing the Wolf Memorandum, as the Wolf Memorandum orders him to do, and as Defendant Edlow has already done.  Plaintiffs sue Defendant Albence in his purported official capacity.

44.     Defendant Joseph Edlow purports to serve as Deputy Director of Policy of U.S. Citizenship and Immigration Services.  Defendant Wolf purported to appoint Defendant Edlow as Deputy Director of USCIS on February 19, 2020.  The Wolf Memorandum was addressed to Defendant Edlow.  Defendant Edlow issued the USCIS Directives in his purported capacity as USCIS Deputy Director of Policy.  Plaintiffs sue him in his purported official capacity.

45.     Defendant Mark A. Morgan purports to serve as "Senior Official Performing the Duties of Commissioner" of U.S. Customs and Border Protection.  On information and belief, Defendant Morgan is, or soon will be, implementing and enforcing the Wolf Memorandum, as the Memorandum orders him to do, and as Defendant Edlow has already done.  The Wolf Memorandum was addressed to Defendant Morgan.  Plaintiffs sue Defendant Morgan in his purported official capacity.

46.     Defendant Department of Homeland Security is the executive department principally charged with administering the federal immigration laws.  *See, e.g.*, 6 U.S.C. §§ 202(5), 251; 8 U.S.C. § 1103(a)(1), (5).

47.     Defendant United States Citizenship and Immigration Services is a component agency of DHS.  *See* 6 U.S.C. § 271.  It is the agency primarily responsible for administering the DACA initiative, including adjudicating first-time and renewal applications, applications for work authorization, applications for advance parole, and other proceedings.

48.     Defendant United States Immigration and Customs Enforcement is a component agency of DHS.  It is responsible for, among other functions, enforcing the federal immigration laws.  *See* 6 U.S.C. § 251-52.

49.     Defendant United States Customs and Border Protection is a component agency of DHS.  It is responsible for, among other functions, "enforce[ing] and administer[ing] all immigration laws" in "coordination with U.S. Immigration and Customs Enforcement and United States Citizenship and Immigration Services" as well as "the detection, interdiction, [and] removal" of "persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8).

## JURISDICTION AND VENUE

50.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

51.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (e)(1).

## FACTUAL AND LEGAL BACKGROUND

52.     It is a bedrock principle of the United States of America that our country, more than any other, is welcoming of immigrants and that its people are better for it.  Describing the United States as a "shining city on a hill," President Ronald Reagan explained that the "visitors to that city on the Potomac do not come as white or black, red or yellow; they are not Jews or Christians; conservatives or liberals; or Democrats or Republicans.  They are Americans awed by what has gone before, proud of what for them is still . . . a shining city on a hill."[3]  Twenty-six years later, then-U.S. Senator Barack Obama invoked the dream of a "city on a hill" in describing college students of diverse backgrounds, most of whom were the first members of their families to attend college:  "I look out at a sea of faces that are African-American and

---

[3] Ronald Reagan, Election Eve Address: A Vision for America (Nov. 11, 1980), https://www.reaganlibrary.gov/11-3-80.

Hispanic-American and Asian-American and Arab-American and Anglo-American.  I see students who have come here from over 100 different countries, believing like those first settlers that they too could find a home in that City on a Hill—that they too could find success in the unlikeliest of places."[4]

53.     From these principles was born the Deferred Action for Childhood Arrivals ("DACA") initiative, which, since June 15, 2012, has granted forbearance from removal proceedings, temporary work authorization, and other benefits to hundreds of thousands of young people who came to the United States as children and satisfy specific criteria.  As President Obama explained, DACA "is about young people who grew up in America—kids who study in our schools, young adults who are starting careers, patriots who pledge allegiance to our flag.  These Dreamers are Americans in their hearts, in their minds, in every single way but one: on paper.  They were brought to this country by their parents, sometimes even as infants.  They may not know a country besides ours.  They may not even know a language besides English.  They often have no idea they're undocumented until they apply for a job, or college, or a driver's license."[5]

54.     President Obama further explained why providing relief through DACA is so critical, not just to DACA recipients, but to the country as a whole:  "Ultimately, this is about basic decency.  This is about whether we are a people who kick hopeful young strivers out of

[4] Barack Obama, Commencement Address at University of Massachusetts at Boston (June 2, 2006), https://youtu.be/qWQG8aE8o7s?t=518 (8:38-9:09).

[5] *Obama's Statement Following Trump's Ending of DACA*, Politico, June 5, 2017, https://www.politico.com/story/2017/09/05/obamas-statement-following-trumps-ending-of-daca-transcript-242339.

America, or whether we treat them the way we'd want our own kids to be treated.  It's about who we are as a people—and who we want to be."[6]

55.     Consistent with this rationale, the DACA initiative has, to date, benefitted hundreds of thousands of young people who were brought to the United States as children.  It has kept families together and shielded recipients from being removed from the only country many of them have ever known.  To be eligible, applicants must have entered the United States before the age of sixteen; have lived continuously in the United States since June 2007; be in school, have attained certain educational milestones, or have served honorably in the United States armed services; have no significant criminal history; and pose no threat to national security, among other criteria.  Until July 28, 2020, those granted DACA's protections were designated low priorities for removal and received authorization to work legally in the United States for a two-year, renewable period.

56.     This case concerns the Trump Administration's latest salvo against DACA and its efforts to run roughshod over the values of our "shining city on a hill" by destroying DACA any way it can.  In an attempted end-run around the Supreme Court's recent decision invalidating the Administration's efforts to terminate DACA, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 & n.7 (2020), Defendant Wolf issued the Wolf Memorandum on July 28, 2020, placing new and draconian restrictions on DACA.  Because Defendant Wolf lacked statutory or constitutional authority to issue the Wolf Memorandum, however, the Memorandum is *ultra vires*, without force or effect, void, and should be vacated.

**I.      The Deferred Action for Childhood Arrivals Initiative**

57.     On June 15, 2012, under the Obama Administration, then-Secretary of Homeland Security Janet Napolitano issued a memorandum (the "Napolitano Memorandum") entitled

---

[6] *Id.*

"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."  The memorandum established an immigration-enforcement initiative known as DACA.[7]

58.    The Napolitano Memorandum establishes guidelines for the exercise of immigration-enforcement discretion with respect to young immigrants who were brought to the United States as children and meet criteria demonstrating that they are low priorities for removal. Deferred action is a type of enforcement discretion under which DHS does not seek, for a limited period, to remove an individual who is present in the United States without authorization.

59.    In its most recent iteration before July 28, 2020, DACA provided renewable, two-year periods of forbearance from removal proceedings, temporary work authorization, and other benefits to young, undocumented people who entered the United States as children.  To be eligible for an exercise of enforcement discretion under the DACA initiative, a person must (1) have come to the United States under the age of sixteen; (2) have continuously resided in the United States since before June 12, 2007, and been present in the U.S. on June 12, 2012; (3) be in school, have graduated from high school, have obtained a general education development certificate or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) not have been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) not be above the age of thirty.  Until Defendant Wolf purported to amend DACA on July 28, 2020, DACA recipients were required to seek renewal of deferred action and work authorization and pay a $495 renewal fee every two years.

---

[7] Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

60.     Over 640,000 young people were benefitting from DACA as of March 31, 2020.[8] The initiative has allowed them to live and work in this country without fear of being unexpectedly separated from their jobs, family members, and communities.  Relying on DACA's effective guarantee of forbearance from removal, DACA recipients have made plans to pursue higher learning, settle into new jobs, and care for their families.

## II.     The Administration's First Attempt to Eliminate DACA

61.     On September 5, 2017, then-Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke Memorandum") entitled "Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"[9]  The Duke Memorandum purported to rescind the Napolitano Memorandum and terminate the DACA initiative.  The Duke Memorandum directed DHS officials to entertain renewal applications from DACA recipients whose benefits were set to expire within six months but reject all first-time and all other renewal applications for relief under the initiative.

62.     On June 22, 2018, in response to several district-court orders enjoining enforcement of the Duke Memorandum because, among other grounds, it was arbitrary and capricious and violated the Administrative Procedure Act ("APA"), then-Secretary of Homeland Security Nielsen issued a second memorandum (the "Nielsen Memorandum") that purported to

---

[8] *See* U.S. Citizenship & Immigr. Servs., Approximate Active DACA Recipients: As of March 31, 2020 (July 22, 2020), https://www.uscis.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20 Receipts%20-%20March%2031%2C%202020.pdf.

[9] Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

clarify and elaborate on the Duke Memorandum's reasoning and recommit DHS to rescinding DACA.[10]

63.     Litigation concerning the legality of the Duke and Nielsen Memoranda wound its way to the United States Supreme Court.   On June 18, 2020, the Court invalidated Acting Secretary Duke's order terminating DACA.   *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 & n.7 (2020).   Holding that Duke's order was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Court concluded that the order had (1) "failed to address" whether DACA recipients had legitimately come to rely on the initiative's protections and would suffer hardship in its absence; and (2) had failed to consider or adequately explain the decision to terminate forbearance from removal under DACA rather than only the initiative's extension of work authorization and other benefits.   *Id.* at 1910-16.  Having concluded that the Duke Memorandum's "dual failure" to "consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients" raised "doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner," the Court affirmed the vacatur of Duke's order rescinding DACA and remanded the matter to the Department of Homeland Security "so that it may consider the problem anew."   *Id.* at 1916 & n.7.

## III.     Defendant Wolf's Subsequent Unlawful Attempt to Restrict DACA

64.     The Trump Administration wasted no time on remand.   In a matter of weeks, Defendant Wolf issued the Wolf Memorandum in his purported capacity as Acting Secretary. The Wolf Memorandum severely restricted access to DACA for new applicants and current

---

[10] Kirstjen M. Nielsen, Memorandum from Secretary Kirstjen M. Nielsen (June 22, 2018), https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf.

recipients alike.  It was also issued without authority because Defendant Wolf never lawfully assumed the office of Acting Secretary.

**A.**     **The Federal Vacancies Reform Act and Homeland Security Act**

65.     Two federal statutes govern the order of succession for Acting Secretary of Homeland Security: the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, and the Homeland Security Act, 6 U.S.C. § 101 *et seq.*

66.     Under 6 U.S.C. § 113(a)(1)(A) and 5 U.S.C. § 3345(a)(1), the Deputy Secretary of Homeland Security, a Presidentially nominated and Senate-confirmed official, assumes the office of Acting Secretary of Homeland Security in the event the Secretary of Homeland Security dies, resigns, or is otherwise unable to perform the functions and duties of the office.

67.     Under 6 U.S.C. § 113(g)(1), the Under Secretary for Management of the Department of Homeland Security, a Presidentially nominated and Senate-confirmed official, assumes the office of Acting Secretary of Homeland Security in the event neither the Secretary of Homeland Security nor the Deputy Secretary of Homeland Security are available to exercise the functions and duties of Secretary.

68.     Under 6 U.S.C. § 113(g)(2), the Secretary of Homeland Security may designate other officers of the Department of Homeland Security in further order of succession to serve as Acting Secretary in the event neither the Secretary nor the Deputy Secretary nor the Under Secretary for Management are available to exercise the functions and duties of Secretary.

69.     Under 5 U.S.C. § 3346(a)(1), acting officials "may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs."  After these 210 days elapse, "the office shall remain vacant," *id.* § 3348(b)(1), and any action taken by someone purporting to hold that office shall have neither force nor effect, *see id.* § 3348(d)(1).

B.      **The Trump Administration Shuffles Officials at the Department of Homeland Security**

70.      Until April 2019, the order of succession at DHS beyond the Deputy Secretary and Under Secretary of Management was governed by two documents: Executive Order 13753 ("Executive Order 13753"), dated December 9, 2016, and DHS Delegation Number 00106 ("Directive 00106"), dated December 15, 2016 and issued pursuant to then-Secretary Jeh Johnson's authority under 6 U.S.C. § 113(g)(2).

71.      Executive Order 13753 designated the order of DHS officials who would become Acting Secretary "during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary," provided they could assume office consistent with the FVRA and were not already holding office in an acting capacity.[11]

72.      Section II.A of Directive 00106 adopted the order of succession laid out in President Obama's executive order "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office."

73.      Section II.B of Directive 00106, however, imposed a separate and different order of succession for Acting Secretary in the event the Secretary becomes "unavailable to act during a disaster or catastrophic emergency."  This second order of succession for disasters and emergencies was laid out in an appendix to Directive 00106 called "Annex A."  Directive 00106 and Annex A's order of succession remained unchanged until April 9, 2019.

74.      President Donald J. Trump nominated Kirstjen Nielsen to be Secretary of Homeland Security on October 11, 2017.  On December 5, 2017, the Senate confirmed her nomination.

---

[11] *See* Exec. Order 13753 § 1, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667, 90,667 (Dec. 9, 2016).

75.    On April 7, 2019, Secretary Nielsen announced via Twitter that she had resigned

that office effective that day.[12]   A little over three hours later, however, she tweeted that she had

"agreed to stay on as Secretary through Wednesday, April 10th to assist with an orderly

transition and ensure that key DHS missions are not impacted."[13]

76.    Before Secretary Nielsen departed office on April 10, 2019, she signed a

memorandum that amended Directive 00106 by striking the text of Annex A and replacing it

with a new order of succession for Secretary of Homeland Security.   This memorandum was

issued "[p]ursuant to Title 6, United States Code, Section 113(g)(2)."[14]

77.    Secretary Nielsen's memorandum did not amend the text of Directive 00106

itself.   It left intact the language in Sections II.A and B of Directive 00106 providing,

respectively, that Executive Order 13753 would govern the order of succession for the Secretary

"[i]n case of the Secretary's death, resignation, or inability to perform the functions of the

Office" and that Annex A would govern the order only in the event the Secretary is "unavailable

to act during a disaster or catastrophic emergency."[15]

78.    Under Secretary Nielsen's new Annex A, the CBP Commissioner, a position then

held by Kevin McAleenan, became third in line to serve as Acting Secretary in the event of the

---

[12] *See* @SecNielsen, Twitter (Apr. 7, 2019, 4:02 PM),
https://twitter.com/SecNielsen/status/1115027147893235712.

[13] @SecNielsen, Twitter (April 7, 2019, 7:36 PM),
https://twitter.com/SecNielsen/status/1115080823068332032.

[14] The United States produced a copy of Nielsen's April 9, 2019 memorandum amending
Directive 00106 in litigation pending in the District of Maryland.   *See* Neal J. Swartz Decl. Ex. 1,
ECF No. 41-2, *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118-PX (D. Md.).

[15] A copy of Directive 00106 as amended by Secretary Nielsen in April 2019 is available as
Enclosure B to a November 15, 2019 letter from Representatives Bennie G. Thompson and
Carolyn B. Maloney to the Comptroller General of the United States.   That letter is in turn
available here:
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%
20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

Secretary's unavailability due to a disaster or catastrophic emergency, after the Deputy Secretary and Under Secretary for Management.

79.     Under the unamended Section II.A, however, which retained the order of succession laid out in Executive Order 13753, Commissioner McAleenan was seventh in line to become Acting Secretary in the event of the Secretary's *resignation*—after the Deputy Secretary of Homeland Security; the Under Secretary for Management; the Administrator of the Federal Emergency Management Agency ("FEMA"); the Under Secretary for National Protection and Programs; the Under Secretary for Science and Technology; and the Under Secretary for Intelligence and Analysis, to the extent those positions were filled by Presidentially nominated and Senate-confirmed appointees.

80.     On April 10, 2019, the offices of Deputy Secretary of Homeland Security, Under Secretary for Management, FEMA Administrator, and Under Secretary for Science and Technology were vacant.  The offices of Under Secretary for National Protection and Programs and the Under Secretary for Intelligence and Analysis were not.

81.     Because Secretary Nielsen resigned her office as Secretary and had not become "unavailable to act during a disaster or catastrophic emergency," two other Senate-confirmed officials—Christopher Krebs, the Senate-confirmed Under Secretary for National Protection and Programs, followed by David Glawe, at the time the Senate-confirmed Under Secretary for Intelligence and Analysis—were lawfully designated to succeed Secretary Nielsen under Section II.A of Directive 00106.

82.     Nonetheless, in obvious contravention of Directive 00106 and Executive Order 13753, on April 10, 2019, CBP Commissioner McAleenan purported to assume Nielsen's office as Acting Secretary of Homeland Security.

83.    Six months later, on October 11, 2019, President Trump tweeted that Commissioner McAleenan would be departing DHS.[16]

84.    On November 8, 2019—212 days after Nielsen vacated the office of Secretary of Homeland Security and 2 days past the 210 days allotted under 5 U.S.C. § 3346(a)(1)— Commissioner McAleenan issued an order in his purported capacity as Acting Secretary purporting to further amend Directive 00106 by striking the text of Section II.A and replacing it with language providing that Annex A would govern the order of succession for the Secretary "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," rather than only in the event of the Secretary's unavailability due to a disaster or catastrophic emergency.[17]

85.    Pursuant to his purported authority as Acting Secretary under 6 U.S.C. § 113(g)(2), Commissioner McAleenan's order also struck the text of Annex A to Directive 00106 and replaced it with a new order of succession in which the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans would become third and fourth in line to serve as Acting Secretary, respectively, after the Deputy Secretary and Under Secretary for Management.

86.    On November 8, 2019, the offices of Deputy Secretary, Under Secretary for Management, and Under Secretary for Strategy, Policy, and Plans were vacant.  But President Trump's nomination of Defendant Wolf as Under Secretary for Strategy, Policy, and Plans was already pending in the Senate.

---

[16] @realDonaldTrump, Twitter (Oct. 11, 2019, 4:46 PM), https://twitter.com/realdonaldtrump/status/1182804700699086848?lang=en.

[17] A copy of Commissioner McAleenan's order purportedly amending Directive 00106 is available as Enclosure A to a November 15, 2019 letter from Representatives Bennie G. Thompson and Carolyn B. Maloney to the Comptroller General of the United States.  That letter is in turn available here: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro% 20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

87.     The Senate confirmed Defendant Wolf as Under Secretary for Strategy, Policy, and Plans on November 13, 2019.

88.     On November 13, 2019—216 days after Nielsen vacated the office of Secretary and 6 days past the 210 days allotted under 5 U.S.C. § 3346(a)(1)—Commissioner McAleenan resigned as Acting Secretary of Homeland Security.  Because the Deputy Secretary, Under Secretary of Management, and CBP Commissioner positions were vacant, Defendant Wolf purported to take office that same day as Acting Secretary of Homeland Security under Commissioner McAleenan's November 8, 2019 order purportedly amending Directive 00106.

89.     On November 15, 2019, Bennie G. Thompson, Chairman of the House Committee on Homeland Security, and Carolyn B. Maloney, then the Acting Chairwoman of the House Committee on Oversight and Reform, wrote the United States Comptroller General—head of the United States Government Accountability Office ("GAO")—expressing skepticism that Commissioner McAleenan lawfully assumed office as Acting Secretary of Homeland Security consistent with 6 U.S.C. § 113(g), that he lawfully amended Directive 00106 on November 8, 2019 consistent with the Federal Vacancies Reform Act, 6 U.S.C. § 3345 *et seq.*, and that Defendant Wolf lawfully purported to succeed Commissioner McAleenan as Acting Secretary. The letter requested that the GAO "conduct an expedited review to resolve whether Mr. Wolf," who is "now engaged in decision-making that impact[s] the security of every American," is "legally serving in the position" of Acting Secretary of Homeland Security.[18]

90.     On August 14, 2020, the GAO's General Counsel issued a report in response to Representatives Thompson and Maloney's letter.   The report observed that although

---

[18] Letter from U.S. Reps. Bennie G. Thompson, Chairman, Homeland Security Committee, and Carolyn Maloney, Acting Chairwoman, Committee on Oversight & Reform, to U.S. Comptroller General Gene Dodaro (Nov. 15, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

Commissioner "McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen," "the express terms of the existing designation" governing the order of succession to the office of Secretary of Homeland Security "required another official to assume that title."  "As such," the report explained, Commissioner "McAleenan did not have the authority to amend the Secretary's existing designation" to permit Defendant Wolf to succeed McAleenan as Acting Secretary.  "Accordingly," the report concluded, "Messrs. Wolf and Cuccinelli were named to their respective positions of Acting Secretary and Senior Official Performing the Duties of Deputy Secretary by reference to an invalid order of succession."  The report announced that GAO would refer the questions of "who should be serving as the Acting Secretary and the Senior Official Performing the Duties of Deputy Secretary" and the "consequences of actions taken by these officials" to the "DHS Office of Inspector General for its review."[19]

91.    On August 25, 2020, President Trump announced via Twitter that he intended to nominate Defendant Wolf as the permanent Secretary of Homeland Security.[20]  As of the filing of this Complaint, President Trump has not done so.  Nor has he ever designated Defendant Wolf as Acting Secretary of Homeland Security.

### C.    The Wolf Memorandum and USCIS Directives

92.    On July 28, 2020—474 days after Secretary Nielsen vacated the office of Secretary of Homeland Security and 258 days after Defendant Wolf purportedly assumed office as Acting Secretary—Wolf issued the Wolf Memorandum, which is entitled "Reconsideration of

---

[19] U.S. Gov't Accountability Office, B-3321650, Decision Letter on Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security (Aug. 14, 2020) at 11, https://www.gao.gov/assets/710/708830.pdf.

[20] @realDonaldTrump, Twitter (Aug. 25, 2020, 9:30 AM), https://twitter.com/realDonaldTrump/status/1298296592764735490.

the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"

93.     In "the exercise of [Defendant Wolf's purported] authority and discretion in establishing national immigration policies and priorities" under 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202(5), the Wolf Memorandum purports to rescind the Duke and Nielsen Memoranda, states that Defendant Wolf is "considering" the DACA initiative "anew," and purports to order "certain immediate changes to the DACA policy."

94.     As a practical matter, the Wolf Memorandum purports to rescind, but effectively reinstates, the Duke and Nielsen Memoranda.  Addressed to Defendants Albence, Edlow, and Morgan in their official capacities, the Memorandum orders them to immediately implement changes to DACA similar to those wrought by the Duke Memorandum in 2017, and effectively eliminates DACA for new applicants.  Specifically, the Wolf Memorandum orders Defendants Albence, Edlow, and Morgan to take the following steps, among others, "effective immediately":

- Reject all initial applications for DACA participation, reject associated applications for work authorization, and refund all associated fees, purportedly "without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future";

- Process all pending and future properly submitted DACA- and work-authorization-renewal applications submitted by current DACA recipients;

- Limit any DACA or related work-authorization renewals to one year rather than two;

- Reject all pending and future applications for advance parole from DACA beneficiaries "absent" unexplained "exceptional circumstances";

- Refrain from terminating previously approved grants of deferred action, work authorization, or advance parole "for the remaining duration of their validity periods" solely on the basis of the Memorandum's purported directives; and

- Exercise "discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

95.     On August 21, 2020, USCIS, the arm of DHS chiefly responsible for administering immigration services and benefits, issued policy directives purporting to implement the Wolf Memorandum's changes to DACA.  The USCIS Directives instruct all USCIS personnel to immediately act as follows:

- Reject all initial DACA requests and associated applications for employment authorization submitted by immigrants who have never before been granted DACA relief, and return all associated fees, without prejudice to refiling such requests should DHS elect to begin accepting initial requests again;

- Reject DACA renewal requests received more than 150 days prior to the expiration of the recipient's current DACA validity period;

- Limit the period of any grant of deferred action and any associated period of work authorization under DACA to one year;

- Continue to charge a $410 processing fee and $85 biometrics fee for applications for work-authorization renewals despite the fact that future periods of deferred action and work authorization will be halved;[21]

---

[21] Though not discussed in the USCIS implementation directives, USCIS's website indicates that the same $495 fee covers associated applications for renewed grants of deferred action under DACA even though the length of any such renewal, like the length of work-authorization renewals, has been halved.

- Reject all pending and future Form I-131 applications for advance parole from DACA recipients, unless the applicant can demonstrate "exceptional circumstances"; and

- Immediately update USCIS's internal operating procedures to permit DHS officers to exercise "discretionary authority" under the Wolf Memorandum "to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

96.     Under the Wolf Memorandum and USCIS Directives, USCIS has already denied first-time applications for DACA benefits submitted by clients of Plaintiffs and, absent relief from this Court, will continue to do so.  On information and belief, absent relief from this Court, USCIS will soon begin granting applications for renewed deferred action and work authorization submitted by clients of Plaintiffs for only one year rather than two.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**The Wolf Memorandum and USCIS Directives Are Void Because They Were Issued by Defendant Wolf While He Was Purporting to Serve As Acting Secretary In Violation of the Homeland Security Act and the Federal Vacancies Reform Act**

97.     Plaintiffs repeat and incorporate by reference the preceding allegations.

98.     Defendant Wolf's purported accession to the office of Acting Secretary of Homeland Security violated the Homeland Security Act, as follows:

99.     When he purported to assume the office of Acting Secretary of Homeland Secretary on April 10, 2019 upon Secretary Kirstjen Nielsen's resignation, former CBP Commissioner McAleenan did so in violation of the DHS directive governing the order of succession to that office issued by Secretary of Homeland Security Jeh Johnson and amended by Secretary Nielsen pursuant to the Homeland Security Act, 6 U.S.C. § 113(g)(2).  Therefore,

Commissioner McAleenan was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office.

100.    Because Commissioner McAleenan never lawfully assumed the functions, duties, and powers of the office of Acting Secretary of Homeland Security, he lacked lawful authority to further amend the DHS directive governing the order of succession to that office under 6 U.S.C. § 113(g)(2).  Thus, his November 8, 2019 order purporting to do so was *ultra vires* and void.

101.    Defendant Wolf purported to assume office as Acting Secretary of Homeland Security, and could only have done so, under Commissioner McAleenan's November 8, 2019 order purportedly amending the DHS directive governing the order of succession to that office pursuant to 6 U.S.C. § 113(g)(2).  Because Commissioner McAleenan's order was *ultra vires* and void, however, Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security, and purported to assume the functions, duties, and powers of that office in violation of the Homeland Security Act.

102.    Defendant Wolf's purported accession to the office of Acting Secretary of Homeland Security also violated the Federal Vacancies Reform Act, as follows:

103.    *First*, when Commissioner McAleenan purported to amend the DHS directive governing the order of succession to the office of Secretary of Homeland Security on November 8, 2019, the office had been vacant since Secretary Nielsen departed on April 10, 2019—that is, for 212 days.  The office was therefore "vacant" under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3346(a)(1), 3348(b)(1), and Commissioner McAleenan's November 8, 2019 order claiming to amend the order of succession lacked "force or effect," *id.* § 3348(d)(2).  Because Commissioner McAleenan's order lacked force or effect, and because Defendant Wolf purported to assume office as Acting Secretary and could only have done so under that order, Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security and purported to

assume the functions, duties, and powers of that office in violation of the Federal Vacancies Reform Act.  Under 5 U.S.C. § 3348(d)(1), his promulgation of the Wolf Memorandum in his purported capacity as Acting Secretary had no force or effect.

104.    *Second*, when Defendant Wolf purported to assume office as Acting Secretary of Homeland Security on November 13, 2019, the office of Secretary had been vacant for at least 216 days.  Under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3346(a)(1), 3348(b)(1), the office was to "remain vacant" unless and until a permanent Secretary of Homeland Security was nominated and confirmed.  Defendant Wolf purported to assume office as Acting Secretary of Homeland Security in violation of these provisions.    Under 5 U.S.C. § 3348(d)(1), his promulgation of the Wolf Memorandum in his purported capacity as Acting Secretary had no force or effect.

105.    The President has never designated Defendant Wolf as Acting Secretary of Homeland Security under 5 U.S.C. § 3345 or any other statute, and Defendant Wolf has never served as first assistant to the Secretary of Homeland Security.

106.    Because Defendant Wolf purported to assume office in violation of the Homeland Security Act and the Federal Vacancies Reform Act, he was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office.  As a result, he lacked any lawful authority to issue the Wolf Memorandum.  The Wolf Memorandum is therefore *ultra vires*, without force or effect, and void.

107.    Furthermore, because Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office, he lacked any lawful authority to appoint Defendant Edlow as Deputy Director for Policy of U.S. Citizenship and Immigration Services on February 19, 2020.  Thus, Defendant Edlow never lawfully assumed the functions, duties, and powers of that office.

108.    Because the Wolf Memorandum is *ultra vires*, without force or effect, and void, and because Defendant Edlow never lawfully assumed the functions, duties, and powers of the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services, Defendant Edlow lacked any lawful authority to issue the USCIS Directives implementing the Wolf Memorandum, and those Directives are themselves *ultra vires* and void.

109.    Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

## SECOND CAUSE OF ACTION

### The Wolf Memorandum and USCIS Directives Violate the Administrative Procedure Act

110.    Plaintiffs repeat and incorporate by reference the preceding allegations.

111.    The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

112.    Defendant Wolf's promulgation of the Wolf Memorandum was a final agency action.

113.    Defendant Edlow's promulgation of the USCIS Directives was a final agency action.

114.    Defendant Wolf issued the Wolf Memorandum in his purported capacity as Acting Secretary of Homeland Security.

115.    Defendant Edlow issued the USCIS Directives in his purported capacity as Deputy Director for Policy of U.S. Citizenship and Immigration Services.

116.    Because Defendant Wolf purported to assume office in violation of the Homeland Security Act and the Federal Vacancies Reform Act, he was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office.  As a result, he lacked any lawful authority to issue the Wolf Memorandum.

117.    The Wolf Memorandum was therefore issued "not in accordance with law," "in excess of statutory . . . authority," and/or "short of statutory right" and must be vacated.  5 U.S.C. § 706(2)(A), (C).

118.    Because the Wolf Memorandum was issued in violation of the APA, and because Defendant Edlow never lawfully assumed the functions, duties, and powers of the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services, Defendant Edlow lacked lawful authority to issue the USCIS Directives implementing the Wolf Memorandum.

119.    The USCIS Directives were therefore also issued "not in accordance with law," "in excess of statutory . . . authority," and/or "short of statutory right" and must be vacated.  5 U.S.C. § 706(2)(A), (C).

120.    Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

### THIRD CAUSE OF ACTION

### In the Alternative to Counts One and Two, the Wolf Memorandum and USCIS Directives Were Issued in Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl.2

121.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 96.

122.    The Appointments Clause of the United States Constitution provides that principal officers of the United States must be appointed by the President "by and with the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.

123.    By purporting to exercise the duties and functions of Acting Secretary of Homeland Security, the head of an executive department, Defendant Wolf purports to serve as a principal officer for purposes of the Appointments Clause.

124.    On February 19, 2020, ninety-eight days into Defendant Wolf's purported tenure as Acting Secretary of Homeland Security, he purportedly appointed Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services.  At the time, the office of Secretary of Homeland Security had been vacant without a permanent appointee for 315 days, and Defendant Wolf had not been nominated by the President or confirmed by the Senate to that position.

125.    On July 28, 2020, 258 days into Defendant's Wolf's purported tenure as Acting Secretary of Homeland Security, he issued the Wolf Memorandum heavily restricting—and in some instances, eliminating altogether—access to DACA. At the time, the office of Secretary of Homeland Security had been vacant without a permanent appointee for 475 days, and Defendant Wolf had not been nominated by the President or confirmed by the Senate to that position.

126.    To date, Defendant Wolf has not been nominated by the President by the President or confirmed by the Senate to the office of Secretary of Homeland Security.

127.    Thus, to the extent Defendant Wolf's purported service as Acting Secretary of Homeland Security on February 19, 2020 and July 28, 2020 was consistent with the Homeland Security Act and/or the Federal Vacancies Reform Act, his purported service in that office nonetheless violated the Appointments Clause.   Accordingly, Defendant Wolf's purported appointment of Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services and issuance of the Wolf Memorandum violated the Appointments Clause.

128.    Because the Wolf Memorandum was issued in violation of the Appointments Clause, and because Defendant Wolf appointed Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services in violation of the Appointments Clause, Defendant Edlow lacked lawful authority to issue the USCIS Directives implementing the Wolf Memorandum.

129.    The Wolf Memorandum and USCIS Directives are therefore invalid and must be vacated.

130.    Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment Act

131.    Plaintiffs repeat and incorporate by reference the preceding allegations.

132.    Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

133.    The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, provides that "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* § 2201(a).

134.    The Court has equitable jurisdiction to enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing an

"implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause").

135.    Defendant Wolf was appointed in violation of the Homeland Security Act and the Federal Vacancies Reform Act or, in the alternative, the Appointments Clause.  Plaintiffs are entitled to a declaration that Defendant Wolf's designation as Acting Secretary of Homeland Security violated federal law or the United States Constitution, that Defendant Edlow's purported appointment as Deputy Director for Policy of U.S. Citizenship and Immigration Services violated federal law or the United States Constitution, and that the Wolf Memorandum and USCIS Directives are therefore invalid.

136.    The Wolf Memorandum, which Defendant Wolf promulgated under his purported authority as Acting Secretary of Homeland Security, and the USCIS Directives, which Defendant Edlow promulgated under the purported authority of the Wolf Memorandum and under his own purported authority as Deputy Director for Policy of U.S. Citizenship and Immigration Services, harm Plaintiffs for the reasons stated above.

## REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

1.  Declare that the Wolf Memorandum and USCIS Directives were issued in violation of the Homeland Security Act and the Federal Vacancies Reform Act and are therefore *ultra vires* and have no force or effect;

2.  Declare that the Wolf Memorandum and USCIS Directives were issued not in accordance with law, in violation of the Administrative Procedure Act;

3.  In the alternative, declare the Wolf Memorandum and USCIS Directives were issued in violation of the Appointments Clause of the U.S. Constitution;

4.  Vacate the Wolf Memorandum and USCIS Directives;

5. Immediately and permanently enjoin Defendants and all their officers, employees, agents, and successors from implementing, applying, or enforcing the Wolf Memorandum or the USCIS Directives implementing it;

6. Declare Defendant Chad F. Wolf's purported accession as Acting Director of Homeland Security and Defendant Joseph Edlow's purported appointment as Deputy Director for Policy of U.S. Citizenship and Immigration Services invalid under the Homeland Security Act and the Federal Vacancies Reform Act or, alternatively, the Appointments Clause of the United States Constitution;

7. Award Plaintiffs their costs and reasonable attorneys' fees; and

8. Grant such further and other relief as this Court deems just and proper.

Dated: September 3, 2020

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP


By: _____/s/ Adele M. El-Khouri_____
      ADELE M. EL-KHOURI

THOMAS A. SAENZ
tsaenz@MALDEF.org
(*Pro Hac Vice* application filed concurrently)
ERNEST I. HERRERA
eherrera@MALDEF.org
(*Pro Hac Vice* application filed concurrently)
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
634 South Spring Street
Los Angeles, California 90014
Telephone:    (213) 629-2512
Facsimile:     (213) 629-0266

E. MARTIN ESTRADA
(*Pro Hac Vice* application filed concurrently)
BRANDON E. MARTINEZ
(*Pro Hac Vice* application filed concurrently)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90017
Telephone:    (213) 683-9100
Facsimile:     (213) 687-3702

ADELE M. EL-KHOURI
Adele.El-Khouri@mto.com
XIAONAN APRIL HU
(*Pro Hac Vice* application filed concurrently)
April.Hu@mto.com
MUNGER, TOLLES & OLSON LLP
1117 F. Street, N.W., 7th Floor
Washington, D.C. 20004–1357
Telephone:    (202) 220-1100
Facsimile:     (202) 220-2300

*Counsel for Plaintiffs*

42