**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SANTA FE DREAMERS PROJECT; SPANISH COMMUNITY CENTER; and AMERICAN GATEWAYS, | **Case No. 1:20-CV-02465 (RBW)** |
| *Plaintiffs*, | |
| vs. | |
| CHAD F. WOLF, in his purported official capacity as Acting Secretary of Homeland Security; KENNETH T. CUCCINELLI, in his purported official capacities as Senior Official Performing the Duties of Deputy Secretary of Homeland Security and Acting Director of U.S. Citizenship and Immigration Services; TONY H. PHAM, in his purported official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; JOSEPH EDLOW, in his purported official capacity as Deputy Director for Policy of U.S. Citizenship and Immigration Services; MARK A. MORGAN, in his purported official capacity as Senior Official Performing the Duties of Commissioner of U.S. Customs and Border Protection; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES CUSTOMS AND IMMIGRATION ENFORCEMENT; and UNITED STATES CUSTOMS AND BORDER PROTECTION, | |
| *Defendants*. | |

**PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT**

TO DEFENDANTS AND ALL OTHER INTERESTED PARTIES:

Please take notice that pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Santa Fe

Dreamers Project, Spanish Community Center, and American Gateways will and hereby do move

the Court for an order granting summary judgment to Plaintiffs and against Defendants; declaring unlawful, vacating, and setting aside:

1. the July 28, 2020 memorandum entitled "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'" issued by Defendant Chad F. Wolf in his purported capacity as Acting Secretary of Homeland Security (the "Wolf Memorandum"); and

2. the August 21, 2020 policy directives entitled "Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, 'Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"" issued by Defendant Joseph Edlow in his purported capacity as Deputy Director for Policy of Defendant United States Citizenship and Immigration Services (the "USCIS Directives");

and immediately and permanently enjoining Defendants, and anyone in active concert or participation with any of them, from implementing or enforcing any part of the Wolf Memorandum and USCIS Directives, among other, additional forms of relief.

As set forth more fully in Plaintiffs' Memorandum of Points and Authorities in Support of this Motion, there is no genuine dispute as to any material fact, and Plaintiffs are entitled to judgment as a matter of law.  In particular, the Wolf Memorandum and USCIS Directives were issued in violation of the Homeland Security Act, 6 U.S.C. § 113(g); the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*; the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*; and the Appointments Clause of the United States Constitution and are therefore *ultra vires*, without force or effect, and void.

2

Plaintiffs' Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities; the Declarations; Plaintiffs' Statement of Material Facts; all papers, pleadings, records and files in this case; all matters of which judicial notice may be taken; and such other argument or evidence as may be presented to this Court at a hearing on this Motion.

Dated:  September 11, 2020

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By:/s/ Adele M. El-Khouri
ADELE M. EL-KHOURI

THOMAS A. SAENZ
tsaenz@MALDEF.org
*(Pro Hac Vice application pending)*
ERNEST I. HERRERA
eherrera@MALDEF.org
*(Pro Hac Vice application pending)*
MEXICAN AMERICAN LEGAL DEFENSE
   AND EDUCATIONAL FUND
634 South Spring Street
Los Angeles, California 90014
Telephone:     (213) 629-2512
Facsimile:      (213) 629-02666

ADELE M. EL-KHOURI
Adele.El-Khouri@mto.com
XIAONAN APRIL HU
April.Hu@mto.com
*(Pro Hac Vice application pending)*
MUNGER, TOLLES & OLSON LLP
1117 F. Street, N.W., 7th Floor
Washington, D.C. 20004–1357
Telephone:     (202) 220-1100
Facsimile:      (202) 220-2300

E. MARTIN ESTRADA
Martin.Estrada@mto.com
*(Pro Hac Vice application pending)*
BRANDON E. MARTINEZ
Brandon.Martinez@mto.com
*(Pro Hac Vice application pending)*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90017
Telephone:     (213) 683-9100
Facsimile:      (213) 687-3702

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SANTA FE DREAMERS PROJECT; SPANISH
COMMUNITY CENTER; and AMERICAN
GATEWAYS,

        *Plaintiffs*,

    vs.

CHAD F. WOLF, in his purported official capacity
as Acting Secretary of Homeland Security;
KENNETH T. CUCCINELLI, in his purported
official capacities as Senior Official Performing the
Duties of Deputy Secretary of Homeland Security
and Acting Director of U.S. Citizenship and
Immigration Services; TONY H. PHAM,* in his
purported official capacity as Senior Official
Performing the Duties of Director of U.S.
Immigration and Customs Enforcement; JOSEPH
EDLOW, in his purported official capacity as Deputy
Director for Policy of U.S. Citizenship and
Immigration Services; MARK A. MORGAN, in his
purported official capacity as Senior Official
Performing the Duties of Commissioner of U.S.
Customs and Border Protection; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES
CUSTOMS AND IMMIGRATION
ENFORCEMENT; and UNITED STATES
CUSTOMS AND BORDER PROTECTION,

        *Defendants*.

**Case No. 1:20-CV-02465-RBW**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

* Defendant Tony H. Pham purported to succeed Matthew T. Albence as Senior Official
Performing the Duties of Director of U.S. Immigration and Customs Enforcement.  Under Fed.
R. Civ. P. 25(d), he is automatically substituted for Mr. Albence as a defendant.  The parties'
motion for leave to amend the caption to reflect this substitution on this and all subsequent
filings, as well as to set an expedited schedule for briefing cross-motions for summary judgment,
is pending.  *See* Dkt. No. 10.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL AND STATUTORY BACKGROUND ................................................................3

    I.    DEFERRED ACTION FOR CHILDHOOD ARRIVALS ................................................3

    II.   THE FEDERAL VACANCIES REFORM ACT AND THE HOMELAND SECURITY ACT ................5

    II.   DEFENDANT WOLF'S PURPORTED ACCESSION AS ACTING SECRETARY OF HOMELAND SECURITY AND ISSUANCE OF THE JULY 28, 2020 MEMORANDUM ....................7

        A.    The DHS Order of Succession Before April 10, 2019.............................................7

        B.    Secretary Nielsen Amends DHS's Order of Succession.........................................8

        C.    Kevin McAleenan Purports to Assume Office as Acting Secretary.....................10

        D.    Defendant Wolf Purports to Take Control as Acting Secretary ...........................11

        E.    The Wolf Memorandum and USCIS Directives....................................................12

        F.    GAO Concludes Defendant Wolf Assumed Office as Acting Secretary Unlawfully ............................................................................................................14

LEGAL STANDARD............................................................................................................15

ARGUMENT .........................................................................................................................15

    I.    THE WOLF MEMORANDUM WAS ISSUED IN VIOLATION OF THE HSA AND IS *ULTRA VIRES*..............................................................................................................16

    II.   THE WOLF MEMORANDUM WAS ISSUED IN VIOLATION OF THE FVRA AND LACKS FORCE OR EFFECT. ...............................................................................................19

    III.  THE USCIS DIRECTIVES IMPLEMENTING THE WOLF MEMORANDUM ARE ALSO VOID. .......................................................................................................................22

    IV.  THE WOLF MEMORANDUM AND USCIS DIRECTIVES VIOLATE THE APA. .........................23

        A.    The Wolf Memorandum and USCIS Directives Are Final Agency Actions Under the APA......................................................................................................23

        B.    The Wolf Memorandum and USCIS Directives Were Issued in Excess of Statutory Authority and Not in Accordance with Law. ........................................24

    V.    ALTERNATIVELY, THE WOLF MEMORANDUM AND USCIS DIRECTIVES WERE ISSUED IN VIOLATION OF THE APPOINTMENTS CLAUSE. ....................................................25

    VI.  THE COURT SHOULD VACATE THE WOLF MEMORANDUM AND USCIS DIRECTIVES AND ENJOIN THEIR ENFORCEMENT NATIONWIDE. ................................................28

CONCLUSION......................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

F<small>EDERAL</small> C<small>ASES</small>

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
    321 F.3d 1166 (D.C. Cir. 2003) ............................................................................................16

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................................................15

*Am. Clinical Lab. Assoc. v. Azar*,
    931 F.3d 1195 (D.C. Cir. 2019) ............................................................................................16

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................................................24

*Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*,
    830 F.3d 570 (D.C. Cir. 2016) ..............................................................................................28

*Catholic Health Initiatives v. Sebelius*,
    617 F.3d 490 (D.C. Cir. 2010) ..............................................................................................24

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) ..............................................................................................24

*City of Arlington v. F.C.C.*,
    569 U.S. 290 (2013) .............................................................................................................18

*City of Los Angeles v. Barr*,
    941 F.3d 931 (9th Cir. 2019) ................................................................................................18

*City of Philadelphia v. Att'y Gen. of U.S.*,
    916 F.3d 276 (3d Cir. 2019)..................................................................................................18

*Clark v. Martinez*,
    543 U.S. 371 (2005).............................................................................................................21

*Clinton v. City of New York*,
    524 U.S. 417 (1998).............................................................................................................18

*Cuozzo Speed Techs., LLC v. Lee*,
    136 S. Ct. 2131 (2016).........................................................................................................25

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .........................................................................................29

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................... 3, 4, 5

*Doe v. Rumsfeld*,
   341 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................ 29

*Edmond v. United States*,
   520 U.S. 651 (1997) ............................................................................................... 26

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
   140 S. Ct. 1649 (2020) ........................................................................................... 28

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................................................... 20

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ............................................................................... 28

*Itserve All., Inc. v. Cissna*,
   443 F. Supp. 3d 14 (D.D.C. 2020) ......................................................................... 18

*L.M.-M. v. Cuccinelli*,
   442 F. Supp. 3d 1 (D.D.C. 2020) ............................................................... 19, 22, 25

*Lucia v. S.E.C.*,
   138 S. Ct. 2044 (2018) ........................................................................................... 28

*Mittleman v. Postal Regulatory Comm'n*,
   757 F.3d 300 (D.C. Cir. 2014) ............................................................................... 16

*N.L.R.B. v. SW General, Inc.*,
   137 S. Ct. 929 (2017) ..................................................................................... *passim*

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ............................................................................. 28

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ......................................................................... 15

*SW Gen., Inc. v. N.L.R.B.*,
   796 F.3d 67 (D.C. Cir. 2015) ........................................................................... 22, 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ........................................................................................... 24

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988)................................................................................................20

*United States v. Eaton*,
    169 U.S. 331 (1898)................................................................................................27

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................................18

**FEDERAL STATUTES**

5 U.S.C. § 704................................................................................................................23

5 U.S.C. § 706........................................................................................................15, 25

5 U.S.C. § 706(2)......................................................................................................3, 15

5 U.S.C. § 706(2)(A)................................................................................22, 23, 24, 25

5 U.S.C. § 706(2)(B)....................................................................................................25

5 U.S.C. § 706(2)(C)....................................................................................................25

5 U.S.C. § 706(2)(D)....................................................................................................25

5 U.S.C. § 3331............................................................................................................21

5 U.S.C. § 3345.......................................................................................................6, 14

5 U.S.C. § 3345(a)(1)..................................................................................................6, 7

5 U.S.C. § 3345(a)(2)..................................................................................................6, 7

5 U.S.C. § 3345(a)(3)..................................................................................................6, 7

5 U.S.C. § 3346(a)(1)................................................................................3, 6, 19, 21

5 U.S.C. § 3347(a)(1)(A)..............................................................................................7

5 U.S.C. § 3347(a)(1)(B)..............................................................................................7

5 U.S.C. § 3348(b)(1)............................................................................6, 19, 21, 22

5 U.S.C. § 3348(d)................................................................................................22, 25

5 U.S.C. § 3348(d)(1)............................................................................3, 6, 19, 22

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

5 U.S.C. § 3348(d)(2) ..................................................................................21

6 U.S.C. § 112(a)(2)..........................................................................22, 23, 27

6 U.S.C. § 113 ............................................................................................19

6 U.S.C. § 113(a)(1)(A) ..............................................................................7, 20

6 U.S.C. § 113(a)(1)(F)..........................................................................7, 10, 20

6 U.S.C. § 113(g) ........................................................................................14

6 U.S.C. § 113(g)(1) ..........................................................................7, 19, 20, 21

6 U.S.C. § 113(g)(2) ........................................................................... *passim*

6 U.S.C. § 202(5).........................................................................................23

6 U.S.C. § 271(a) .......................................................................................22

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §
    1902, 130 Stat. 2000 (2016).................................................................17

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) ...................................................................................15

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article II, § 2, cl. 2 ..............................................................3, 5, 26, 27

**OTHER AUTHORITIES**

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1525
    (1833).............................................................................................26

Jie Zong et al., A Profile of Current DACA Recipients by Education, Industry,
    and Occupation 2, 4-8 (Nov. 2017), https://www.migrationpolicy.org/
    research/profile-current-daca-recipients-education-industry-and-occupation .........................4

Miriam Jordan, *Immigrant 'Dreamers' in Search of a Job Are Being Turned
    Away*, N.Y. Times (Aug. 20, 2020),
    https://www.nytimes.com/2020/08/20/us/immigration-daca-dreamers-
    employers.html...................................................................................4

## INTRODUCTION

Since 2012, the Deferred Action for Childhood Arrivals initiative ("DACA") has provided renewable periods of forbearance from removal and work authorization to nearly a million young people who came to the United States as children, grew up and were educated here, and call this country home. The young people who earned these protections are widely accepted as integral members of our communities: they serve in our military, work in all our professions, pose no threat to our security or stability, and have made a lasting and invaluable contribution to our country's character and economy.

Nonetheless, the Trump Administration has made every effort to undermine DACA and destabilize the lives of the young people the program protects. In June of this year, the United States Supreme Court invalidated the Trump Administration's 2017 attempt to rescind DACA entirely. Undeterred, however, the Administration moved promptly to substantially limit DACA once again. On July 28, 2020, Defendant Chad F. Wolf, the Department of Homeland Security's Under Secretary for Strategy, Policy, and Plans and the federal official purporting to serve as Acting Secretary of Homeland Security, issued a memorandum (the "Wolf Memorandum" or "Memorandum") that, among other draconian directives, (1) prohibits immigration officials from accepting first-time DACA applications; (2) caps renewed periods of deferred action and work authorization for current beneficiaries at one year rather than two; (3) denies advance parole to DACA beneficiaries who wish to travel outside of the United States absent "exceptional circumstances"; and (4) permits officials to "terminate or deny" DACA "at any time when immigration officials determine termination or denial of deferred action is appropriate." Through a set of policy directives issued on August 21, 2020 (the "USCIS Directives"), Defendant Joseph Edlow, the purported Deputy Director for Policy of Defendant U.S. Immigration and Citizenship Services ("USCIS"), has begun to implement the Wolf Memorandum's new restrictions on DACA.

1

When he issued the Memorandum, however, Defendant Wolf acted without any lawful authority to sit atop DHS as Acting Secretary, let alone to exercise that office's powers to establish this country's immigration policies.  Because an order issued without authority is no order at all, Plaintiffs—three nonprofit organizations that provide vital legal services to immigrants in New Mexico, Illinois, and Texas—respectfully ask this Court to declare the Wolf Memorandum and USCIS Directives invalid and permanently enjoin Defendants or their agents from enforcing the Memorandum or Directives' terms against any person.

Plaintiffs are entitled to judgment as a matter of law.  Under the Homeland Security Act and the Federal Vacancies Reform Act, Congress has provided for the lawful succession of officials to serve as Acting Secretary of Homeland Security in the event the permanent Secretary dies, resigns, or becomes unavailable to serve.  Pursuant to these provisions, past Secretaries of Homeland Security have explicitly established the order of succession to that office in the event rampant vacancies in the Department—of the sort the Trump Administration has long maintained—render Congress's succession statutes inadequate.  None of these governing authorities—or for that matter the Constitution—allowed Defendant Wolf to assume office as Acting Secretary of Homeland Security.

*First*, Defendant Wolf purportedly assumed office as Acting Secretary contrary to 6 U.S.C. § 113(g)(2), the Homeland Security Act provision that permits permanent and acting Secretaries of Homeland Security to designate their own successors from within the Department's ranks.  This alone rendered his issuance of the Memorandum *ultra vires* and void.  *Second*, by the time Defendant Wolf took *de facto* control of DHS, the office of Secretary of Homeland Security had been vacant for more than 210 days, meaning that any action Defendant Wolf purportedly took as Acting Secretary—including issuing the Memorandum and appointing Defendant Edlow to the post from which he issued the USCIS Directives—lacked "force or effect" under the Federal

Vacancies Reform Act, 5 U.S.C. §§ 3346(a)(1), 3348(d)(1).  *Third*, because Defendant Wolf issued his Memorandum without authority to do so, the Memorandum and USCIS Directives also violate the APA and must be vacated.  *See* 5 U.S.C. § 706(2).  *Fourth*, to the extent the Homeland Security Act and Federal Vacancies Reform Act somehow permitted Defendant Wolf to assume office as the acting head of the Department of Homeland Security, his service violates the Appointments Clause, which requires the President to nominate, and the Senate to confirm, officers who serve as the heads of executive departments indefinitely.  *See* U.S. Const. art. II, § 2, cl. 2.  The Wolf Memorandum was therefore issued without authority and is void.

Riddled as they are with these legal infirmities, the Wolf Memorandum and USCIS Directives are dead letters.  The Court should grant Plaintiffs' motion for summary judgment and vacate the Wolf Memorandum and USCIS Directives.

## FACTUAL AND STATUTORY BACKGROUND

### I.    DEFERRED ACTION FOR CHILDHOOD ARRIVALS

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing DACA.  *See* Martinez Decl. ex. 4.  In its most recent iteration before July 28, 2020, DACA provided renewable, two-year periods of forbearance from removal proceedings, temporary work authorization, and eligibility for other benefits to young, undocumented people who entered the United States before the age of sixteen; have lived continuously in the United States since June 2007; are in school, have attained certain educational milestones, or served honorably in the United States armed services; have no significant criminal history; and pose no threat to national security, among other criteria.  *Id.* at 1-2.[1]  By March 31,

---

[1] The U.S. Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), describes the initial DACA framework and the Obama Administration's ultimately unsuccessful effort in November 2014 to expand the program to provide for three-year forbearance periods and extend similar benefits to undocumented parents of U.S. citizens and permanent residents, among other changes.  *Id.* at 1902.  Because all subsequent efforts to expand or eliminate DACA have been vacated, the

2020, over 825,000 young people had benefitted from DACA's protections. *See* Martinez Decl. ex. 6 at 1. The importance of DACA to those young people, and their contributions to the economic and social fabric of their communities and their adopted country, are well documented.[2]

In September 2017, acting on advice from then-Attorney General Jefferson B. Sessions III, then-Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke Memorandum") purporting to rescind the Napolitano Memorandum and terminate DACA. *See Regents*, 140 S. Ct. at 1903; Martinez Decl. ex. 7 (Duke Memorandum); *id.* ex. 8 (Sessions letter). Within days, "multiple groups of plaintiffs ranging from individual DACA recipients and States to the Regents of the University of California and the National Association for the Advancement of Colored People" sued to block the Duke Memorandum. *Regents*, 140 S. Ct. at 1903. Several courts around the country subsequently enjoined the Memorandum's enforcement on the ground that it inadequately explained the Department of Homeland Security's ("DHS") reasons for rescinding DACA, in violation of the Administrative Procedure Act ("APA"). *Id.* at 1903-04. In response, the new Secretary of Homeland Security, Kirstjen M. Nielsen, issued a second memorandum (the "Nielsen Memorandum") on June 22, 2018, purporting to clarify and elaborate on the Duke Memorandum's reasoning and recommitting DHS to rescinding DACA. *Id.* at 1904; Martinez Decl. ex. 9 (Nielsen Memorandum).

The battle over DACA's future eventually landed in the Supreme Court. The Court held, among other things, that it had jurisdiction to review DACA's rescission under the APA, *see Regents*, 140 S. Ct. at 1905-07, and that the Nielsen Memorandum's purported clarifications of the

---

Napolitano Memorandum and the eligibility criteria it imposed governed DACA from June 2012 until Defendant Wolf purported to again restrict the initiative on July 28, 2020.

[2] *See, e.g.*, *Regents*, 140 S. Ct. at 1914; Jie Zong et al., A Profile of Current DACA Recipients by Education, Industry, and Occupation 2, 4-8 (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation; Miriam Jordan, *Immigrant 'Dreamers' in Search of a Job Are Being Turned Away*, N.Y. Times (Aug. 20, 2020), https://www.nytimes.com/2020/08/20/us/immigration-daca-dreamers-employers.html.

Duke Memorandum were "impermissible *post hoc* rationalizations" that the Court could not properly consider, *see id.* at 1908-10 (internal quotation marks omitted).  On the merits of the APA claims, the Court further held that the Duke Memorandum was arbitrary and capricious and violated the APA because it (1) failed to adequately consider or explain why the Memorandum's assertion that DACA's extension of work authorization and other benefits was illegal required the rescission of both eligibility for those benefits *and* the initiative's forbearance-from-removal component; and (2) altogether "failed to address whether there was legitimate reliance" on DACA. *Id.* at 1910-15 (internal quotation marks omitted).  Having concluded that these "dual failure[s]" raised "doubts about whether [DHS] appreciated the scope of its discretion or exercised that discretion in a reasonable manner," the Court affirmed the vacatur of the rescission of DACA and remanded the matter "to DHS so that it may consider the problem anew."  *Id.* at 1916 & n.7.

On remand, DHS again attempted in effect to rescind DACA by issuing the Wolf Memorandum.  This time, however, DHS's action suffers from a different fatal flaw: Defendant Wolf had no authority to issue the Memorandum because he was purporting to serve as Acting Secretary of Homeland Security in violation of two federal statutes, the Federal Vacancies Reform Act ("FVRA") and the Homeland Security Act ("HSA"), and, alternatively, the Appointments Clause of the United States Constitution.

## II.    THE FEDERAL VACANCIES REFORM ACT AND THE HOMELAND SECURITY ACT

The FVRA and HSA govern the appointment of Acting Secretaries of Homeland Security.

"Article II of the Constitution requires that the President obtain 'the Advice and Consent of the Senate' before appointing 'Officers of the United States.'"  *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 934 (2017) (quoting U.S. Const. art. II, § 2, cl. 2).  When an office requiring Senate confirmation becomes vacant, its responsibilities "may go unperformed if . . . the President and Senate cannot promptly agree on a replacement."  *Id.*  Recognizing this gap, Congress has

authorized the President to direct certain officials in certain circumstances to carry out the responsibilities of a vacant office temporarily, without Senate confirmation.  "The Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 *et seq.*, is the latest version of that authorization."  *Id.*

The FVRA provides three methods by which a person may take office as an acting official of an executive department without having been nominated and confirmed to that position.  *First,* under 5 U.S.C. § 3345(a)(1), when a permanent official dies, resigns, or is otherwise unable to discharge his or her office, the official's "first assistant" automatically assumes "the functions and duties of the office temporarily in an acting capacity."  *Second*, under 5 U.S.C. § 3345(a)(2), notwithstanding Subsection (a)(1), the President may designate as an acting official a person who has been nominated and confirmed to another federal office.  *Third*, under 5 U.S.C. § 3345(a)(3), again notwithstanding Subsection (a)(1), the President may designate as an acting official a person who has not been nominated and confirmed to any federal office but who has held a position and minimum salary at the same department for at least ninety days over the previous year.

No matter the method by which an acting official assumes office, he or she may serve as such "for no longer than 210 days beginning on the date the vacancy occurs," subject to certain exceptions not relevant here, 5 U.S.C. § 3346(a)(1), at which point the office "shall remain vacant," *id.* § 3348(b)(1).  Any "action taken" in "the performance of any function or duty of [the] vacant office" by "any person who is not acting" consistent with these designation provisions and temporal limitations "ha[s] no force or effect" and "may not be ratified."  *Id.* § 3348(d)(1)-(2).

The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency" for which "appointment is required to be made by the President, by and with the advice and consent of the Senate"—unless, as relevant here, another statute either itself "authorizes . . . the head of an Executive department[] to

designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity" or "designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1)(A)-(B).

The Homeland Security Act does both, thereby offering additional means for the designation of Acting Homeland Security Secretaries.  One of the HSA's provisions, 6 U.S.C. § 113(a)(1)(A), provides that the Deputy Secretary of Homeland Security is the Secretary's first assistant for purposes of 5 U.S.C. § 3345(a)(1), which satisfies the first of the FVRA's three appointment methods described above.  Similarly, 6 U.S.C. § 113(a)(1)(F) provides that the Under Secretary for Management is the Deputy Secretary's first assistant for FVRA purposes.  A later subsection of the statute, 6 U.S.C. § 113(g)(1), eliminates the President's authority under the FVRA, 5 U.S.C. § 3345(a)(2) and (3), to designate someone other than the Under Secretary for Management as Acting Secretary if that office is occupied while the Deputy Secretary position is vacant: "Notwithstanding chapter 33 of Title 5, the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary." Finally, the next subsection of the HSA authorizes the Secretary of Homeland Security to establish a "further order of succession to serve as Acting Secretary" in the event the Secretary, the Deputy Secretary, and the Under Secretary for Management are unable to serve as such.  6 U.S.C. § 113(g)(2).

## II.    DEFENDANT WOLF'S PURPORTED ACCESSION AS ACTING SECRETARY OF HOMELAND SECURITY AND ISSUANCE OF THE JULY 28, 2020 MEMORANDUM

### A.    The DHS Order of Succession Before April 10, 2019

Before Secretary Nielsen departed office in April 2019, the order of succession at DHS beyond the Deputy Secretary and Under Secretary of Management was governed by two documents: an executive order signed by President Obama on December 9, 2016 ("Executive

Order 13753"), and a directive—DHS Delegation Number 00106—signed by then-Secretary of Homeland Security Jeh Johnson on December 15, 2016 ("Directive 00106") pursuant to his authority under 6 U.S.C. § 113(g)(2).  *See* Martinez Decl. exs. 10, 11.  Consistent with the Homeland Security Act, Executive Order 13753 designated the order of DHS officials who, provided they could assume office consistent with the FVRA and were not already holding office in an acting capacity, would become Acting Secretary "during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary."  *Id.* ex. 10 § 1.  Section II.A of Directive 00106 adopted the order of succession laid out in Executive Order 13753 "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office."  *Id.* ex. 11 § II.A.  But Section II.B of the Directive imposed a separate and different order of succession for Acting Secretary, to "the extent not otherwise prohibited by law," in the event the Secretary becomes "unavailable to act during a disaster or catastrophic emergency."  *Id.* § II.B.  This second order of succession for disasters and emergencies was laid out in an appendix to the Directive called "Annex A."  *Id.* at A-1.  Directive 00106 and Annex A would remain as Secretary Johnson left them until April 10, 2019.

## B.    Secretary Nielsen Amends DHS's Order of Succession

On April 7, 2019, after serving as President Trump's Homeland Security Secretary for less than two years, Secretary Nielsen announced via Twitter that she had resigned her office effective that day.  Martinez Decl. ex. 12.  A little over three hours later, however, she tweeted that she had "agreed to stay on as Secretary through Wednesday, April 10th to assist with an orderly transition and ensure that key DHS missions are not impacted."  *Id.* ex. 13.

Before leaving office, Secretary Nielsen signed a memorandum that amended Directive 00106 by striking the text of Annex A and replacing it with a new order of succession for Secretary. Martinez Decl. ex. 14 at 2.  Although it amended Annex A to the Directive, Secretary Nielsen's

order did not amend the text of the Directive itself, *see id.*—including the language in Sections II.A and B of the Directive providing, respectively, that Executive Order 13753 would govern the order of succession for Secretary "[i]n case of the Secretary's death, *resignation*, or inability to perform the functions of the Office" and that Annex A would govern the order only in the event the Secretary is "unavailable to act *during a disaster or catastrophic emergency*." *Id.* ex. 11 §§ II.A, II.B (emphases added).

Under Secretary Nielsen's new Annex A—issued pursuant to "the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2)"—the Commissioner of U.S. Customs and Border Protection ("CBP"), a position then held by Kevin McAleenan, became third in line to serve as Acting Secretary in the event of the Secretary's unavailability due to a disaster or catastrophic emergency, after the Deputy Secretary and Under Secretary for Management.  Martinez Decl. ex. 14 at 2 (April 2019 Nielsen order replacing Annex A); *see also id.* ex. 11 § II.B, A-1 (Directive 00106 as updated on April 10, 2019).  But under the unamended Section II.A, which retained the order of succession laid out in Executive Order 13753, Commissioner McAleenan was *seventh* in line to become Acting Secretary in the event of the Secretary's *resignation*—after the Deputy Secretary of Homeland Security; the Under Secretary for Management; the Administrator of the Federal Emergency Management Agency; the Under Secretary for National Protection and Programs; the Under Secretary for Science and Technology; and the Under Secretary for Intelligence and Analysis, to the extent those positions were filled by presidentially nominated and Senate-confirmed appointees.  *See id.* ex. 11 § II.A (Directive 00106 as updated on April 10, 2019); *see also id.* ex. 10 § 1 (Executive Order 13753 as issued on December 9, 2016).

### C.      Kevin McAleenan Purports to Assume Office as Acting Secretary

When Secretary Nielsen departed the office of Secretary on April 10, 2019, the offices of Deputy Secretary of Homeland Security,[3] Under Secretary for Management,[4] FEMA Administrator,[5] and Under Secretary for Science and Technology[6] were vacant, but two nominated-and-confirmed appointees, Christopher Krebs and David J. Glawe, were serving as Under Secretary for National Protection and Programs and Under Secretary for Intelligence and Analysis, respectively.[7]   Under Section II.A of Directive 00106 and Executive Order 13753— neither of which Secretary Nielsen's order had affected—Krebs and then Glawe were next in line to take over for Nielsen as Acting Secretary.   *See* Martinez Decl. exs. 11 § II.A (Directive 00106 as updated on April 10, 2019), 10 § 1 (Executive Order 13753 as issued on December 9, 2016). Notwithstanding the proper order of succession, CBP Commissioner McAleenan leapfrogged over Krebs and Glawe and claimed to assume office as Acting Secretary on April 10, 2019, in total disregard of the Directive.   *See id.* ex. 21.

McAleenan would purport to serve as Acting Secretary until November 2019.   On October 11, 2019, President Trump tweeted that McAleenan would be departing DHS.   *See* Martinez Decl. ex. 22.   On November 8, 2019—212 days after Nielsen departed and the office of Secretary had

---

[3] The office of Deputy Secretary had been vacant since Elaine Duke resigned the role in April 2018.   *See* Martinez Decl. ex. 15.

[4] Secretary Nielsen's Under Secretary for Management, Claire Grady, resigned and departed office the same day as Nielsen; she had been serving as Acting Deputy Secretary under 6 U.S.C. § 113(a)(1)(F).   *See* Martinez Decl. exs. 16, 20.

[5] The office of FEMA Administrator had been vacant since Brock Long resigned the role in February 2019.   *See* Martinez Decl. ex. 17.

[6] It appears that the office of Under Secretary for Science and Technology has been vacant since at least May 30, 2017, when, according to Defendant DHS's website, the current "Senior Official Performing the Duties of the Under Secretary for Science and Technology (DHS)," William N. Bryan, assumed office.   *See* Martinez Decl. ex. 18.

[7] *See* Martinez Decl. ex. 19, 20.

become vacant—McAleenan issued an order that struck the text of Section II.A of Directive 00106 and replaced it with language providing that Annex A would govern the order of succession for Secretary "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," rather than—as the Directive had provided since December 2016—only in the event of the Secretary's unavailability due to a disaster or catastrophic emergency. *See id.* ex. 23 at 1. Exercising his purported authority as Acting Secretary under 6 U.S.C. § 113(g)(2), McAleenan's order also struck the text of Annex A and replaced it with a new order of succession in which the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans would become third and fourth in line to serve as Acting Secretary, respectively, after the Deputy Secretary and Under Secretary for Management. *Id.* When McAleenan issued this purported order, the offices of Deputy Secretary, Under Secretary for Management, and Under Secretary for Strategy, Policy, and Plans were vacant.[8] But President Trump's nomination of Defendant Chad T. Wolf as Under Secretary for Strategy, Policy, and Plans was pending in the Senate. *See id.* ex. 24 at S1443 (reflecting Defendant Wolf's nomination on February 25, 2019).

    **D.**    **Defendant Wolf Purports to Take Control as Acting Secretary**

On November 13, 2019—less than a week after McAleenan purportedly amended Directive 00106 and 217 days after Nielsen vacated the office of Secretary[9]—the Senate confirmed Defendant Wolf as Under Secretary for Strategy, Policy, and Plans. *See* Martinez Decl. ex. 25 at S6519-20. Within hours, McAleenan departed as Acting Secretary, and Wolf was promptly sworn

---

[8] *See supra* nn. 3-4.

[9] The Complaint alleges that the office of Secretary had been vacant for at least 216 days by the time Defendant Wolf purported to assume office as Acting Secretary. *See* Dkt. No. 1 ¶ 88. While true, 217 days passed between April 10, 2019, when Secretary Nielsen left office, and November 13, 2019, when Defendant Wolf purportedly assumed his position as Acting Secretary.

in as Under Secretary for Strategy, Policy, and Plans and claimed to take office as Acting Secretary of Homeland Security.  *See id.* exs. 26, 27.

Defendant Wolf continues to serve as Under Secretary for Strategy, Policy, and Plans and purportedly as Acting Secretary of Homeland Security to this day.  On February 19, 2020, in his purported capacity as Acting Secretary, he appointed Defendant Edlow as USCIS's Deputy Director for Policy.  *See* Martinez Decl. exs. 28, 34.

### E.    The Wolf Memorandum and USCIS Directives

Just weeks after the Supreme Court rejected the Trump Administration's effort to rescind DACA, Defendant Wolf, on July 28, 2020, issued a memorandum entitled "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."  *See* Martinez Decl. ex. 1.

The Wolf Memorandum purports to rescind the Duke and Nielsen Memoranda invalidated by the Supreme Court and announces that Defendant Wolf has "concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission"; that Wolf is therefore "considering" the policy "anew"; and that he is "making certain immediate changes to the DACA policy to mitigate" his purported "enforcement policy concerns while [he] conduct[s] a full and careful consideration of a full rescission."  Martinez Decl. ex. 1 at 1, 4.  Specifically, the Wolf Memorandum purports to order DHS officials[10] to take the following steps, among others, "effective immediately":

- Reject all initial applications for DACA participation, reject associated applications for work authorization, and refund all associated fees, purportedly "without prejudice to re-

---

[10] The Wolf Memorandum was addressed to Defendant Mark A. Morgan, purportedly the "Senior Official Performing the Duties of Commissioner of [Defendant] U.S. Customs and Border Protection"; Matthew T. Albence, then the Deputy Director and purportedly the "Senior Official Performing the Duties of Director" of Defendant U.S. Immigration and Customs Enforcement; and Defendant Joseph Edlow, purportedly the Deputy Director for Policy of Defendant USCIS.  *See* Martinez Decl. ex. 1, at 1.  Since the Wolf Memorandum was issued, Defendant Tony H. Pham purported to succeed Mr. Albence as "Senior Official Performing the

filing such requests should DHS determine to begin accepting initial requests again in the future";

• Process all pending and future properly submitted DACA- and work-authorization-renewal applications submitted by current DACA recipients;

• Limit any DACA or related work-authorization renewals to one year rather than two;

• Reject all pending and future applications for advance parole from DACA beneficiaries "absent" unexplained "exceptional circumstances";

• Refrain from terminating previously approved grants of deferred action, work authorization, or advance parole "for the remaining duration of their validity periods" solely on the basis of the Memorandum's purported directives; and

• Exercise "discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

*Id.* at 7-8.

On August 21, 2020, Defendant Edlow, in his capacity as Deputy Director for Policy of USCIS, the DHS unit that primarily administers DACA, released the USCIS Directives implementing the Wolf Memorandum. *See* Martinez Decl. ex. 2. Shortly thereafter, USCIS publicly announced that it had begun implementing the Memorandum by, among other things, "reject[ing] all initial DACA requests from aliens who have never previously received DACA and return[ing] all fees" and limiting "grants of deferred action and employment authorization under DACA to no more than one year." *See id.* ex. 3 at 1. Pursuant to the USCIS Directives, USCIS has already capped at one year DACA forbearance renewals for some of Plaintiffs' clients and rejected first-time DACA applications submitted by others. Madrigal ¶ 16; Yang Decl. ¶ 21. Together, the Wolf Memorandum and USCIS Directives rescinded DACA for new applicants in all but name and severely restricted its protections for current recipients.

---

Duties of the Director" of Defendant U.S. Immigration and Customs Enforcement. *See id.* ex. 32.

### F.       GAO Concludes Defendant Wolf Assumed Office as Acting Secretary Unlawfully

On November 15, 2019, Bennie G. Thompson, Chairman of the House Committee on Homeland Security, and Carolyn B. Maloney, Acting Chairwoman of the House Committee on Oversight and Reform, wrote the United States Comptroller General—head of the United States Government Accountability Office ("GAO")—expressing skepticism that Commissioner McAleenan lawfully assumed office as Acting Secretary of Homeland Security consistent with 6 U.S.C. § 113(g), that he lawfully amended Directive 00106 on November 8, 2019 consistent with the Federal Vacancies Reform Act, 6 U.S.C. § 3345 *et seq.*, and that Defendant Wolf lawfully purported to succeed McAleenan as Acting Secretary.  *See* Martinez Decl. ex. 29.  The letter requested that the GAO "conduct an expedited review to resolve whether Mr. Wolf," who is "now engaged in decision-making that impact[s] the security of every American," is "legally serving in the position" of Acting Secretary of Homeland Security.  *Id.* at 2.

On August 14, 2020, the GAO's General Counsel issued a report in response to these concerns.  *See* Martinez Decl. ex. 30.  Observing that Commissioner "McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen" contrary to "the express terms of the existing designation" that governed the order of succession to that office, the GAO report concluded that "McAleenan did not have the authority to amend the Secretary's existing designation" to permit Defendant Wolf to succeed him as Acting Secretary and that, "[a]ccordingly," Defendant Wolf assumed the title of Acting Secretary "by reference to an invalid order of succession."  *Id.* at 11.  The report announced that GAO would refer the questions of "who should be serving as the Acting Secretary and the Senior Official Performing the Duties of Deputy Secretary" and the "consequences of actions taken by these officials" to the "DHS Office of Inspector General for its review."  *Id.*

14

On August 25, 2020, President Trump announced via Twitter that he intends to nominate Defendant Wolf as the permanent Secretary of Homeland Security.  *See* Martinez Decl. ex. 31.  As of September 11, 2020, he has not done so.  Nor has he ever designated Wolf as Acting Secretary of Homeland Security.  In the meantime, the Administration continues to implement the Wolf Memorandum and the USCIS Directives.

## LEGAL STANDARD

This Court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), viewing the evidence in the light most favorable to the non-moving party, *Stand Up for California! v. U.S. Dep't of Interior*, 298 F.Supp.3d 136, 139 (D.D.C. 2018).  In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  Thus "[t]he entire case . . . is a question of law," and the district court "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted).  Under the APA, the Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The Court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory . . . authority."  *Id.* § 706(2).

## ARGUMENT

The Wolf Memorandum and USCIS Directives are *ultra vires*, without force or effect, and void because, for four principal reasons, Defendants Wolf and Edlow lacked authority to issue them.  *First*, because McAleenan never lawfully assumed office as Acting Secretary, he never lawfully revised the order of succession for that office, meaning that Defendant Wolf

assumed the title of Acting Secretary in violation of the HSA, that he lacked authority to issue the Wolf Memorandum or appoint Defendant Edlow to office, and that Defendant Edlow in turn lacked authority to issue the USCIS Directives.  *Second*, Defendant Wolf assumed office in violation of the FVRA because, by the time his predecessor issued the revised order of succession and Wolf purportedly took office as Acting Secretary, the office of Secretary had been vacant for longer than the 210 days that the FVRA permits.  This, too, means that Defendant Wolf's issuance of the Wolf Memorandum and appointment of Defendant Edlow, and thus Edlow's issuance of the USCIS Directives, were *ultra vires* with no force or effect.  *Third*, because Defendants Wolf and Edlow issued the Wolf Memorandum and USCIS Directives without lawful authority to do so, the Memorandum and Directives violate the APA and must be set aside.  And *fourth*, if the HSA and FVRA did authorize Defendant Wolf to take office as Acting Secretary indefinitely without Presidential nomination and Senate consent, he nevertheless issued the Wolf Memorandum and appointed Defendant Edlow in violation of the Appointments Clause.

## I.   THE WOLF MEMORANDUM WAS ISSUED IN VIOLATION OF THE HSA AND IS *ULTRA VIRES*.

Defendant Wolf never lawfully occupied the office of Acting Secretary of Homeland Security because he assumed office in contravention of the Directive governing the DHS line of succession, in violation of the HSA.  He therefore lacked authority to promulgate the Wolf Memorandum, rendering the Memorandum *ultra vires*.

Executive action is *ultra vires* if it is made in excess of statutory authority.  *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (citation omitted).  An executive official acts *ultra vires* when, among other circumstances, he issues rules without statutory authority to do so.  *See, e.g.*, *Am. Clinical Lab. Assoc. v. Azar*, 931 F.3d 1195, 1208 (D.C. Cir. 2019); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003).

The HSA did not authorize Defendant Wolf to take office as Acting Secretary because the amended DHS order of succession that purportedly allowed him to do so was itself *ultra vires* and void.  Under Directive 00106 and Executive Order 13753, which governed the DHS order of succession pursuant to the HSA when Secretary Nielsen resigned, *see supra* 8-10, Commissioner McAleenan was not next in line to succeed her as Acting Secretary.  *See* Martinez Decl. exs. 11 § II.A (Directive 00106 as updated on April 10, 2019), 10 § 1 (Executive Order 13753 as issued on December 9, 2016).  When McAleenan jumped the line in contravention of that order of succession, he violated Section 113(g)(2) and therefore never lawfully assumed the powers and duties of Acting Secretary.

Defendant Wolf's purported accession as Acting Secretary is in turn the fruit of McAleenan's unlawful succession, for Wolf's claim to that position rests solely on McAleenan's unlawful amendment of the DHS line of succession.  Section 113(g)(2) empowers only the Secretary of Homeland Security or a lawfully designated Acting Secretary to assign "other officers of the Department in further order of succession to serve as Acting Secretary."  Commissioner McAleenan thus did not have authority to amend the order of succession, and his November 8, 2019 order purporting to do so was *ultra vires* and void.[11]

From this, it follows that Defendant Wolf's purported accession as Acting Secretary was likewise unlawful.  Defendant Wolf's sole basis for claiming the office of Acting Secretary was McAleenan's November 8, 2019 order, which in itself was null and void because McAleenan never

---

[11] If anything, McAleenan's defective November 8, 2019 order purporting to amend the DHS order of succession for all purposes, not just in the event the Secretary is unavailable due to a disaster or catastrophic emergency, *see* Martinez Decl. ex. 23, was an implicit acknowledgment that Secretary Nielsen's April 2019 order amending the DHS order of succession had failed to amend the order of succession in the event of the Secretary's *resignation*, *see id.* exs. 14 at 2 (Nielsen's April 2019 order), 11 § II.A (section of Directive 00106, as updated on April 10, 2019, providing that Executive Order 13753 would govern the DHS order of succession "[i]n case of the Secretary's death, *resignation*, or inability to perform the functions of the Office" (emphasis added)).

lawfully assumed office.  The *valid*, governing order of succession did not include Defendant

Wolf's position of Under Secretary for Strategy, Policy, and Plans at all.[12]  *See* Martinez Decl.

exs. 11 § II.A (Directive 00106 as updated on April 10, 2019), 10 § 1 (Executive Order 13753 as

issued on December 9, 2016).  Accordingly, Defendant Wolf never assumed the functions and

duties of Acting Secretary in conformity with Section 113(g)(2).

Because he never lawfully assumed the office of Acting Secretary, Defendant Wolf lacked

any authority to issue the Memorandum purportedly restricting DACA.  This is the very definition

of *ultra vires* agency action.  The authority of the executive branch, including the heads of

executive agencies, to act "must stem either from an act of Congress or from the Constitution

itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also, e.g.*, *City of

Arlington v. F.C.C.*, 569 U.S. 290, 297-98 (2013) (observing that administrative agencies' "power

to act and how they are to act is authoritatively prescribed by Congress, so that when they act

improperly, *no less than when they act beyond their jurisdiction*, what they do is ultra vires"

(emphasis added)); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the

Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").  Executive

actions issued without such authority are void.  *See, e.g.*, *Itserve All., Inc. v. Cissna*, 443 F. Supp.

3d 14, 30 (D.D.C. 2020) ("[A]gency actions beyond delegated authority are *ultra vires* and should

be invalidated."); *see also, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 942 (9th Cir. 2019)

("Because none of DOJ's proffered bases for statutory authority gives the Attorney General or the

Assistant AG the power to impose the notice and access conditions, the conditions are ultra

vires."); *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 284-92 (3d Cir. 2019) (holding

---

[12] Indeed, when President Obama signed Executive Order 13753 on December 9, 2016, the position of Under Secretary for Strategy, Policy, and Plans did not even exist.  *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1902, 130 Stat. 2000, 2670-72 (2016) (December 23, 2016 law creating Office of Strategy, Policy, and Plans and position of Under Secretary for the same).

the same).   Defendant Wolf had no lawful authority to issue the Memorandum.   The Wolf

Memorandum is therefore *ultra vires* as a matter of law.

## II.   THE WOLF MEMORANDUM WAS ISSUED IN VIOLATION OF THE FVRA AND LACKS FORCE OR EFFECT.

Even if Defendant Wolf's purported accession to the office of Acting Secretary did not

violate the HSA, it was unlawful under the FVRA.   One court in this Circuit recently vacated as

void a USCIS policy issued by Defendant Cuccinelli on the ground that he took office as acting

director of Defendant USCIS in violation of the FVRA.   *See L.M.-M. v. Cuccinelli*, 442 F. Supp.

3d 1, 23-36 (D.D.C. 2020).   This Court should do the same with respect to the Wolf Memorandum

and USCIS Directives.   Both Commissioner McAleenan's order amending the order of succession

and Defendant Wolf's issuance of the Memorandum are void because they violated the FVRA's

time limitations on the service of acting federal officials.   The Wolf Memorandum and any actions

purporting to implement it are *ultra vires* and void on this ground as well.

As explained above, *supra* 5-6, the FVRA caps an officer's ability to serve as an acting

agency head at 210 days beginning "on the date the vacancy" in the office he is filling "occurs," 5

U.S.C. § 3346(a)(1), at which point the office is deemed "vacant," and any action "in the

performance of any function or duty" of that office by any acting official purporting to continue

in the office has "no force or effect" and "may not be ratified," *id.* § 3348(b)(1)-(2), (d)(1)-(2).

The FVRA's 210-day cap on the service of acting officials applies to those who assume

office as Acting Secretary of Homeland Security under Section 113 of the HSA.   Sections

113(g)(1) and (g)(2) authorize the DHS Under Secretary for Management and "such other officers

of the Department" as "the Secretary may designate" to become Acting Secretary

"[n]otwithstanding chapter 33 of Title 5," respectively.   *See supra* 7.   But that phrase does not

exempt Acting Secretaries who take office under those provisions from the FVRA's 210-day

limitation.   "In statutes, the word [notwithstanding] 'shows which provision prevails *in the event*

19

*of a clash*.'" *SW Gen.*, 137 S. Ct. at 939 (emphasis added) (quoting Antonin Scalia & Brian Garner,

Reading Law: The Interpretation of Legal Texts 126-27 (2012)).  There is no such clash between

Sections 113(g)(1) and (g)(2) with respect to the FVRA's 210-day cap.  The HSA simply provides

one method by which DHS officials down the chain can assume the office of Acting Secretary

lawfully under the FVRA.  It says nothing about the FVRA's time limits, let alone supplants them.

What is more, reading Sections 113(g)(1) and (g)(2) of the HSA wholly to supplant the

FVRA would also put those sections in irreconcilable tension with other provisions of the HSA

that plainly subject Deputy Secretaries and Under Secretaries for Management who become Acting

Secretaries and Acting Deputy Secretaries, respectively, to the FVRA's 210-day cap.  *See* 6 U.S.C.

§ 113(a)(1)(A), (F) (providing that the Deputy Secretary of Homeland Security is "the Secretary's

first assistant" and that the Under Secretary for Management is the "first assistant to the Deputy

Secretary" for FVRA purposes, including its 210-day cap).  Such a reading would violate basic

rules of statutory interpretation.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,

529 U.S. 120, 133 (2000) (explaining the "fundamental canon of statutory construction that the

words of a statute must be read in their context," "with a view to their place in the overall statutory

scheme," and to "fit, if possible, all parts into an harmonious whole." (internal quotation marks

omitted)); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371

(1988) (explaining that "[s]tatutory construction . . . is a holistic endeavor" and that a "provision

that may seem ambiguous in isolation is often clarified by the remainder of the statutory

scheme . . . because only one of the permissible meanings produces a substantive effect that is

compatible with the rest of the law").  It would also render Section 113(g)(1) and (2) of the HSA

unconstitutional by allowing certain Acting Secretaries to serve indefinitely without Presidential

nomination and Senate confirmation—a reading that defies the principle that "when deciding

which of two plausible statutory constructions to adopt," a court should select the one that avoids

raising "a multitude of constitutional problems." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

Defendant Wolf's purported accession as Acting Secretary violated the FVRA's 210-day

cap in two ways. *First*, when McAleenan attempted to amend the DHS order of succession on

November 8, 2019, the office of Homeland Security Secretary had been vacant since Secretary

Nielsen departed DHS on April 10, 2019—for a total of 212 days.[13]  Thus, on November 8, 2019,

the office of Secretary was "vacant" under the FVRA, 5 U.S.C. § 3348(b)(1), and McAleenan's

order on that date claiming to amend Directive 00106 lacked "force or effect," *id.* § 3348(d)(2).

This means that Section II.A of the Directive continued to govern the DHS order of succession

when McAleenan resigned and Defendant Wolf was sworn in as Under Secretary for Strategy,

Policy, and Plans on November 13, 2019.  Because Defendant Wolf had no place in the valid line

of succession, *see* Martinez Decl. exs. 11 § II.A, 10 § 1, he unlawfully assumed office as Acting

Secretary and issued the Wolf Memorandum without authority to do so.

*Second*, even assuming that McAleenan somehow lawfully amended the order of

succession on November 8, 2019, by the time Defendant Wolf claimed office as Acting Secretary

pursuant to that amended succession order on November 13, 2019, the office of Secretary had been

vacant for at least 217 days—seven days more than the 210 days that Section 3346(a)(1) permits

for the service of an acting official.[14]  Under Section 3348(b)(1), the office was to "remain vacant"

unless and until a permanent Secretary was nominated and confirmed, and under Section

---

[13] In fact, it is possible that Secretary Nielsen vacated her office even earlier, when she tendered her resignation letter to President Trump and announced her resignation via Twitter on April 7, 2019.  *See* Martinez Decl. ex. 12.  If so, then the office of Secretary had been vacant for 215 days when McAleenan purported to amend the DHS order of succession on November 8, 2019.

[14] If Secretary Nielsen resigned on April 7 rather than April 10, 2019, then her office had been vacant for 220 days by the time Defendant Wolf was confirmed as Under Secretary for Strategy, Policy, and Plans on November 13, 2019.

3348(d)(1), any "action taken . . . in the performance of any function or duty" of that office "by any person" purporting to occupy it had "no force or effect."  Defendant Wolf claimed office as Acting Secretary in violation of the first of these provisions.  As a result, under the second of these provisions, his issuance of the Wolf Memorandum in his purported capacity as Acting Secretary had no force or effect.

Because the FVRA's 210-day cap on the service of acting federal officials governs officials who purport to become Acting Secretary pursuant to the HSA, and because Defendant Wolf took office as Acting Secretary in double violation of that cap, the Wolf Memorandum has "no force or effect" under 5 U.S.C. § 3348(d)(1) and was "void ab initio."  *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 78 (D.C. Cir. 2015); *see also, e.g.*, *L.M.-M.*, 442 F. Supp. 3d at 29-36 (vacating USCIS asylum directives issued by Defendant Cuccinelli under both the FVRA, 5 U.S.C. § 3348(d), and the APA, 5 U.S.C. § 706(2)(A), (C), because Cuccinelli assumed office in violation of FVRA).

## III.   THE USCIS DIRECTIVES IMPLEMENTING THE WOLF MEMORANDUM ARE ALSO VOID.

Because the Wolf Memorandum is void, the USCIS Directives purportedly implementing it are void as well.

*First*, the Directives purport to restrict DACA, a lawful DHS initiative issued by a prior, duly appointed Secretary of Homeland Security, in deference to an *ultra vires* order that has no force or effect.  As a component agency of DHS, *see* 6 U.S.C. § 271(a), USCIS and its personnel must act consistent with, not contrary to, policy directives issued by the Secretary of Homeland Security, who "is the head of the Department," *id.* § 112(a)(2); "shall have direction, authority, and control over it," *id.*; and is "responsible for . . . [e]stablishing national immigration enforcement policies and priorities," *id.* § 202(5).  USCIS personnel certainly cannot contradict governing Department policy in furtherance of a contrary policy that is *ultra vires* and without force or effect.  Yet that is precisely what the USCIS Directives purport to do.

*Second*, the officer who issued and implemented the USCIS Directives, Defendant Edlow, did so without lawful authority.  For the same reasons Defendant Wolf lacked statutory authority under the HSA or FVRA to issue the Wolf Memorandum, Wolf lacked statutory authority to appoint Defendant Edlow USCIS's Deputy Director for Policy.  Defendant Edlow therefore never lawfully assumed the functions, duties, and powers of that office, including the authority to issue the USCIS Directives.  Thus, those Directives are *ultra vires* and void, too.

## IV.   THE WOLF MEMORANDUM AND USCIS DIRECTIVES VIOLATE THE APA.

For the same reasons they were issued in violation of the HSA and FVRA, the Wolf Memorandum and USCIS Directives violate, and must be vacated pursuant to, the APA.  Under the APA, this Court must "hold unlawful and set aside agency action" when, among other circumstances, the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or was issued "not in accordance with law."  *See* 5 U.S.C. § 706(2)(A), (C).  The Wolf Memorandum and USCIS Directives are plainly unlawful under those provisions.

### A.   The Wolf Memorandum and USCIS Directives Are Final Agency Actions Under the APA.

As a threshold matter, the Wolf Memorandum and USCIS Directives are "final agency action[s]" under the APA.  *See* 5 U.S.C. § 704.  The Wolf Memorandum was issued by the *de facto* (though not *de jure*) head of the department that promulgated DACA and is charged with its administration; provides that its policy directives are "effective immediately," Martinez Decl. ex. 1 at 7; and mentions no deadline or sunset period for those directives or timeframe for the supposed policy reconsideration the directives are supposedly designed to facilitate.  Moreover, USCIS has publicly announced, and Plaintiffs' declarations confirm, that it is already capping DACA renewals to one year and rejecting first-time DACA applications pursuant to the Memorandum and Directives.  *Id.* ex. 2 (USCIS Directives) at 5-6, ex. 3 (USCIS press release); Madrigal Decl. ¶ 16; Yang Decl. ¶ 21.  Similarly, the USCIS Directives were issued by an official purporting to

occupy the USCIS office charged with establishing USCIS policy.  *See* Martinez Decl. ex. 2.  They purport to order "certain immediate changes to DACA processing consistent with and in furtherance of the Wolf Memorandum" and, like the Wolf Memorandum, purport to govern indefinitely until further notice.  *Id.* at 3.

The Memorandum and USCIS Directives therefore "'mark the consummation'" of DHS and USCIS's "decisionmaking process,'" respectively; "'determine'" legal "'rights or obligations'"; and are thus final agency actions reviewable under the APA.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *id.* at 1815 (emphasizing the "pragmatic approach . . . long taken to finality" (internal quotation marks omitted)); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-36 (D.C. Cir. 1986).

### B.   The Wolf Memorandum and USCIS Directives Were Issued in Excess of Statutory Authority and Not in Accordance with Law.

For the same reasons the Wolf Memorandum is *ultra vires* and lacks force or effect under the HSA and FVRA, it was issued in excess of Defendant Wolf's statutory authority within the meaning of the APA.  And for the same reasons the USCIS Directives are *ultra vires*, they were issued in excess of Defendant Edlow's statutory authority within the meaning of the APA.

The APA requires a court to "hold unlawful and set aside agency action" that is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "not in accordance with law."  5 U.S.C. § 706(2)(A), (C); *see also, e.g.*, *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 498 (D.C. Cir. 2010) (Brown, J., concurring in judgment) ("When an agency has acted beyond its delegated authority, a reviewing court will hold such action *ultra vires* . . . or a violation of the Administrative Procedure Act . . . .").  Actions by agency officials holding office without lawful authority violate the APA.  *See, e.g.*, *SW Gen.*, 796 F.3d at 78-83 (vacating agency order under 5 U.S.C. § 706 because administrative complaint that triggered order was issued by an acting general counsel serving in violation of the FVRA); *L.M.-M.*, 442 F. Supp.

3d at 29-36 (vacating Defendant Cuccinelli's asylum directives under both 5 U.S.C. § 706(2)(A) and (C) and 5 U.S.C. § 3348(d) because Cuccinelli assumed office in violation of the FVRA); *see also, e.g.*, *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2141-42 (2016) (noting that an agency head's "shenanigans" in excess of his "statutory limits" may be "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to 'set aside agency action' that is . . . 'in excess of statutory jurisdiction'" (quoting 5 U.S.C. § 706(2)(A)-(D))).

As explained above, *see supra* Parts I-II, neither the HSA nor the FVRA authorized Defendant Wolf to assume the office of Acting Secretary of Homeland Security, so the Wolf Memorandum—which Defendant Wolf purportedly issued pursuant to the duties and functions of that office—violates the APA. Moreover, because the USCIS Directives purport to contradict the Napolitano Memorandum in furtherance of the Wolf Memorandum, and because in any event the Directives were issued by a purported USCIS Deputy Director for Policy never lawfully appointed to that office, *see supra* Part III, the USCIS Directives also violate the APA.

Accordingly, for the same reasons the Wolf Memorandum and USCIS Directives are *ultra vires* and lack force or effect, they are also agency actions rendered in excess of statutory authority and not in accordance with law. *See* 5 U.S.C. § 706(2)(A), (C).

V.   **ALTERNATIVELY, THE WOLF MEMORANDUM AND USCIS DIRECTIVES WERE ISSUED IN VIOLATION OF THE APPOINTMENTS CLAUSE.**

Defendant Wolf took office in violation of the HSA and FVRA, so the Wolf Memorandum and USCIS Directives are void under those statutes and the APA. But if the Court disagrees, Plaintiffs are nonetheless entitled to judgment as a matter of law for another reason: because Defendant Wolf's service violates the Appointments Clause, he lacked constitutional authority to issue the Wolf Memorandum. This renders the USCIS Directives unlawful as well, both because Defendant Wolf lacked constitutional authority to appoint Defendant Edlow as USCIS's Deputy

Director for Policy and because the Directives purport to implement a policy directive issued without constitutional authority.

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . ." U.S. Const. art. II, § 2, cl. 2.  The nomination-and-consent procedure is a carefully wrought "'structural safeguard of the constitutional scheme,'" *SW Gen.*, 137 S. Ct. at 935 (alteration adopted) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)), both because it "prevents congressional encroachment upon the Executive," *Edmond*, 520 U.S. at 659, and because it imposes "'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters . . . from family connection, from personal attachment, or from a view to popularity,'" *SW Gen.*, 137 S. Ct. at 935 (quoting The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton)).  Enforcing the Appointments Clause's terms ensures that the "consciousness of this check will make the president more circumspect, and deliberate in his nominations for office."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1525 (1833).

Defendant Wolf assumed office in violation of the Appointments Clause.  That Clause vests in the President "the exclusive power to select the principal (noninferior) officers of the United States" and in the Senate the sole authority to confirm those officers.  *Edmond*, 520 U.S. at 659-60; *see also SW Gen.*, 137 S. Ct. at 945 ("Principal officers must be appointed by the President by and with the advice and consent of the Senate.").  As the purported Acting Secretary of Homeland Security, Defendant Wolf claims to be the "head" of an executive department, 6 U.S.C. § 112(a)(2) (providing that the Secretary of Homeland Security is "the head of the Department and shall have direction, authority, and control over it"), and therefore to exercise the powers,

functions, and duties of a principal officer.  But the President has never nominated him, and the Senate has never confirmed him, to the office of Secretary of Homeland Security.

Nor does the fact that Defendant Wolf has been purporting to serve only "temporarily" change the constitutional analysis.  He is not an "inferior Officer[]" whom the Appointments Clause authorizes a "Head[] of [a] Department[]" to appoint.  U.S. Const. art. II, § 2, cl. 2.  To the extent the Constitution permits principal officers to designate their own successors in the event of resignation, they may do so only "[b]ecause the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions."  *United States v. Eaton*, 169 U.S. 331, 343 (1898).  By contrast, Defendant Wolf has purported for nearly a year to "exercise[] all of the statutory duties" of an office that has been vacant for nearly a year and half.  *SW Gen.*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring).  He has purported to rescind policy directives issued by prior, duly appointed permanent Secretaries of Homeland Security, as he claimed to do in the Wolf Memorandum; to appoint officers of DHS and its constituent agencies, including Defendant Edlow as USCIS's Deputy Director for Policy; and to dictate the disbursement of billions of dollars of DHS funds.[15]  "There was thus nothing 'special and temporary' about [Defendant Wolf's] appointment."  *Id.* (quoting *Eaton*, 169 U.S. at 343).  Accordingly, even if he was ostensibly designated to serve "temporarily," Defendant Wolf has in fact been serving as Secretary of Homeland Security since November 13, 2019 in all but name.  "[T]he structural protections of the Appointments Clause" cannot "be avoided based on such trivial distinctions."  *Id.*  Holding otherwise would permit precisely the pre-Revolutionary "'grievance[]'"

---

[15] *See, e.g.*, Martinez Decl. ex. 33 (stating that Defendant Wolf "announced final allocations of $385 million for seven Fiscal Year (FY) 2020 DHS competitive preparedness grant programs" on the advice of "[his] Homeland Security Advisory Council," in addition to "more than $1.3 billion in non-competitive grant funding" allocated earlier).

the Clause was meant to avoid: "the manipulation of appointments."  *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1656-57 (2020).

For these reasons, even if the Court concludes that the HSA and FVRA authorized Defendant Wolf to assume office, issue the Wolf Memorandum, and appoint Defendant Edlow, Defendant Wolf nonetheless took these actions in violation of the Appointments Clause.  This renders the Wolf Memorandum—and the USCIS Directives that Defendant Edlow issued in furtherance of the Wolf Memorandum, *see supra* Part III—void.  *See, e.g.*, *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018) (vacating as void action by agency official appointed in violation of Appointments Clause).  Plaintiffs are thus entitled to judgment as a matter of law on their Appointments Clause claim, and the Wolf Memorandum and USCIS Directives must be vacated, even if they do not prevail on their claims under the HSA, FVRA, and APA.

## VI.   THE COURT SHOULD VACATE THE WOLF MEMORANDUM AND USCIS DIRECTIVES AND ENJOIN THEIR ENFORCEMENT NATIONWIDE.

Because the Wolf Memorandum and USCIS Directives are unlawful, this Court should vacate the Memorandum and Directives and permanently enjoin Defendants or their agents from enforcing them.

In this Circuit, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also, e.g.*, *Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the normal remedy." (internal quotation marks omitted)).  A "nationwide remedy is necessary to provide complete relief for promulgation of an unlawful rule" because, "when a plaintiff proves that a rule was unlawfully promulgated, halting the rule's application to the plaintiff may lessen the real-world impact of the unlawful rule on the

plaintiff but does not fully redress 'the violation established'—that is, the promulgation of an unlawful rule." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020); *see also, e.g.*, *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 18-19 (D.D.C. 2004) (entering a permanent injunction, after having issued a preliminary injunction, of the Department of Defense's "involuntary anthrax inoculation program" as to "all persons," not just plaintiffs).

Prompt resolution of this issue permanently and on a nationwide basis is particularly important here. The Wolf Memorandum and USCIS Directives are harming immigrants across at least three states in disparate regions and forcing at least three nonprofit immigrant-services organizations to dramatically divert their finite staffing and budgetary resources to counteract those harms, at grave risk to their core missions and other clients. *See* Madrigal Decl. ¶¶ 9-22; Gloria Decl. ¶¶ 17-31; O'Sullivan Decl. ¶¶ 7-12; Wilkes Decl. ¶ 8-11; Love Decl. ¶¶ 17-36; Yang Decl. ¶¶ 11-22. Similar organizations across the country are at risk of the same harms as Plaintiffs' and, like Plaintiffs, will have to redirect organizational resources to counteract those harms. Gloria Decl. ¶ 31; Love Decl. ¶ 36. These widespread impacts merit nationwide relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, vacate the Wolf Memorandum and USCIS Directives in their entirety, and permanently enjoin Defendants or their agents from enforcing any part of the Memorandum or Directives.

Dated:  September 11, 2020                    Respectfully submitted,

                                             MUNGER, TOLLES & OLSON LLP


                                             By:/s/ Adele M. El-Khouri
                                             ADELE M. EL-KHOURI

THOMAS A. SAENZ                              ADELE M. EL-KHOURI
tsaenz@MALDEF.org                            Adele.El-Khouri@mto.com
*(Pro Hac Vice application pending)*         XIAONAN APRIL HU
ERNEST I. HERRERA                            April.Hu@mto.com
eherrera@MALDEF.org                          *(Pro Hac Vice application pending)*
*(Pro Hac Vice application pending)*         MUNGER, TOLLES & OLSON LLP
MEXICAN AMERICAN LEGAL DEFENSE               1117 F. Street, N.W., 7th Floor
   AND EDUCATIONAL FUND                      Washington, D.C. 20004–1357
634 South Spring Street                      Telephone:     (202) 220-1100
Los Angeles, California 90014                Facsimile:     (202) 220-2300
Telephone:     (213) 629-2512
Facsimile:     (213) 629-02666               E. MARTIN ESTRADA
                                             Martin.Estrada@mto.com
                                             *(Pro Hac Vice application pending)*
                                             BRANDON E. MARTINEZ
                                             Brandon.Martinez@mto.com
                                             *(Pro Hac Vice application pending)*
                                             MUNGER, TOLLES & OLSON LLP
                                             350 South Grand Avenue, 50th Floor
                                             Los Angeles, California 90017
                                             Telephone:     (213) 683-9100
                                             Facsimile:     (213) 687-3702

                                             *Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANTA FE DREAMERS PROJECT; SPANISH COMMUNITY CENTER; and AMERICAN GATEWAYS,<br><br>   *Plaintiffs*,<br><br> vs.<br><br>CHAD F. WOLF, in his purported official capacity as Acting Secretary of Homeland Security; KENNETH T. CUCCINELLI, in his purported official capacities as Senior Official Performing the Duties of Deputy Secretary of Homeland Security and Acting Director of U.S. Citizenship and Immigration Services; TONY H. PHAM, in his purported official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; JOSEPH EDLOW, in his purported official capacity as Deputy Director for Policy of U.S. Citizenship and Immigration Services; MARK A. MORGAN, in his purported official capacity as Senior Official Performing the Duties of Commissioner of U.S. Customs and Border Protection; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES CUSTOMS AND IMMIGRATION ENFORCEMENT; and UNITED STATES CUSTOMS AND BORDER PROTECTION,<br><br>   *Defendants*. | **Case No. 1:20-CV-02465-RBW** |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, pursuant to Local Rule 7(h), respectfully submit the following statement of material facts as to which they contend there is no genuine issue:

1.      Plaintiffs are three non-profit organizations that provide free or low-cost legal services to immigrants: Santa Fe Dreamers Project, Spanish Community Center, and American Gateways.  Plaintiff Santa Fe Dreamers Project is based in Santa Fe, New Mexico.  Plaintiff Spanish Community Center is based in Joliet, Illinois.  Plaintiff American Gateways is based in Austin, Texas.  Among other services, Plaintiffs assist immigrants with renewing and applying for temporary forbearance from removal and eligibility for benefits under the Deferred Action for Childhood Arrivals initiative ("DACA").  *See* Love Decl. ¶¶ 3, 5-10, 12, 15-16; O'Sullivan Decl. ¶¶ 2, 5, 7; Wilkes Decl. ¶¶ 2, 5, 7; Gloria Decl. ¶¶ 2, 5-15; Madrigal Decl. ¶¶ 3, 6-8; Yang Decl. ¶¶ 7, 9-10.

2.      DACA is an initiative of Defendant U.S. Department of Homeland Security ("DHS") initiative that defers removal for eligible young immigrants who were brought to the United States as children.  Before July 28, 2020, DACA provided recipients with two-year periods of forbearance from removal and eligibility for work authorization and other benefits.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901-05 (2020) (tracing DACA's history and status as of June 2020); *see also* Martinez Decl. ex. 4.

3.      By March 31, 2020, over 825,000 young people had benefitted from DACA's protections.  *See* Martinez Decl. ex. 6 at 1.

4.      In September 2017, acting on advice from then-Attorney General Jefferson B. Sessions III, then-Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke Memorandum") purporting to rescind the Napolitano Memorandum and terminate DACA.  *See Regents*, 140 S. Ct. at 1903; Martinez Decl. ex. 7 (Duke Memorandum); *id.* ex. 8 (Sessions letter).

5.      Several courts around the country subsequently enjoined the Duke Memorandum's enforcement on the ground that it inadequately explained the Department of Homeland Security's ("DHS") reasons for rescinding DACA, in violation of the Administrative Procedure Act ("APA"). *Regents*, 140 S. Ct. at 1903-04.  In response, the new Secretary of Homeland Security, Kirstjen M. Nielsen, issued a second memorandum (the "Nielsen Memorandum") on June 22, 2018, purporting to clarify and elaborate on the Duke Memorandum's reasoning and recommitting DHS to rescinding DACA.  *Id.* at 1904; Martinez Decl. ex. 9 (Nielsen Memorandum).

6.      On June 18, 2020, the United States Supreme Court held that the Duke Memorandum was arbitrary and capricious and violated the APA because it (1) failed to adequately consider or explain why the Memorandum's assertion that DACA's extension of work authorization and other benefits was illegal required the rescission of both eligibility for those benefits *and* the initiative's forbearance-from-removal component; and (2) altogether "failed to address whether there was 'legitimate reliance'" on DACA.  *Regents*, 140 S. Ct. at 1910-15 (internal quotation marks omitted).  Having concluded that these "dual failure[s]" raised "doubts about whether [DHS] appreciated the scope of its discretion or exercised that discretion in a reasonable manner," the Court affirmed the vacatur of the rescission of DACA and remanded the matter "to DHS so that it may consider the problem anew."  *Id.* at 1916 & n.7.

7.      On December 9, 2016, President Obama issued Executive Order 13753, *Amending the Order of Succession in the Department of Homeland Security*, which invoked his authority under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3345 *et seq*., to establish the order of succession for the Secretary of Homeland Security during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary.  *See* Martinez Decl. ex. 10.

8.      On December 15, 2016, then-Secretary of Homeland Security Jeh Johnson issued DHS Delegation Number 00106 ("Directive 00106") pursuant to his authority under 6 U.S.C. § 113(g)(2).  *See* Martinez Decl. ex. 11.  Directive 00106 contained two sections amending the order of succession for Secretary.  Section II.A adopted the order of succession laid out in Executive Order 13753 in the event of the Secretary's death, resignation, or inability to perform the functions of the Office.  *Id.* § II.A.  Section II.B imposed a separate and different order of succession for Acting Secretary, to "the extent not otherwise prohibited by law," in the event the Secretary becomes "unavailable to act during a disaster or catastrophic emergency."  *Id.* § II.B. This second order of succession for disasters and emergencies was laid out in an appendix to the Directive called "Annex A."  *Id.* at A-1.

9.      On April 7, 2019, then-Secretary of Homeland Security Nielsen announced via Twitter that she would resign as Secretary effective that day.  *See* Martinez Decl. ex. 12.  A little over three hours later, she announced on Twitter that she had agreed to stay on as Secretary through Wednesday, April 10, 2019.  *See id.* ex. 13.

10.     Prior to leaving office, Secretary Nielsen signed an April 9, 2019 memorandum amending Directive 00106 by striking and replacing the text of Annex A.  *See* Martinez Decl. ex. 14 at 2.  The new text of Annex A listed the CBP Commissioner as third in line to serve as Acting Secretary, after the Deputy Secretary and the Under Secretary for Management.  *Id.*

11.     On April 10, 2019, under Section II.A of Directive 00106 and Executive Order 13753, the order of succession in the event of the Secretary of Homeland Security's resignation was as follows, in relevant part: Deputy Secretary of Homeland Security; Under Secretary for Management; Administrator of the Federal Emergency Management Agency; Under Secretary for National Protection and Programs; Under Secretary for Science and Technology; Under Secretary

for Intelligence and Analysis; and Customs and Border Protection ("CBP") Commissioner.  *See* Martinez Decl. ex. 11 § II.A; *id.* ex. 10 § 1; *see also id.* ex. 14 at 2.

12.     On April 10, 2019, the offices of Deputy Secretary of Homeland Security, Under Secretary for Management, FEMA Administrator, and Under Secretary for Science and Technology were vacant, but two nominated-and-confirmed appointees, Christopher Krebs and David J. Glawe, were serving as Under Secretary for National Protection and Programs and Under Secretary for Intelligence and Analysis, respectively.  *See* Martinez Decl. exs. 15-20.  Under Section II.A of Directive 00106 and the Obama executive order that section incorporated, Krebs and then Glawe were next in line to take over for Nielsen as Acting Secretary.  *See id.* exs. 11 § II.A, 10 § 1.

13.     On April 10, 2019, Secretary Nielsen resigned, and CBP Commissioner Kevin McAleenan purported to assume office as Acting Secretary of Homeland Security.  *See* Martinez Decl. ex. 21.

14.     On November 8, 2019, 212 days after Nielsen vacated the office of Secretary of Homeland Security, Commissioner McAleenan issued an order in his purported capacity as Acting Secretary striking the text of Section II.A in Directive 00106 and replacing it with language providing that Annex A would govern in the case of the Secretary's death, resignation, or inability to perform the functions of the Office.  His order also purportedly modified the order of succession in Annex A to include the Under Secretary for Strategy, Policy, and Plans as fourth in line to serve as Acting Secretary, after the Deputy Secretary, Under Secretary for Management, and CBP Commissioner.  *See* Martinez Decl. ex. 23 at 1.

15.     On November 13, 2019, 217 days after Nielsen vacated the office of Secretary, the Senate confirmed Defendant Chad F. Wolf as Under Secretary for Strategy, Policy, and Plans.  *See*

Martinez Decl. ex. 25 at S6519-20.  That same day, Commissioner McAleenan resigned as Acting Secretary of Homeland Security, and Defendant Wolf purportedly took office as Acting Secretary of Homeland Security.  *See id.* exs. 26, 27.  Defendant Wolf continues to serve as Under Secretary for Strategy, Policy, and Plans and purportedly as Acting Secretary of Homeland Security to this day.  *See id.* ex. 26.

16.     On February 19, 2020, Defendant Wolf purported to appoint Defendant Joseph Edlow to the position of Deputy Director of U.S. Citizenship and Immigration Services.  *See* Martinez Decl. exs. 28, 34.

17.     On July 28, 2020, Defendant Wolf issued a memorandum (the "Wolf Memorandum") purporting to order immediate changes to the DACA policy, including rejecting all initial applications for DACA participation and associated applications for work authorization; processing all pending and future properly submitted DACA- and work-authorization- renewal applications submitted by current DACA recipients; limiting any DACA or related work-authorization renewals to one year; and rejecting all pending and future applications for advance parole from DACA beneficiaries absent exceptional circumstances, among other changes.  The Wolf Memorandum was addressed to Matthew T. Albence and Defendants Joseph Edlow and Mark A. Morgan in their official capacities as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement, Deputy Director for Policy of U.S. Citizenship and Immigration Services, and Senior Official Performing the Duties of Commissioner of U.S. Customer and Border Protection, respectively.  *See* Martinez Decl. ex. 1.

18.     On August 21, 2020, U.S. Citizenship and Immigration Services ("USCIS") issued policy directives purporting to implement the Wolf Memorandum's changes to DACA ("USCIS Directives").  *See* Martinez Decl. exs. 2-3.

19.     Defendant Tony H. Pham purported to succeed Mr. Albence as "Senior Official Performing the Duties of the Director" of Defendant U.S. Immigration and Customs Enforcement and therefore has automatically been substituted for Mr. Albence as a Defendant.  *See* Martinez Decl. ex. 32; *see also* Fed. R. Civ. P. 25(d).

20.     Under the Wolf Memorandum and USCIS Directives, USCIS has already capped at one year DACA forbearance renewals for some of Plaintiffs' clients and rejected first-time DACA applications submitted by others.  *See* Madrigal Decl. ¶ 16; Yang Decl. ¶ 21.

21.     The Wolf Memorandum and USCIS Directives are harming Plaintiffs by forcing them to divert resources to counteract the Memorandum and Directives' effects on their workloads and clients; depleting the resources they are able to expend serving clients with needs unrelated to DACA; jeopardizing their eligibility for key grant funding; undermining the substantial goodwill they have cultivated with the communities they serve; and thereby impeding their abilities to carry out their core organizational missions of assisting every immigrant who seeks their services, among other harms.  *See* Love Decl. ¶¶ 17-33; O'Sullivan Decl. ¶¶ 7-12; Wilkes Decl. ¶ 8-11; Madrigal Decl. ¶¶ 9-22; Gloria Decl. ¶¶ 17-30; Yang Decl. ¶¶ 11-22.

22.     Similar organizations across the country are at risk of suffering the same harms as Plaintiffs' and, like Plaintiffs, likely will have to redirect organizational resources to counteract those harms.  *See* Gloria Decl. ¶ 31; Love Decl. ¶ 36.

23.     The Wolf Memorandum and USCIS Directives are also harming Plaintiffs' clients, whose ability to remain in this country, to lawfully work here, and to utilize government services largely depends on the free and low-cost immigration services that Plaintiffs provide.  *See* Madrigal Decl. ¶¶ 16, 21-22; Love Decl. ¶¶ 34-35; Yang Decl. ¶ 21-22.  By impairing Plaintiffs' ability to provide critical assistance to DACA recipients and other immigrants alike, the Wolf

Memorandum and USCIS Directives put at serious risk the livelihoods, residency, and quality of life of those immigrants and their families.  *See* Madrigal Decl. ¶¶ 21-22; Gloria Decl. ¶ 31; Love Decl. ¶¶ 34-36; Yang Decl. ¶ 22.

24.     These harms will continue so long as the Wolf Memorandum and USCIS Directives remain in place.  *See* Gloria Decl. ¶¶ 18-19, 30; Madrigal Decl. ¶¶ 16, 20; Love Decl. ¶¶ 17, 24, 28; Wilkes Decl. ¶¶ 8, 11; O'Sullivan Decl. ¶ 12; Yang Decl. ¶ 18.

Dated:  September 11, 2020

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP


By:/s/ Adele M. El-Khouri
ADELE M. EL-KHOURI

THOMAS A. SAENZ
tsaenz@MALDEF.org
*(Pro Hac Vice application pending)*
ERNEST I. HERRERA
eherrera@MALDEF.org
*(Pro Hac Vice application pending)*
MEXICAN AMERICAN LEGAL DEFENSE
   AND EDUCATIONAL FUND
634 South Spring Street
Los Angeles, California 90014
Telephone:     (213) 629-2512
Facsimile:     (213) 629-02666

ADELE M. EL-KHOURI
Adele.El-Khouri@mto.com
XIAONAN APRIL HU
April.Hu@mto.com
*(Pro Hac Vice application pending)*
MUNGER, TOLLES & OLSON LLP
1117 F. Street, N.W., 7th Floor
Washington, D.C. 20004–1357
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

E. MARTIN ESTRADA
Martin.Estrada@mto.com
*(Pro Hac Vice application pending)*
BRANDON E. MARTINEZ
Brandon.Martinez@mto.com
*(Pro Hac Vice application pending)*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90017
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

*Counsel for Plaintiffs*