**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SANTA FE DREAMERS PROJECT, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-02465-RBW |
| CHAD WOLF, *et al.*, | |
| Defendants. | |

## DECLARATION OF RACHAEL L. WESTMORELAND

I, RACHAEL L. WESTMORELAND, DECLARE:

1. I am a trial attorney in the U.S. Department of Justice, Civil Division, Federal Programs Branch, and counsel to Defendants in the above-captioned matter. I submit this declaration in support of Defendants' Motion for Summary Judgment.

2. Appended hereto as Exhibit 1 is a true and correct copy of Kirstjen M. Nielsen's signed approval of an April 9, 2019 Memorandum for the Secretary with the subject "Designation of an Order of Succession for the Secretary," with redactions.

3. Appended hereto as Exhibit 2 is a true and correct copy of the Declaration of Neal J. Swartz, executed on June 1, 2020.

4. Appended hereto as Exhibit 3 is a true and correct copy of the "notice of a vacancy and designation of an acting officer" for Kevin K. McAleenan, submitted by Neal J. Swartz to the Honorable Michael R. Pence, President of the Senate.

5. Appended hereto as Exhibit 4 is a true and correct copy of the "notice of a vacancy and designation of an acting officer" for Claire M. Grady, submitted by Neal J. Swartz to the Honorable Michael R. Pence, President of the Senate.

6. Appended hereto as Exhibit 5 is a true and correct copy of the "notice of a vacancy and designation of an acting role" for Charles H. Fulghum, submitted by Neal J. Swartz to the Honorable Michael R. Pence, President of the Senate.

7. Appended hereto as Exhibit 6 is a true and correct copy of the "Amendment to the Order of Succession for the Secretary of Homeland Security," signed by Kevin K. McAleenan on November 8, 2019.

8. Appended hereto as Exhibit 7 is a true and correct copy of the "Order Designating the Order of Succession for the Secretary of Homeland Security," signed by Peter T. Gaynor on September 10, 2020.

9. Appended hereto as Exhibit 8 is a true and correct copy of the June 15, 2012 memorandum signed by Janet Napolitano with the subject "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

10. Appended hereto as Exhibit 9 is a true and correct copy of the September 5, 2017 memorandum signed by Elaine C. Duke with the subject "Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"

11. Appended hereto as Exhibit 10 is a true and correct copy of the July 28, 2020 memorandum signed by Chad F. Wolf with the subject "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"

12. Appended hereto as Exhibit 11 is a true and correct copy of the August 21, 2020 memorandum signed by Joseph Edlow with the subject "Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, 'Reconsideration of the June 15, 2012 Memorandum 'Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"

13. Appended hereto as Exhibit 12 is a true and correct copy of the revision number 08.6 to DHS Delegation 00106, titled "DHS Orders of Succession and Delegations of Authorities for Named Positions," signed by Jeh Johnson on December 15, 2016.

14. Appended hereto as Exhibit 13 is a true and correct copy of the email sent by Kirstjen M. Nielsen on April 10, 2019 entitled "Farewell Message from Secretary Kirstjen M. Nielsen."

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 25, 2020 in Washington, D.C.

RACHAEL
WESTMORELAND

Digitally signed by RACHAEL
WESTMORELAND
Date: 2020.09.25 17:23:15
-04'00'

Rachael L. Westmoreland

# EXHIBIT 1



Office of the General Counsel
**U.S. Department of Homeland Security**
Washington, DC 20528

April 9, 2019

**MEMORANDUM FOR THE SECRETARY**

**FROM**:                      John M. Mitnick
                               General Counsel

**SUBJECT**:                   Designation of an Order of Succession for the Secretary

**Summary**:  Pursuant to your authority set forth in section 113 of title 6, United States Code, you have expressed your desire to designate certain officers of the Department of Homeland Security (DHS) in order of succession to serve as Acting Secretary.  Your approval of the attached document will accomplish such designation.

**Discussion**: ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████
███████████████

**Action**:  By approving the attached document, you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to Section 113(g)(2) of title 6, United States Code.

Approve/date _____        Disapprove/date_____

Modify/date _____          Needs discussion/date_____

Attachment:  Annex A

### Amending the Order of Succession in the Department of Homeland Security

By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:

Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A. Order for Delegation of Authority by the Secretary of the Department of Homeland Security.

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of U.S. Customs and Border Protection;

4. Administrator of the Federal Emergency Management Agency;

5. Director of the Cybersecurity and Infrastructure Security Agency;

6. Under Secretary for Science and Technology;

7. Under Secretary for Intelligence and Analysis

8. Administrator of the Transportation Security Administration;

9. Director of U.S. Immigration and Customs Enforcement;

10. Director of U.S. Citizenship and Immigration Services;

11. Under Secretary for Strategy, Policy, and Plans;

12. General Counsel;

13. Deputy Under Secretary for Management;

14. Deputy Commissioner of U.S. Customs and Border Protection;

15. Deputy Administrator of the Transportation Security Administration;

16. Deputy Director of U.S. Immigration and Customs Enforcement;

17. Deputy Director of U.S. Citizenship and Immigration Services;

18. Director of the Federal Law Enforcement Training Center.

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| A.B.-B., *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-00846 |
| | ) | |
| Mark A. Morgan, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF NEAL J. SWARTZ**

I, Neal J. Swartz, make the following declaration.

1. I am the Associate General Counsel for General Law, Office of the General Counsel for the U.S. Department of Homeland Security (DHS).  I have held this position since June 2013.  One of my responsibilities is to advise and assist in matters involving the Department's orders of succession.  This declaration is based on my personal knowledge and on information that I have obtained in the course of my official duties as the Associate General Counsel for General Law, DHS.

2. Pursuant to 6 U.S.C. § 113(g)(2) the Secretary of Homeland Security may designate officers of the Department in further order of succession to serve as Acting Secretary.

3. On April 9, 2019, then-Secretary Nielsen was presented a memorandum titled "Designation of an Order of Succession for the Secretary," dated April 9, 2019, that included a proposed new Annex A. (The memorandum is already in the record. *See* Blackwell Decl., Ex. 8, Designation of an Order of Succession for the Secretary (Apr. 9, 2019), ECF No. 17-1).  The memorandum and its attachment proposed amending the DHS order of succession to designate officials to serve as Acting Secretary, pursuant to

the Secretary's authority under 6 U.S.C. § 113(g)(2).  Then-Secretary Nielsen approved

the proposed modification by affixing her signature at the bottom of the memorandum.

As explained in that memorandum, her signature below the action line represented that

she approved the attached document that modified the order of succession for the

Secretary of Homeland Security.  The memorandum's attachment established an order of

succession for the position of Secretary of Homeland Security, without exceptions or

limitations.  Specifically, the memorandum's attachment, titled "Amending the Order of

Succession in the Department of Homeland Security," stated that then-Secretary Nielsen

had "designat[ed] the order of succession for the Secretary of Homeland Security as

follows:".  The list the then-Secretary approved set out the order of succession for the

officials who may serve as Acting Secretary.  The list controlled the succession order for

every vacancy in the office of the Secretary, no matter the reason for the vacancy.

4.  The following day, DHS Delegation No. 00106 was amended to reflect and implement

then-Secretary Nielsen's change to the order of succession for the Secretary of Homeland

Security.  The amendment was executed by placing a new Annex A in DHS Delegation

No. 00106.  The amended DHS Delegation No. 00106 was then reissued as DHS

Delegation No. 00106, Revision No. 8.5 titled "DHS ORDERS OF SUCCESSION AND

DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS," issued December

15, 2016, and updated April 10, 2019. (This document is already in the record. *See*

Blackwell Decl., Ex. 3, DHS Order of Succession and Delegations of Authorities for

Named Positions, DHS Delegation No. 00106 Rev. 08.6, ECF No. 17-1).  DHS

Delegation No. 00106 is an administrative document that is periodically updated to

consolidate and maintain in a single document the orders of succession for many senior

positions in DHS.  Modifications to an order of succession are effective immediately

upon the Secretary's approval and signature, and not when those decisions are transposed into DHS Delegation No. 00106 at a later time.  As an internal administrative document that is meant to collect the orders of succession, DHS Delegation No. 00106 itself cannot override or change official action taken by the Secretary.

5.  When then-Secretary Nielsen resigned, both the Department of Homeland Security Deputy Secretary and the Under Secretary for Management positions were vacant (exhibits 1 and 2).

6.  Therefore, then-Secretary Nielsen's signed order amending the DHS order of succession for Acting Secretary, pursuant to her authority under 6 U.S.C. § 113(g)(2), was effective when she signed the order on April 9, 2019, and controls the order of succession should a discrepancy or conflict exist between her signed order and DHS Delegation No. 00106, Revision No. 8.5.  In fact, the April 9, 2019 signed order would have controlled the order of succession even if DHS Delegation No. 00106 was never updated to reflect the April 9, 2019 change.

7.  The document, attached as Exhibit 1, is a true and correct copy of a memorandum titled "Federal Vacancies Reform Act Submission," issued by the Associate General Counsel for General Law, dated November 19, 2018 with an attachment "Discontinuation of service in an acting role, DHS – Deputy Secretary."

8.  The document, attached as Exhibit 2, is a true and correct copy of a memorandum titled "Federal Vacancies Reform Act Submission," issued by the Associate General Counsel for General Law, dated April 11, 2019 with an attachment "Vacancy and Designation of an acting officer, DHS – Under Secretary for Management."

In accordance with 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of June, 2020 in Bethesda, MD.

NEAL J
SWARTZ

Digitally signed by
NEAL J SWARTZ
Date: 2020.06.01
14:40:56 -04'00'

Neal J. Swartz
Associate General Counsel
Office of the General Counsel
Department of Homeland Security

# EXHIBIT 3

Office of the General Counsel
Department of Homeland Security
Washington, DC 20528



APR 1 1 2019

The Honorable Michael R. Pence
President of the Senate
S-212, Capitol Building
Washington, DC 20510

Re:  Federal Vacancies Reform Act Submissions

Dear Mr. Vice President:

On behalf of the Department, I submit forms for a *vacancy and designation of an acting officer* for positions that are covered by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277 as codified in 5 U.S.C. § 3345 *et seq.*

Should you have any questions or otherwise require agency contact in this matter, please contact Mr. Leo Boucher at (202) 447-3623 or via email at leo.boucher@hq.dhs.gov.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law

Attachments:
Vacancy and Designation of an acting officer, DHS - Secretary

# Submission Under the Federal Vacancies Reform Act

## Addressees

| ● President of the United States Senate | ○ Speaker of the U.S. House of Representatives | ○ Comptroller General of the United States |
|---|---|---|

## This Report Provides Notification of:

| ● Vacancy | ● Designation of acting officer | ○ Nomination | ○ Action on nomination |
|---|---|---|---|

○ Change in previously submitted reported information     ○ Discontinuation of service in acting role

(date: _____)

Name of Department or Agency and Any Suborganization

U.S. Department of Homeland Security, Office of the Secretary

| Vacancy Title | | Date Vacancy Began |
|---|---|---|
| Secretary | | 04/10/19 |

| Name of Acting Officer | Date Service Began | Authority for Acting Designation if Other Than Vacancies Act |
|---|---|---|
| Kevin K. McAleenan | 04/11/19 | 6 U.S.C. § 113(g)(2) |

| Name of Nominee for Position | | Date Nomination Submitted |
|---|---|---|
| | | |

| Action on Nomination:   ○ Confirmed   ○ Rejected, withdrawn, returned | Date of Action |
|---|---|
| | |

## Agency Contact

Name and Title

Leo E. Boucher III, Asst. General Counsel, Administrative Law, General Law Division

Contact's Address

Department of Homeland Security

| Contact's Phone Number   (202) 447-3623 | Contact's E-Mail Address   leo.boucher@hq.dhs.gov |
|---|---|

## Submitted By

| Name and Title   Neal J. Swartz, Associate General Counsel for General Law | Telephone Number   (202) 282-8377 |
|---|---|
| Signature | Date   APR 1 1 2019 |

## For Congressional Use Only

Committee of Jurisdiction

Date Received

## For GAO Use Only

GAO Control Number

2/8/00

EXHIBIT 4

Office of the General Counsel
**Department of Homeland Security**
Washington, DC 20528

APR 1 6 2018



**Homeland Security**

The Honorable Michael R. Pence
President of the Senate
S-212, Capitol Building
Washington, DC 20510

Re: Federal Vacancies Reform Act Submission

Dear Mr. Vice President:

On behalf of the Department, I submit the attached form for a *notice of a vacancy and designation of an acting officer* for a position covered by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277 as codified in 5 U.S.C. § 3345 *et seq*.

Should you have any questions or otherwise require agency contact in this matter, please contact Mr. Leo Boucher at (202) 447-3623 or via email at leo.boucher@hq.dhs.gov.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law

Attachment:
DHS Deputy Secretary Vacancy, Designation as Acting

# Submission Under the Federal Vacancies Reform Act

## Addressees

● President of the United States Senate  ○ Speaker of the U.S. House of Representatives  ○ Comptroller General of the United States

## This Report Provides Notification of:

● Vacancy  ● Designation of acting officer  ○ Nomination  ○ Action on nomination

○ Change in previously submitted reported information  ○ Discontinuation of service in acting role

(date: _____ )

Name of Department or Agency and Any Suborganization

**U.S. Department of Homeland Security**

| Vacancy Title | | Date Vacancy Began |
|---|---|---|
| **Deputy Secretary** | | **04/14/18** |

| Name of Acting Officer | Date Service Began | Authority for Acting Designation if Other Than Vacancies Act |
|---|---|---|
| **Grady, Claire M.** | **04/15/18** | |

| Name of Nominee for Position | Date Nomination Submitted |
|---|---|
| | |

| Action on Nomination: | ○ Confirmed | ○ Rejected, withdrawn, returned | Date of Action |
|---|---|---|---|

## Agency Contact

Name and Title

**Leo E. Boucher III, Asst. General Counsel, Administrative Law, General Law Division**

Contact's Address

**Department of Homeland Security**

| Contact's Phone Number | Contact's E-Mail Address |
|---|---|
| **(202) 447-3623** | **leo.boucher@hq.dhs.gov** |

## Submitted By

| Name and Title | Telephone Number |
|---|---|
| **Neal J. Swartz, Associate General Counsel for General Law** | **(202) 282-8377** |

| Signature | Date |
|---|---|
| | **APR 1 6 2018** |

## For Congressional Use Only

Committee of Jurisdiction

Date Received

## For GAO Use Only

GAO Control Number

2/8/00

# EXHIBIT 5

Office of the General Counsel
Department of Homeland Security
Washington, DC 20528



**Homeland Security**

APR 1 1 2019

The Honorable Michael R. Pence
President of the Senate
S-212, Capitol Building
Washington, DC 20510

Re:  Federal Vacancies Reform Act Submission

Dear Mr. Vice President:

On behalf of the Department, I submit the attached form for a *vacancy* and *designation of an acting role* for a position covered by the Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277 as codified in 5 U.S.C. § 3345 *et seq*.

Should you have any questions or otherwise require agency contact in this matter, please contact Mr. Leo Boucher at (202) 447-3623 or via email at leo.boucher@hq.dhs.gov.

Sincerely,

Neal J. Swartz
Associate General Counsel for General Law

Attachments:
Vacancy & Designation of an acting officer, DHS –Under Secretary for Management

## Submission Under the Federal Vacancies Reform Act

**Addressees**

- ● President of the United States Senate
- ○ Speaker of the U.S. House of Representatives
- ○ Comptroller General of the United States

**This Report Provides Notification of:**

- ● Vacancy
- ● Designation of acting officer
- ○ Nomination
- ○ Action on nomination
- ○ Change in previously submitted reported information
- ○ Discontinuation of service in acting role

(date: _____)

Name of Department or Agency and Any Suborganization

U.S. Department of Homeland Security, Management Directorate

| Vacancy Title | | Date Vacancy Began |
|---|---|---|
| Under Secretary for Management | | 04/10/19 |

| Name of Acting Officer | Date Service Began | Authority for Acting Designation if Other Than Vacancies Act |
|---|---|---|
| Charles H. Fulghum | 04/11/19 | |

| Name of Nominee for Position | Date Nomination Submitted |
|---|---|
| | |

| Action on Nomination: | ○ Confirmed | ○ Rejected, withdrawn, returned | Date of Action |
|---|---|---|---|

**Agency Contact**

Name and Title

Leo E. Boucher III, Asst. General Counsel, Administrative Law, General Law Division

Contact's Address

U.S. Department of Homeland Security

| Contact's Phone Number | Contact's E-Mail Address |
|---|---|
| (202) 447-3623 | leo.boucher@hq.dhs.gov |

**Submitted By**

| Name and Title | Telephone Number |
|---|---|
| Neal J. Swartz, Associate General Counsel for General Law | (202) 282-8377 |

| Signature | Date |
|---|---|
| *[signature]* | APR 1 1 2019 |

**For Congressional Use Only**

Committee of Jurisdiction

Date Received

**For GAO Use Only**

GAO Control Number

2/8/00

EXHIBIT 6

**Amendment to the Order of Succession for the Secretary of Homeland Security**

Section II.A of DHS Delegation No. 00106, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, is amended hereby to state as follows: "In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A."

By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security by amending Annex A of DHS *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106. Annex A is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A, Order for Delegation of Authority by the Secretary of the Department of Homeland Security
*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of the U.S. Customs and Border Protection;

4. Under Secretary for Strategy, Policy, and Plans;

5. Administrator and Assistant Secretary of the Transportation Security Administration;

6. Administrator of the Federal Emergency Management Agency;

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

Dated: 11/08/19

Kevin K. McAleenan
Acting Secretary of Homeland Security

EXHIBIT 7

Order Designating the Order of Succession
for the Secretary of Homeland Security

(a) By any authority vested in me as Acting Secretary of Homeland Security, including the Homeland
Security Act of 2002, 6 U.S.C. § 113(g)(2), and notwithstanding any Department of Homeland Security
(DHS) prior delegation, directive, instruction, policy, or other document of any kind, including without
limitation DHS Delegation No. 00106, I hereby designate the order of succession for the Secretary of
Homeland Security as follows:

Order of Succession for the Secretary of Homeland Security
*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of the U.S. Customs and Border Protection

4. Under Secretary for Strategy, Policy, and Plans;

5. Administrator and Assistant Secretary of the Transportation Security Administration; and

6. Administrator of the Federal Emergency Management Agency.

(b) No individual who is serving in an office listed in paragraph (a) in an acting capacity, by virtue of so
serving, shall act as Secretary pursuant to this order.

(c) I am issuing this Order out of an abundance of caution and to minimize any disruption occasioned by
a recent Government Accountability Office (GAO) opinion (B-331650 (Comp. Gen., Aug. 14, 2020))
and recent challenges filed in Federal court alleging that the November 8, 2019, order of succession
issued by then-Acting Secretary Kevin McAleenan was not valid.   I believe that the GAO's opinion and
the plaintiff's arguments in those court cases are incorrect and present an unnecessary distraction to the
mission of the Department of Homeland Security.   Nevertheless, under GAO's view, no Secretary has
ever properly invoked 6 U.S.C. § 113(g)(2) "[to] designate such other officers of the Department in
further order of succession to serve as Acting Secretary."   In that case, the Federal Vacancies Reform
Act (FVRA) would provide an alternative basis for an official to exercise the functions and duties of the
Secretary temporarily in an acting capacity.   As the most senior successor listed in Executive Order
13753, 81 Fed. Reg. 90667 (Dec. 9, 2016), in accordance with the President's advance exercise of his
authority to name an Acting Secretary under the FVRA, and without casting doubt on the continued
validity of the Amendment to the Order of Succession for the Secretary of Homeland Security issued by
Acting Secretary McAleenan on November 8, 2019, I am relying on any authority I may have been
granted by the FVRA to designate the order of succession for the Secretary of Homeland Security
pursuant to 6 U.S.C. § 113(g)(2), as specified and directed in paragraph (a) of this Order.   Upon my
signature, any authority that I may have been granted by the FVRA will terminate because 6 U.S.C.
§ 113(g)(2) applies "[n]otwithstanding chapter 33 of title 5."

(d) This Order Designating the Order of Succession for the Secretary of Homeland Security shall be
effective immediately upon the affixing of the signature of the undersigned.

Dated: 10 SEPT 2020

_____

Peter T. Gaynor
Department of Homeland Security

# EXHIBIT 8

*Secretary*

U.S. Department of Homeland Security
Washington, DC 20528



# Homeland Security

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
                   Acting Commissioner, U.S. Customs and Border Protection

                   Alejandro Mayorkas
                   Director, U.S. Citizenship and Immigration Services

                   John Morton
                   Director, U.S. Immigration and Customs Enforcement

FROM:              Janet Napolitano
                   Secretary of Homeland Security

SUBJECT:           Exercising Prosecutorial Discretion with Respect to Individuals
                   Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

EXHIBIT 9

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

September 5, 2017

MEMORANDUM FOR:      James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

FROM:                Elaine C. Duke
Acting Secretary

SUBJECT:             **Rescission of the June 15, 2012 Memorandum Entitled "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the
United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children," which established
the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the
manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to
execute a wind-down of the program, consistent with the parameters established in this memorandum.

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 2

**Background**

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] *Id.*

Re: Rescission of June 15, 2012 DACA Memorandum
Page 3

with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

---

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 4

**Rescission of the June 15, 2012 DACA Memorandum**

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

Re:  Rescission of June 15, 2012 DACA Memorandum
Page 5

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

EXHIBIT 10



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:    Chad F. Wolf
Acting Secretary

SUBJECT:    **Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies. Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy. To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy. More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission. At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration. Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission. Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:** There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy. And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients. They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients. They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide. And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy. And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please. In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist. Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole. Accordingly, that has been the status quo for more than two years. It makes sense to continue that approach while I reconsider whether to rescind or revise the policy. If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time. And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year. Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it. And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal. They will merely have to seek renewal on an annual, rather than biannual, basis. In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis. Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period. But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS. DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration. In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1]     Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.

*   *   *   *   *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS. Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

# EXHIBIT 11



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

August 21, 2020

# Memorandum

TO:        Associate Directors and Program Office Chiefs

FROM:     Joseph Edlow
             Deputy Director for Policy

SUBJECT:  Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,
             "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial
             Discretion with Respect to Individuals Who Came to the United States as
             Children'"

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum
entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children.'" In light of
the U.S. Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents
of the University of California, et al.* Nos. 18-587, 18-588, 18-589, Acting Secretary Wolf
rescinded memoranda issued by former Acting Secretary Elaine Duke in 2017 and former
Secretary Kirstjen Nielsen in 2018 that had concluded that the Deferred Action for Childhood
Arrivals (DACA) policy established on June 15, 2012 by former Secretary Janet Napolitano[1]
(hereafter "the Napolitano memorandum") should be rescinded after an orderly wind-down
process.

Acting Secretary Wolf's memorandum (hereafter "the Wolf Memorandum") also set forth
departmental action to effect certain immediate changes to limit the scope of the DACA policy
pending a full and careful reconsideration of the DACA policy. Through this memorandum, I am
providing additional guidance to facilitate implementation of the specific changes to the DACA
policy that are within the purview of USCIS.

The Wolf Memorandum directed the following actions, effective immediately:

- Reject all initial DACA requests and associated applications for Employment
  Authorization Documents, and refund all associated fees, without prejudice to re-filing

---

[1] Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, Re:
Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June
15, 2012) ("Napolitano memorandum").

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 2

such requests should DHS determine to begin accepting initial requests again in the future;

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries;

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year;

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances;

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate; and

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum changes that policy.

To facilitate implementation of the Wolf Memorandum, I am providing additional guidance to USCIS personnel as follows:

> **Reject all initial DACA requests and associated applications for Employment Authorization Documents, and return all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.**

The Wolf Memorandum makes clear that these changes should apply to all initial DACA requests submitted by aliens who have never before received DACA, whether submitted after the issuance of his memorandum or pending before USCIS at the time his memorandum was issued. In accordance with the Wolf Memorandum, USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA.* Since the Supreme Court's decision in

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 3

*Regents*, these requests, if properly filed, have generally been on hold at the USCIS filing
location pending further action by USCIS.[2]

Historically, USCIS policy on DACA renewals has permitted DACA recipients to request
renewal of DACA for up to one year after their underlying DACA grant has expired.  DACA
recipients who failed to submit their renewal requests within the one-year time period following
expiration have generally been permitted to request DACA anew.  Given the lapse of time
between these aliens' last DACA period and their subsequent request to again receive DACA,
however, USCIS has treated such requests as requests for "initial" DACA for required evidence,
processing, and adjudication purposes.  Likewise, DACA recipients whose most recent period of
DACA has been terminated by USCIS (rather than expired on its own terms) have also been
permitted to request DACA anew, but such requests are treated as requests for "initial" DACA
(even if the lapse of time between the termination of their most recent period of DACA and their
subsequent request to receive DACA again is less than one year).

Under the preliminary injunctions issued in January and February of 2018,[3] USCIS has accepted
and adjudicated DACA requests from aliens who have previously received grants of DACA *at
any time*—including requests that are treated as "initial" requests for the reasons described
above.  Given the Acting Secretary's desire to maintain the status quo of the past few years,
USCIS will continue to accept and adjudicate such requests notwithstanding any language in the
Wolf Memorandum about rejecting "all" requests for initial DACA.

> ➢ **Adjudicate all pending and future DACA renewal requests and associated
> applications for Employment Authorization Documents from DACA recipients.**

USCIS shall continue to adjudicate all pending DACA renewal requests and renewal requests
received after the Wolf Memorandum, as well as certain initial requests as discussed above,
under the general adjudicative guidelines in place for DACA.  USCIS will continue to reject,
without prejudice to re-submission, DACA renewal requests that are not properly filed in
accordance with form instructions and USCIS filing guidance, as it has done since USCIS first
started accepting DACA renewal requests.  While USCIS will continue to adjudicate DACA
requests under the same general adjudicative guidelines, USCIS is implementing certain
immediate changes to DACA processing consistent with and in furtherance of the Wolf
Memorandum.

Since June 2014 when DHS and USCIS announced the DACA renewal process, USCIS has
consistently instructed DACA recipients to file renewal requests between 150 days and 120 days

---

[2] Initial DACA requests that were properly filed prior to September 5, 2017, should be adjudicated to completion in
the event that any of these requests still remain pending with USCIS.  This guidance to reject and return the fees for
pending initial DACA requests does not apply to initial DACA requests properly filed prior to September 5, 2017.

[3] See https://www.uscis.gov/humanitarian/deferred-action-for-childhood-arrivals-response-to-january-2018-
preliminary-injunction

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 4

prior to their DACA expiration.[4]  Previously, USCIS has accepted renewal requests filed in advance of that period.  In furtherance of the directives in the Wolf Memorandum, USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period.  The Wolf Memorandum expressed concerns with the scope of the DACA policy during the interim period the policy is under review.  Exercising discretion to generally reject DACA renewal requests received more than 150 days prior to the expiration of the alien's current period of DACA is more consistent with our long-existing guidance to DACA recipients and serves other important operational interests to improve USCIS's processing and operational efficiencies as a whole.  Additionally, implementing these case intake procedures recognizes that the DACA policy is under comprehensive legal and policy review and may be modified or entirely rescinded by the Acting Secretary once DHS's review of the DACA policy is complete.  Therefore, USCIS believes that it is more prudent to generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period as the DACA policy may be revised or rescinded before USCIS would normally take final adjudicative action on these early filed renewal requests.

USCIS understands that applicants, petitioners, and requestors have an interest in timely adjudications.  This is particularly true for aliens granted temporary authorization to work in the United States who then apply to USCIS to renew their employment authorization documents before their temporary employment authorization expires.  The interim adjustment discussed in this memorandum with respect to early filed DACA renewals balances concerns with the scope of the DACA policy during this interim period with the interests DACA recipients have in preventing gaps in DACA and associated employment authorization.  Further, this guidance reflects an understanding that USCIS processes millions of requests for immigration benefits every year in addition to DACA requests, and therefore USCIS must also balance the interests of all other individuals requesting immigration benefits from the agency.  Of course, this balancing of interests must be done with consideration given to available resources.

USCIS has seen thousands of instances of current DACA recipients filing for DACA renewal when they still have more than 150 days remaining in their current DACA validity.  USCIS data shows that as of June 30, 2020, there were over 11,000 active DACA recipients with DACA renewals pending before USCIS whose current DACA was not set to expire until after January 1, 2021; further, there were nearly 400 active DACA recipients with pending renewal requests whose DACA was not set to expire until the year 2022.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date.  USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.  However, permitting and accepting DACA renewal requests filed many months in advance of

---

[4] See DACA FAQ 50; https://www.uscis.gov/archive/frequently-asked-questions#renewal; See also: https://www.dhs.gov/news/2014/06/05/secretary-johnson-announces-process-daca-renewal

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 5

DACA expiration only to be preliminarily processed by USCIS and placed on hold is not an efficient use of agency resources.

In assessing whether USCIS should exercise its discretion to begin generally rejecting DACA renewal requests filed more than 150 days prior to expiration, I considered the interests DACA renewal requestors may have in being permitted to file for renewal more than 150 days prior to DACA expiration. In consideration of these potential interests, I examined DACA renewal processing times. USCIS data shows that from August 1, 2019 to August 1, 2020, approximately ninety-six percent of DACA renewal requests processed were completed in 120 or fewer days.

The data demonstrate that in the overwhelming majority of DACA renewal cases, it is not necessary to accept DACA renewal requests more than 150 days before the alien's current DACA period expires in order to facilitate timely processing and minimize gaps in DACA and associated employment authorization. For those aliens, the only effect of this change will be for those early requesters either to wait until the specified period to request renewal or to re-file an early-filed renewal request at the appropriate time. In cases where the requestor may not continue to meet the DACA guidelines, including concerns that arise from background check results, renewal processing may require more time, but these outliers do not reasonably justify permitting routine acceptance of early filings during this interim period while the DACA policy is under review given USCIS's other policy and operational concerns.

Lastly, nothing precludes USCIS from exercising its discretion to accept a DACA renewal request filed 150 days or more in advance of expiration if there are legitimate reasons for doing so, and nothing precludes USCIS from again modifying recommended filing timelines either during this interim period or should DHS announce changes to the DACA policy in the future.

> **Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.**

As described in the Wolf Memorandum, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one year.[5]

The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one year minus one day from the date of approval. Also consistent with past practices, the associated employment authorization validity period shall end on the same date that the DACA validity period ends.

The Wolf Memorandum acknowledged that shortening validity periods to one year during this interim period will have the effect of increasing the total amount of fees DACA requestors would pay over a multi-year period and asked USCIS to consider whether it is possible to reduce renewal fees during this time. USCIS is currently considering the merits and feasibility of

---

[5] 8 CFR 274a.12(c) states in pertinent part that "USCIS, in its discretion, may establish a specific validity period for an employment authorization document . . ."

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 6

reducing DACA-related fees during the interim period the DACA policy is under review. Pursuant to INA Section 286(m), DHS may set fees at a level that will "ensure recovery of full costs" of providing adjudication services. While USCIS has never charged a fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, all DACA requestors are required to file Form I-765, Application for Employment Authorization, which does require a fee with very limited exemptions. DACA requestors are also required to pay a biometrics fee.

USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being. Lastly, as noted above, USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period, which may lessen some of the economic impact from shortened DACA renewal validity periods.

> **Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.**

Notwithstanding the prospective changes made by the Wolf Memorandum, USCIS will allow previous two-year grants of DACA and associated employment authorization to remain undisturbed during their existing two-year validity periods (unless USCIS terminates an alien's DACA and associated employment authorization for other reasons). Consistent with this guidance, two-year DACA recipients who apply for a replacement EAD due to loss, theft, or the mutilation of their prior EAD will receive a replacement EAD with the same expiration date based on the original two-year validity period, assuming the application is otherwise approvable.

> **Reject all pending and future Form I-131 applications for advance parole from DACA recipients and refund all associated fees, absent exceptional circumstances.**

Acting Secretary Wolf states the following in his memorandum with respect to advance parole:

"In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist."

Because USCIS will not be able to determine whether Form I-131 applications already received at the DACA-specific filing location fit within Secretary Wolf's stated parole policy without adjudicating the applications, and applicants who filed their Form I-131 before the Wolf Memorandum was issued did not have prior knowledge of the guidance in the memorandum, USCIS has determined that it would be more efficient and fair if applicants refile their applications under the new guidance. Therefore, USCIS shall reject and return the fees for all Form I-131 applications received at the DACA specific filing location that have been held since July 24, 2020.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 7

If those DACA recipients still wish to submit a request for advance parole, they may submit their Form I-131 applications consistent with filing instructions that will be announced on the USCIS website. The Form I-131 rejection notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

Regarding Form I-131 applications filed by DACA recipients at non-DACA filing locations before the Wolf Memorandum was issued and therefore accepted, USCIS will treat these applications similarly to those that have been on hold at the DACA-specific filing location. USCIS will administratively close these cases and refund the fees. USCIS will issue notices informing these applicants that their application has been administratively closed consistent with the Wolf Memorandum. The notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

USCIS will continue to maintain the current policy for DACA recipients who apply for advance parole in association with other non-DACA immigration requests. For instance, if a DACA recipient has a pending Form I-485 Application to Register Permanent Residence or Adjust Status and requests advance parole on the basis of his or her pending Form I-485, USCIS will adjudicate the advance parole request under the existing policies for Form I-485-based advance parole requests. USCIS will not apply this memorandum to a parole request by a DACA recipient if the request is associated with another underlying immigration benefit (i.e., other than DACA) as described in the instructions to Form I-131 or in USCIS policy guidance.

DACA recipients who have no separate basis for requesting advance parole as described in the instructions to Form I-131 may request advance parole if they have valid DACA and can demonstrate that they warrant the extraordinary privilege of being permitted to return to the United States after traveling abroad, even without a lawful immigration status, pursuant to a valid advance parole travel document.

The Wolf Memorandum sets forth new agency guidance with respect to management of the adjudication of advance parole applications submitted by DACA recipients who do not have a non-DACA basis for advance parole. For nearly three years, advance parole applications submitted by DACA recipients were rejected or denied by USCIS (the applications that were accepted and then denied were accepted solely because they were submitted to an incorrect filing location).

The Wolf Memorandum does not revive the prior DACA-based advance parole standards[6] or add a supplementary exceptional circumstances test to those standards. Rather, the Wolf

---

[6] The prior policy for granting advance parole based on DACA stated that USCIS would generally only grant advance parole if the DACA recipient's travel abroad would be in the furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- Educational purposes, such as semester-abroad programs and academic research, or;

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 8

Memorandum institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards during an interim period while DHS conducts a full review of the DACA policy. As Acting Secretary Wolf noted, it makes sense to continue this approach while he reconsiders whether to rescind or revise the prior policy. The only difference is that the Wolf Memorandum permits USCIS to process advance parole applications submitted by DACA recipients consistent with INA Section 212(d)(5) and based on a full consideration of all the discretionary factors presented in the alien's application.

Such grants of advance parole should, as a threshold matter, be consistent with the statutory description of parole under INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefit. Accordingly, I am directing USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with the statute and take into consideration all other discretionary factors present in the case under the totality of circumstances.

Secretary Wolf's memorandum providing for "exceptional circumstances" should be understood in the context of this existing high statutory standard for parole found in INA Section 212(d)(5). Therefore, in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole under Secretary Wolf's interim policy regarding the discretionary exercise of parole for urgent humanitarian reasons or significant public benefit. Additionally, as USCIS has noted since DACA recipients were first permitted to apply for advance parole, travel for vacation is not a valid basis for advance parole.

While the determination of whether to grant advance parole to a DACA recipient based on exceptional circumstances is a case-by-case assessment involving the assessment of the totality of factors presented, some examples of travel that may fit within the statutory standard for parole include, but are not limited to the following:

- Travel to support the national security interests of the United States including U.S. military interests;

- Travel in furtherance of U.S. federal law enforcement interests;

- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States;

- Travel needed to support the immediate safety, well-being, or care of an *immediate* relative, particularly minor children of the alien.

The burden shall be on the alien to establish eligibility for parole pursuant to INA section 212(d)(5).

---

- Employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 9

USCIS will consider all discretionary factors presented in the application before making a decision on the advance parole request. The advance permission to travel abroad and return to the United States pursuant to an advance parole travel document is an extraordinary privilege. It is a particularly extraordinary privilege when conferred to an alien who has resided in the United States contrary to our immigration laws (irrespective of when the alien arrived in the United States). The June 15, 2012 Napolitano memorandum itself contained no directive to provide this extraordinary benefit to DACA recipients, and USCIS has not granted this benefit to DACA recipients since the issuance of the September 5, 2017, Duke memorandum.

To ensure compliance with this interim policy, I am directing that any applications for advance parole preliminarily assessed to be approvable by the Service Center(s) designated to adjudicate such applications, receive concurrence from no lower than the Deputy Associate Director for Service Center Operations Directorate (SCOPS) prior to final approval. SCOPS will develop a process to facilitate this review in a timely manner.

SCOPS shall immediately work with the Office of Intake and Document Production (OIDP) and the External Affairs Directorate (EXA) to develop public guidance consistent with this memorandum. The public guidance shall make clear that any applications for advance parole submitted by DACA recipients and received at the designated filing location will be considered a DACA-based application for advance parole based on the Wolf Memorandum.

The public guidance shall make clear that USCIS will accept the application if properly completed and process the fee prior to making an adjudicative determination on whether advance parole should be granted. The public guidance shall also make clear that any applications denied by USCIS because USCIS finds that the application does not merit approval, in the exercise of its discretion, under INA Section 212(d)(5), are not appealable and shall not receive a refund of application fees.

As noted above, INA Section 286(m) gives USCIS authority to collect application fees that "ensure recovery of the full costs of providing [adjudication services]." The determination of whether to grant advance parole under INA Section 212(d)(5) must be made by a trained Immigration Officer after required background checks and other processing requirements are completed. Those services cost money which USCIS recoups from the application fee. As those services must be completed prior to a final determination on whether the alien merits a grant of advance parole USCIS will not refund the application fees on advance parole applications that USCIS denies, consistent with USCIS standard practice.

SCOPS will work with the Office of Policy and Strategy (OP&S) and the Office of the Chief Counsel (OCC) to develop additional training or guidance materials to assist officers in the adjudication of these applications consistent with this memorandum.

> **Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.**

USCIS shall not terminate any previously approved advance parole documents issued to DACA recipients during the stated validity period of the existing advance parole document, absent a

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 10

valid, separate legal basis distinct from the directives in the Wolf Memorandum for terminating advance parole.[7]

> **Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.**

Based on the immediate review of the DACA policy, including the immediate interim changes to the policy discussed in the Wolf Memorandum and this memorandum, I am directing SCOPS to immediately review the internal guidance document referred to as the DACA SOP last revised on August 28, 2013. SCOPS should work with OCC and OP&S to immediately update the DACA SOP consistent with the Wolf Memorandum and this memorandum. The updated DACA SOP shall make clear that it is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress.

SCOPS should also review other internal DACA operational guidance and training materials currently in use to ensure that they are consistent with the Wolf Memorandum and this memorandum.

USCIS must continue to follow the DACA termination procedures required by all relevant court orders as long as they remain in effect.

> **Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.**

USCIS shall continue to operate under the DACA information sharing policy described above. Nothing in this memorandum or the Wolf Memorandum makes any change to that policy.

**Use**

This memorandum is intended solely for the instruction of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to, create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[7] USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017.

EXHIBIT 12

**Department of Homeland Security**
**DHS Delegation Number: 00106**
**Revision Number: 08.6**
**Issue Date: 12/15/2016**
**Updated Date: 11/14/2019**

# DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS

# I.    Purpose

This is a succession order for named positions and a delegation of authority for the continuity of essential functions of officials at the Department of Homeland Security (DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic emergencies, or vacancies in offices.

# II.    Succession Order/Delegation

A.    In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A.

B.    I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency.

C.    The order of succession for the named positions, other than the Office of the Secretary, are provided in Annexes B through AC.

D.    I hereby delegate authority to the officials occupying the identified positions in the orders listed in Annexes B through AC to exercise the powers and perform the functions and duties of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency until that condition ceases.

1

E.      In terms of named positions in which appointment is required to be made by the President, by and with the advice and consent of the Senate (PAS), if positions are vacant as that term is used in the Federal Vacancies Reform Act of 1998, the First Assistant shall act as the incumbent until a successor is appointed, unless otherwise designated by the President.  The individual serving in the position identified as the first to succeed is designated the "First Assistant" for the purposes of the Federal Vacancies Reform Act of 1998.  If the First Assistant position is vacant, the next designated official in the order of succession may exercise all the powers, duties, authorities, rights, and functions authorized by law to be exercised by the incumbent, but may not perform any function or duty required by law to be performed exclusively by the office holder.

F.      For all other positions that are not subject to the Federal Vacancies Reform Act of 1998, any official in the order provided for in the succession order may exercise all the powers, duties, authorities, rights, and functions authorized to be performed by the incumbent, to the extent not otherwise limited by law.

G.      Only officials specifically designated in the order of succession for each of the named positions in Annexes B through AC are eligible, subject to modification in accordance with Section II.I.  Unless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession.

H.      The prohibition on any re-delegation of powers, authorities, functions, and duties contained in Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents is not applicable to restrict the authority of any individual who is exercising the authority of a vacant position under this Delegation.  Such an individual shall, however, be bound by such Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents, and shall not further re-delegate powers to any individual.

I.      Each Annex may be updated separately.  A Component Head seeks modification of his/her order of succession by forwarding a proposed updated Annex to the Office of Operations Coordination (OPS), Continuity Division and the Office of the Under Secretary for Management (MGMT), Program Manager, Delegations and Directives; Annexes are processed by MGMT, in consultation with the Office of the General Counsel (OGC), for approval of the Secretary.  At a minimum, the Annex is coordinated with OGC and the White House Liaison. Where possible, Component orders of succession should be at least three positions deep and geographically dispersed.

J.      The Office of the Executive Secretary, MGMT, and OPS are responsible for maintaining a current list of incumbents holding all positions identified in Annexes B through AC.

2

Delegation # 00106
Revision # 08.6

K.     Nothing in this delegation is intended to limit my discretion as Secretary to depart from this delegation.

# III.   Authorities

A.     Title 5, United States Code (U.S.C.) §§ 3345-49 (Federal Vacancies Reform Act of 1998, as amended)

B.     Title 6, U.S.C., § 112 (Secretary; functions)

C.     Title 6, U.S.C., § 113(g) (Other Officers)

# IV.   Office of Primary Interest

OPS and MGMT is the office of primary interest for maintaining and updating the Annexes to this Delegation.

Jeh Charles Johnson
Secretary of Homeland Security

Dec 15 2016
Date

**Legend**

| | |
|---|---|
| Career | C |
| Limited Term Appointment | L |
| Military Officer | M |
| Non-Career in the Senior Executive Service or Schedule C | N |
| Presidential Appointee | P |
| Presidential Appointee with Senate Confirmation | S |
| Scientific Professional | T |
| First Assistant pursuant to the Federal Vacancies Reform Act | * |

3

Delegation # 00106
Revision # 08.6

ATTACHMENT 1

# DHS ORDERS OF SUCCESSION AND ORDERS FOR DELEGATIONS OF AUTHORITIES

| Annex | Title | Issue Date |
|---|---|---|
| Annex A | Order For Delegation of Authority by the Secretary of the Department of Homeland Security | Revision 08.6, 11/08/2019 |
| Annex B | Deputy Secretary, Office of the | Revision 08.6, 11/13/2019 |
| Annex C | Citizenship and Immigration Service Ombudsman | Revision 06, 09/14/2016 |
| Annex D | Citizenship and Immigration Services, United States | Revision 08.6, 06/10/2019 |
| Annex E | Civil Rights and Civil Liberties, Office for | Revision 06, 09/14/2016 |
| Annex F | Coast Guard, United States | Revision 06, 09/14/2016 |
| Annex G | Countering Weapons of Mass Destruction Office | Revision 08.2, 05/21/2018 |
| Annex H | Customs and Border Protection, United States | Revision 08.6, 11/14/2019 |
| Annex I | Executive Secretariat | Revision 06, 09/14/2016 |
| Annex J | Federal Emergency Management Agency | Revision 06, 09/14/2016 |
| Annex K | Federal Law Enforcement Training Center | Revision 06, 09/14/2016 |
| Annex L | General Counsel, Office of the | Revision 06, 09/14/2016 |
| Annex M | Immigration and Customs Enforcement, United States | Revision 06, 09/14/2016 |
| Annex N | Inspector General, Office of | Revision 06, 09/14/2016 |
| Annex O | Intelligence and Analysis, Office of | Revision 06, 09/14/2016 |
| Annex P | Legislative Affairs, Office of | Revision 06, 09/14/2016 |
| Annex Q | Management Directorate | Revision 06, 09/14/2016 |
| Annex R | National Protection and Programs Directorate | Revision 08, 07/11/2017 |
| Annex S | Operations Coordination, Office of | Revision 06, 09/14/2016 |
| Annex T | Partnership and Engagement, Office of | Revision 06, 09/14/2016 |
| Annex U | Strategy, Policy, and Plans, Office of | Revision 08.4, 02/15/2019 |
| Annex V | Privacy Office, Chief | Revision 06, 09/14/2016 |
| Annex W | Public Affairs, Office of | Revision 06, 09/14/2016 |
| Annex X | Science and Technology | Revision 07, 01/19/2017 |
| Annex Y | Secret Service, United States | Revision 06, 09/14/2016 |
| Annex Z | Transportation Security Administration | Revision 08.3, 10/23/2018 |
| Annex AA | Chief Financial Officer (DHS) | Revision 06, 09/14/2016 |
| Annex AB | Deputy Administrator, Federal Emergency Management Agency (FEMA) | Revision 06, 09/14/2016 |
| Annex AC | Protection and National Preparedness (FEMA) | Revision 06, 09/14/2016 |

ANNEX A

# ORDER FOR DELEGATION OF AUTHORITY BY THE SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY

*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1.  Deputy Secretary of Homeland Security
2.  Under Secretary for Management
3.  Commissioner of U.S. Customs and Border Protection
4.  Under Secretary for Strategy, Policy, and Plans
5.  Administrator and Assistant Secretary of the Transportation Security Administration
6.  Administrator of the Federal Emergency Management Agency

A-1

ANNEX B
ISSUE DATE: 11/13/2019        APPROVAL: 11/13/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Deputy Secretary, Office of the** | |
| 1 Deputy Secretary | S |
| 2 Under Secretary for Management* | S |
| 3 Principal Deputy Director, U.S. Citizenship and Immigration Services | N |
| 4 Administrator, Transportation Security Administration | S |
| 5 Administrator, Federal Emergency Management Agency | S |
| 6 Director, Cybersecurity and Infrastructure Agency | S |
| 7 Under Secretary, Science and Technology | S |
| 8 Under Secretary, Intelligence and Analysis | S |
| 9 Commissioner, U.S. Customs and Border Protection | S |
| 10 Director, U.S. Immigration and Customs Enforcement | S |
| 11 Director, U.S. Citizenship and Immigration Services | S |
| 12 Under Secretary, Office of Strategy, Policy, and Plans | S |
| 13 General Counsel | S |
| 14 Deputy Under Secretary for Management | C |
| 15 Deputy Commissioner, U.S. Customs and Border Protection | C |
| 16 Deputy Administrator, Transportation Security Administration | C |
| 17 Deputy Director, U.S. Immigration and Customs Enforcement | C |
| 18 Deputy Director, U.S. Citizenship and Immigration Services | C |
| 19 Director, Federal Law Enforcement Training Centers | C |

Delegation # 00106
Revision # 08.6

ANNEX C
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Citizenship and Immigration Services Ombudsman** | | |
| 1 | Ombudsman | N |
| 2 | Deputy Director | C |
| 3 | Senior Advisor | L |
| 4 | Chief of Staff | C |
| 5 | Director of Operations | C |
| 6 | Chief of Casework | C |

C-1

ANNEX D
ISSUE DATE: 06/10/2019       APPROVAL: 06/10/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                 Career Status

| | Citizenship and Immigration Services, United States | |
|---|---|---|
| 1 | Director | S |
| 2 | Principal Deputy Director* | N |
| 3 | Deputy Director | C |
| 4 | Associate Director, Management Directorate | C |
| 5 | Associate Director, Refugee Asylum and International Operations Directorate | C |
| 6 | Associate Director, Service Center Operations Directorate | C |
| 7 | Associate Director, Field Operations Directorate | C |
| 8 | Director, National Benefits Center | C |

Delegation # 00106
Revision # 08.6

ANNEX E
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Civil Rights and Civil Liberties, Office for** | | |
| 1 | Civil Rights and Civil Liberties Officer | P |
| 2 | Deputy Officer, Programs and Compliance | C |
| 3 | Deputy Officer, Equal Employment Opportunity Programs | C |
| 4 | Executive Officer | C |

E-1

ANNEX F
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                    Career Status

| | Coast Guard, United States | |
|---|---|---|
| 1 | Commandant | M |
| 2 | Vice Commandant | M |
| 3-4 | Deputy Commandant for Mission Support or Deputy Commandant for Operations in precedence of their grade | M |
| 5-6 | Other Vice Admirals in precedence of their grade | M |

F-1

ANNEX G
ISSUE DATE: 05/21/2018        APPROVAL: 05/21/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                    Career Status

| | Countering Weapons of Mass Destruction Office | |
|---|---|---|
| 1 | Assistant Secretary | P |
| 2 | Deputy Assistant Secretary | C |
| 3 | Chief of Staff | C |
| 4 | Deputy Director, Domestic Nuclear Detection Office | C |
| 5 | Deputy Director, Office of Health Affairs | C |

G-1

ANNEX H
ISSUE DATE: 11/14/2019       APPROVAL: 11/14/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                           Career Status

| | Customs and Border Protection, United States | |
|---|---|---|
| 1 | Commissioner | S |
| 2 | Chief Operations Officer* | N |
| 3 | Deputy Commissioner | C |
| 4 | Executive Assistant Commissioner, Office of Field Operations | C |
| 5 | Chief, U.S. Border Patrol | C |
| 6 | Executive Assistant Commissioner, Air and Marine Operations | C |
| 7 | Executive Assistant Commissioner, Trade | C |
| 8 | Executive Assistant Commissioner, Operations Support | C |
| 9 | Executive Assistant Commissioner, Enterprise Services | C |

Delegation # 00106
Revision # 08.6

ANNEX I
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Executive Secretariat** | |
| 1    Executive Secretary | N |
| 2    Deputy Executive Secretary | C |
| 3    Assistant Executive Secretary, Briefing Books/Interagency Coordination | C |

I-1

ANNEX J
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Federal Emergency Management Agency** | | |
| 1 | Administrator | S |
| 2 | Deputy Administrator* | S |
| 3 | Deputy Administrator, Protection and National Preparedness | S |
| 4 | Associate Administrator, Response and Recovery | N |
| 5 | FEMA Region IX Administrator | C |
| 6 | FEMA Region VI Administrator | C |

J-1

Delegation # 00106
Revision # 06

ANNEX K
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                          Career Status

| | Federal Law Enforcement Training Centers | |
|---|---|---|
| 1 | Director | C |
| 2 | Deputy Director for Training | C |
| 3 | Deputy Director for Management | C |
| 4 | Assistant Director, Mission and Readiness Support | C |
| 5 | Assistant Director, Regional and International Training | C |
| 6 | Assistant Director, Chief Financial Officer | C |
| 7 | Assistant Director, Glynco Training | C |
| 8 | Assistant Director, Centralized Training Management | C |
| 8 | Assistant Director, Washington Operations | C |
| 9 | Assistant Director, Chief Information Officer | C |
| 10 | Chief of Staff | C |

Delegation # 00106
Revision # 06

ANNEX L
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **General Counsel, Office of the** | | |
| 1 | General Counsel | S |
| 2 | Principal Deputy General Counsel* | C |
| 3 | Deputy General Counsel [Senior ranking by time in position and in DHS][1] | N |
| 4 | Deputy General Counsel [Senior ranking by time in position and in DHS] | N |
| 5 | Deputy General Counsel [Senior ranking by time in position and in DHS] | N |
| 6 | Chief of Staff | C |
| 7 | Associate General Counsel, Operations and Enforcement | C |
| 8 | Associate General Counsel, General Law | C |
| 9 | Chief Counsel, Transportation Security Administration | C |
| 10 | Chief Counsel, Federal Law Enforcement Training Center | C |

[1] For the Deputy General Counsel positions identified in lines 3-5, seniority is determined by length of time in the position. In the event more than one Deputy General Counsel has the same appointment date, time in service in the Department is the second determining factor for seniority.

L-1

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Immigration and Customs Enforcement, United States** | | |
| 1 | Assistant Secretary | S |
| 2 | Deputy Director* | C |
| 3 | Executive Associate Director, Homeland Security Investigations | C |
| 4 | Executive Associate Director, Enforcement and Removal Operations | C |
| 5 | Executive Associate Director, Management and Administration | C |
| 6 | Principal Legal Advisor | N |
| 7 | Special Agent in Charge – Denver | C |
| 8 | Field Officer Director – San Antonio | C |

ANNEX N
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|----------|---|---------------|
| **Inspector General, Office of** | | |
| 1 | Inspector General | S |
| 2 | Deputy Inspector General* | C |
| 3 | Counsel to the Inspector General | C |
| 4 | Assistant Inspector General, Audits | C |
| 5 | Assistant Inspector General, Inspections | C |
| 6 | Assistant Inspector General, Emergency Management Oversight | C |

Delegation # 00106
Revision # 06

ANNEX O
ISSUE DATE: 9/14/2016        APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Intelligence and Analysis, Office of** | |
| 1 Under Secretary for Intelligence and Analysis/DHS Chief Intelligence Officer | S |
| 2 Principal Deputy Under Secretary for Intelligence and Analysis* | C |
| 3 Deputy Under Secretary for Intelligence Operations | C |
| 4 Deputy Under Secretary for Mission Support | C |
| 5 Associate Deputy Director, El Paso Intelligence Center/ Strategic Analysis Section | C |

O-1

ANNEX P
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Legislative Affairs, Office of** | |
| 1  Assistant Secretary for Legislative Affairs | P |
| 2  Deputy Assistant Secretary (Senate) | N |
| 3  Deputy Assistant Secretary (House) | N |
| 4  Chief of Staff | C |
| 5  Director, Management Team | C |
| 6  Director, FEMA Team | C |
| 7  Director, Borders and Immigration | C |

Delegation # 00106
Revision # 06

ANNEX Q
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Management Directorate** | | |
| 1 | Under Secretary for Management | S |
| 2 | Deputy Under Secretary for Management* | C |
| 3 | Chief Financial Officer | S |
| 4 | Chief Information Officer | P |
| 5 | Chief Human Capital Officer | C |
| 6 | Chief Procurement Officer | C |
| 7 | Chief Readiness Support Officer | C |
| 8 | Chief Security Officer | C |
| 9 | Chief of Staff | C |
| 10 | Deputy Director, Federal Law Enforcement Training Center | C |

Delegation # 00106
Revision # 06

ANNEX R
ISSUE DATE: 07/11/2017       APPROVAL: 07/11/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                      Career Status

| | National Protection and Programs Directorate | |
|---|---|---|
| 1 | Under Secretary | S |
| 2 | Deputy Under Secretary for NPPD* | N |
| 3 | Assistant Secretary, Office of Infrastructure Protection | P |
| 4 | Assistant Secretary, Office of Cybersecurity and Communications | N |
| 5 | Deputy Assistant Secretary, Office of Infrastructure Protection | C |
| 6 | Deputy Assistant Secretary, Office of Cybersecurity and Communications | C |
| 7 | Director, Management | C |
| 8 | Office of Infrastructure Protection, Regional Director for Region 8 | C |

Delegation # 00106
Revision # 08

ANNEX S
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|----------|---------------|
| **Operations Coordination, Office of** | |
| 1    Director | C |
| 2    Deputy Director | C |
| 3    Director, Current Operations Division | C |
| 4    Director, National Operations Center | C |
| 5    Chief of Staff | C |

Delegation # 00106
Revision # 06

ANNEX T
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Partnership and Engagement, Office of** | |
| 1   Assistant Secretary | N |
| 2   Assistant Secretary for State and Local Law Enforcement | N |
| 3   Deputy Assistant Secretary, Intergovernmental Affairs | C |
| 4   Deputy Assistant Secretary, Private Sector Office | N |
| 5   Director of Local Affairs | C |

Delegation # 00106
Revision # 06

ANNEX U
ISSUE DATE: 2/15/2019          APPROVAL: 2/15/2019

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Strategy, Policy, & Plans, Office of** | |
| 1   Under Secretary | S |
| 2   Assistant Secretary for Strategy, Plans, Analysis, and Risk* | N |
| 3   Deputy Under Secretary | C |
| 4   Assistant Secretary for International Affairs | N |
| 5   Assistant Secretary for Threat Prevention and Security Policy | N |
| 6   Assistant Secretary for Border, Immigration, and Trade | N |
| 7   Assistant Secretary for Cyber, Infrastructure, and Resilience | N |
| 8   Deputy Assistant Secretary for Screening Coordination Office | C |
| 9   Deputy Assistant Secretary for International Affairs | C |

U-1

ANNEX V
ISSUE DATE: 9/14/2016        APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Privacy Officer, Chief** | |
| 1 Chief Privacy Officer | N |
| 2 Deputy Chief Privacy Officer | C |
| 3 Deputy Chief FOIA Officer | C |
| 4 Senior Director, Privacy Compliance | C |
| 5 Chief of Staff | C |

Delegation # 00106
Revision # 06

ANNEX W
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Public Affairs, Office of** | |
| 1   Assistant Secretary | P |
| 2   Principal Deputy Assistant Secretary | C |
| 3   Deputy Assistant Secretary for Media Operations/Press Secretary | N |
| 4   Deputy Assistant Secretary for Strategic Communications | N |
| 5   Director of Communications | N |
| 6   Chief of Staff | C |
| 7   Director, Incident Communications | C |

Delegation # 00106
Revision # 06

ANNEX X
ISSUE DATE: 1/19/2017          APPROVAL: 1/19/2017

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | Career Status |
|---|---|
| **Science and Technology** | |
| 1  Under Secretary | S |
| 2  Deputy Under Secretary* | C |
| 3  Chief of Staff | C |
| 4  Director, Homeland Security Advanced Research Projects Agency | C |
| 5  Director, Office of Support to the Homeland Security Enterprise and First Responders Division | C |
| 6  Director, Capability Development Support Division | C |
| 7  Director, Research and Development Partnerships | C |
| 8  Director, Finance and Budget Division | C |
| 9  Director, Administrative Support Division | C |

X-1

ANNEX Y
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

Position                                                                Career Status

| | Secret Service, United States | |
|---|---|---|
| 1 | Director | P |
| 2 | Deputy Director | C |
| 3 | Chief Operating Officer | C |
| 4 | Assistant Director - Protective Operations | C |
| 5 | Assistant Director - Investigations | C |
| 6 | Assistant Director - Government and Public Affairs | C |
| 7 | Assistant Director -  Human Resources | C |
| 8 | Assistant Director - Professional Responsibility | C |
| 9 | Assistant Director - Strategic Intelligence and Information | C |
| 10 | Assistant Director - Training | C |
| 11 | Chief - Uniformed Division | C |
| 12 | Chief Counsel | C |
| 13 | Chief Technology Officer | C |
| 14 | Chief Financial Officer | C |
| 15 | Chief - Strategic Planning and Policy | C |
| 16 | Deputy Assistant Director(s) - Protective Operations | C |
| 17 | Deputy Assistant Director(s) - Investigations | C |
| 18 | Deputy Assistant Director(s) - Government and Public Affairs | C |
| 19 | Deputy Assistant Director(s) -  Human Resources | C |
| 20 | Deputy Assistant Director(s) - Professional Responsibility | C |
| 21 | Deputy Assistant Director(s) - Strategic Intelligence and Information | C |
| 22 | Deputy Assistant Director(s) - Training | C |
| 23 | Deputy Assistant Director(s) - Technical Development and Mission Support | C |
| 24 | Deputy Assistant Director(s) - Strategic Planning and Policy | C |
| 25 | Special Agent in Charge - Washington | C |
| 26 | Special Agent in Charge - New York | C |
| 27 | Special Agent in Charge - Miami | C |
| 28 | Special Agent in Charge - Los Angeles | C |

Delegation # 00106
Revision # 06

ANNEX Z
ISSUE DATE: 10/23/2018      APPROVAL: 10/23/2018

# DHS ORDERS OF SUCCESSION AND
# ORDERS FOR DELEGATIONS OF AUTHORITIES

| Position | | Career Status |
|---|---|---|
| **Transportation Security Administration** | | |
| 1 | Administrator | S |
| 2 | Deputy Administrator | P |
| 3 | Chief of Staff | N |
| 4 | Executive Assistant Administrator, Security Operations | C |
| 5 | Executive Assistant Administrator, Operations Support | C |
| 6 | Executive Assistant Administrator, Law Enforcement/Federal Air Marshal Service | C |
| 7 | Executive Assistant Administrator, Enterprise Support | C |
| 8 | Regional Director, Atlanta, Security Operations | C |
| 9 | Regional Director, Dallas, Security Operations | C |

Delegation # 00106
Revision # 08.3

ANNEX AA
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

## DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL APPOINTEES WITH SENATE CONFIRMATION POSITIONS

| Position | | Career Status |
|---|---|---|
| **Chief Financial Officer (DHS)** | | |
| 1 | Chief Financial Officer | S |
| 2 | Deputy Chief Financial Officer* | C |

AA-1

ANNEX AB
ISSUE DATE: 9/14/2016          APPROVAL: 9/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL
APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Deputy Administrator, Federal Emergency Management Agency (FEMA)** | | |
| 1 | Deputy Administrator, FEMA | S |
| 2 | Deputy Administrator, Protection and National Preparedness* | S |
| 3 | Associate Administrator, Mission Support | C |
| 4 | Deputy Associate Administrator, Office of Policy and Program Analysis | C |
| 5 | Region IX Administrator | C |
| 6 | Region VI Administrator | C |

AB-1

ANNEX AC
ISSUE DATE: 09/14/2016        APPROVAL: 09/14/2016

**DESIGNATION OF FIRST ASSISTANTS FOR NON-COMPONENT HEAD PRESIDENTIAL APPOINTEES WITH SENATE CONFIRMATION POSITIONS**

| Position | | Career Status |
|---|---|---|
| **Protection and National Preparedness (FEMA)** | | |
| 1 | Deputy Administrator, Protection and National Preparedness | S |
| 2 | Assistant Administrator, National Preparedness Directorate* | C |
| 3 | Assistant Administrator, Grant Programs | P |
| 4 | Assistant Administrator, National Continuity Programs | N |

Delegation # 00106
Revision # 06

# EXHIBIT 13

**From:** Office of the Secretary <OfficeoftheSecretary@HQ.DHS.GOV>
**Sent:** Wednesday, April 10, 2019 4:35 PM
**Subject:** Farewell Message from Secretary Kirstjen M. Nielsen



April 10, 2019

**Farewell Message from Secretary Kirstjen M. Nielsen**

As you know, I submitted my resignation to the President earlier this week. Today is my final day at the Department. For nearly two years, I've had the honor to work alongside a talented, dedicated workforce. You serve with professionalism, respect, and determination in fulfilling DHS' important missions. The commitment you make day in and out – securing the land air and sea domains, preventing terrorism, administrating immigration laws, ensuring disaster resilience, safeguarding our cybersecurity landscape and infrastructure, and so much more – is awe inspiring.

Your work is vital to making every American safer, and as I leave you, know that I'll always admire what you've done to defend our way of life. Customs and Border Protection (CBP) Commissioner Kevin McAleenan will now lead DHS as your Acting Secretary. Kevin has led the Department's largest component for two years and his qualifications and experience will be instrumental in overseeing the crisis at our nation's borders. I have full confidence in Kevin's ability to carry out the DHS mission of safeguarding the American people, our homeland, and our values. Please join me in welcoming Kevin as the Acting Secretary.

To each of you I am eternally grateful for your service and could not be prouder to have served alongside you. Thank you for your devotion and sacrifice. God bless each of you and your families, and God bless this great country.

Warmest regards,

Kirstjen M. Nielsen
Secretary of Homeland Security

*With honor and integrity, we will safeguard the American people, our homeland, and our values.*