**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SANTA FE DREAMERS PROJECT, *et al.*,

        Plaintiffs,

        v.

CHAD WOLF, *et al.*,

        Defendants.

Case No. 1:20-cv-02465-RBW

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

I.     Department of Homeland Security Order of Succession ..................................... 2

II.    Deferred Action for Childhood Arrivals ............................................................ 5

III.   Litigation History ............................................................................................... 6

IV.   The Wolf Memorandum ..................................................................................... 7

V.    The Edlow Directive .......................................................................................... 8

LEGAL STANDARD ...................................................................................................... 8

ARGUMENT ................................................................................................................... 8

I.     Acting Secretary Wolf had lawful authority to issue the Wolf Memorandum under the HSA............................................................................................................... 9

II.    The plain text of the FVRA and the HSA make clear that the FVRA's 210-day time limit does not apply to designations under the HSA. ................................. 15

III.   Acting Secretary Wolf's ratification of the Wolf Memorandum cures the alleged violations of the HSA and FVRA. ..................................................................... 20

IV.   Acting Secretary Wolf's service does not violate the Appointments Clause. ................. 22

V.    Plaintiffs' Requested Relief is Overbroad. ....................................................... 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine*,
    527 U.S. 706 (1999) ................................................................................................ 22

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................................ 6

*Bhatti v. Fed. Hous. Fin. Agency*,
    332 F. Supp. 3d 1206 (D. Minn. 2018) ..................................................................... 23

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .............................................................................................. 7

*English v. Trump*,
    279 F. Supp. 3d 307 (D.D.C. 2018) ......................................................................... 12

*Guedes v. ATF*,
    356 F. Supp. 3d 109 (D.D.C. 2019) ......................................................................... 16

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019) ..................................................................................... 22

*Hooks v. Kitsap Tenant Support Servs. Inc.*,
    816 F.3d 550 (9th Cir. 2016) .................................................................................... 16

*Jama v. ICE*,
    543 U.S. 335 (2005) ................................................................................................. 18

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .............................................................................................. 15

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................................. 24

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ................................................................................................. 25

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................................................. 25

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ........................................................................... 6

*NAACP v. Trump*,
    315 F. Supp. 3d 457 (D.D.C. 2018) ........................................................................... 6

*NLRB v. SW Gen., Inc.*,
   137 S. Ct. 929 (2017) ................................................................................. 17

*Palisades Collections LLC v. Shorts*,
   552 F.3d 327 (4th Cir. 2008) ...................................................................... 19

*Regents of the Univ. of Cal. v. DHS*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ...................................................... 6

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ..................................................................................... 5

*Taylor v. Small*,
   350 F.3d 1286 (D.C. Cir. 2003) .................................................................. 8

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ............................................................................... 24

*United States v. Eaton*,
   169 U.S. 331 (1898) ....................................................................... 22, 23, 24

*United States v. Lucido*,
   373 F. Supp. 1142 (E.D. Mich. 1974) ....................................................... 16

*United States v. Smith*,
   962 F.3d 755 (4th Cir. 2020) ........................................................ 16, 19, 24

*Va. Uranium, Inc. v. Warren*,
   139 S. Ct. 1894 (2019) ............................................................................... 18

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ...................................................................... 10

*Weiss v. United States*,
   510 U.S. 163 (1994) ................................................................................... 23

**STATUTES**

5 U.S.C. § 706 ................................................................................................ 8

5 U.S.C. § 3345 *et seq.* ................................................................................. 21

5 U.S.C. § 3345 ....................................................................................... 11, 20, 21

5 U.S.C. § 3346 ....................................................................................... *passim*

5 U.S.C. § 3347 ............................................................................ 12, 15, 16, 17

5 U.S.C. § 3348 (1994) ................................................................................. 22

5 U.S.C. § 3349 ................................................................................................................ 16, 23

6 U.S.C. § 112 .................................................................................................................. 10, 12

6 U.S.C. § 113 ................................................................................................................... *passim*

28 U.S.C. § 508 ....................................................................................................................... 19

29 U.S.C. § 153 ....................................................................................................................... 18

Act of May 8, 1792, 1 Stat. 279 ............................................................................................ 22

Act of Feb. 13, 1795, 1 Stat. 415 .......................................................................................... 22

National Defense Authorization Act for Fiscal Year 2017,
  Pub. L. No. 114-328, 130 Stat. 2000 (Dec. 23, 2016)(codified at 6 U.S.C. § 113(g) .............. 11

**REGULATIONS**

8 C.F.R. § 274a.12 .................................................................................................................. 5

Amending the Order of Succession in the Department of Homeland Security,
  81 Fed. Reg. 90667 (Dec. 9, 2016) .......................................................................................... 21

Ratification of Department Actions,
  85 Fed. Reg. 59651 (Sept. 23, 2020) ................................................................................... 5, 22

**RULES**

Fed. R. Civ. P. 56 .................................................................................................................... 8

**OTHER AUTHORITIES**

*CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New
  DHS Headquarters*, Border Observer,
  https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-
  mcaleenan-sworn-in-as-the-acting-dhs-secretary/ ................................................................. 14

Daniel Lippman, Ian Kullgren, & Anita Kumar, *White House plans to name Chad Wolf
  acting DHS Secretary*, Politico (Oct. 31, 2019),
  https://www.politico.com/news/2019/10/31/chad-wolf-acting-dhs-secretary-063363 ............. 24

*Guidance on Application of Federal Vacancies Reform Act of 1998*,
  23 Op. O.L.C. 60 (Mar. 22, 1999) ........................................................................................... 17

https://www.uscis.gov/about-us/leadership/joseph-edlow-deputy-director-for-policy-us-
  citizenship-and-immigration-services ...................................................................................... 3

*Notice of Intent to Nominate*, (Aug. 27, 2020),
  https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-
  intent-to-nominate-the-following-individual-to-a-key-administration-post-082720/.................. 4

Office of Legal Counsel, *Designating an Acting Director of National Intelligence*,
  43 Op. O.L.C. __ (Nov. 15, 2019), https://www.justice.gov/olc/file/1220586/download........ 13

Press Release, DHS, Kirstjen M. Nielsen, Secretary of Homeland Security, Farewell
  Message from Secretary Kirstjen M. Nielsen (Apr. 10 2019),
  https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen.......... 14

S. Rep. No. 105-250 (1998) ...................................................................................... 16, 17, 19, 20

*Two Nominations Sent to the Senate* (Sept. 10, 2020),
  https://www.whitehouse.gov/presidential-actions/two-nominations-sent-senate-091020/........ 4

Zolan Kanno-Youngs & Maggie Haberman, *Trump to Name Chad Wolf as Acting Secretary*,
  N.Y. Times (Nov. 1, 2019),
  https://www.nytimes.com/2019/11/01/us/politics/trump-chad-wolf-dhs.html ........................ 24

## <u>INTRODUCTION</u>

There can be no dispute that the Department of Homeland Security may *modify* a discretionary non-enforcement policy like DACA at any time, so long as it provides a sufficient explanation. The agency has now done so: for the reasons explained in the Wolf Memorandum, and until further notice, DHS has modified DACA while retaining its core—including by allowing current DACA recipients to renew their DACA. Indeed, Plaintiffs do not challenge the substance of the Wolf Memorandum itself. Instead, they challenge the Memorandum only on the basis that the individual who signed the operative document—Acting Secretary of Homeland Security Chad F. Wolf—was not lawfully appointed to his position.

Plaintiffs' argument is meritless, as it is based on misinterpretations of both the relevant statutory provisions and the agency's own internal documents. Acting Secretary Wolf took office pursuant to a valid order of succession, and has been serving lawfully under the Homeland Security Act ever since. Accordingly, the default limitations imposed on acting service by the Federal Vacancies Reform Act do not apply. Nor does the Appointments Clause of the U.S. Constitution foreclose the practice of temporary acting service, ubiquitous since the founding—especially by an official, like Acting Secretary Wolf, who has already been nominated by the President and confirmed by the Senate to another germane office within the same agency. And because Acting Secretary Wolf is serving lawfully in his position, Plaintiffs' arguments that he unlawfully appointed Deputy Director for Policy of USCIS, Joseph Edlow, fail for the same reasons. In any event, out of an abundance of caution, Acting Secretary Wolf has since ratified the Wolf Memo, rendering it lawful even under Plaintiffs' theory.

For these reasons, and as explained below, Plaintiffs' motion for summary judgment should be denied, and Defendants' cross-motion for summary judgment should be granted.

## BACKGROUND

### I.     Department of Homeland Security Order of Succession

Since its amendment in 2016, the Department of Homeland Security's organic statute—
that is, the Homeland Security Act (HSA)—gives the Secretary of Homeland Security the power
to "designate such other officers of the Department in further order of succession to serve as Acting
Secretary." 6 U.S.C. § 113(g)(2). In April 2019, then-Secretary of Homeland Security Kirstjen
M. Nielsen[1] exercised this power and designated an order of succession for the office of the
Secretary in the event of a vacancy: "By the authority vested in me as Secretary of Homeland
Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate
the *order of succession* for the Secretary of Homeland Security as follows . . . ." *See* Ex. 1,
Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order")
(emphasis added); *see also* Ex. 2, Decl. of Neal J. Swartz ¶ 3 ("Swartz Decl."). That new order of
succession, in turn, made the Commissioner of U.S. Customs and Border Protection (CBP) third
in line to serve as Acting Secretary of Homeland Security. April 2019 Order at 2.

That signed order constituted the controlling order of succession when Nielsen resigned in
April 2019. *See* Swartz Decl. ¶ 6 ("[T]hen-Secretary Nielsen's signed order amending the DHS
order of succession for Acting Secretary, pursuant to her authority under 6 U.S.C. § 113(g)(2), was
effective when she signed the order on April 9, 2019 . . . ."). When Secretary Nielsen resigned,
*see* Ex. 3, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon.
Michael R. Pence, President of the Senate (Apr. 11, 2019), the first two offices in the succession
order were vacant, *see* Swartz Decl. ¶ 5; *see also* Ex. 4, Letter from Neal J. Swartz, Associate

---

[1] Kirstjen M. Nielsen was nominated by the President to serve as the Secretary of Homeland
Security on October 11, 2017, confirmed by the Senate on December 5, 2017, and sworn into the
office on December 6, 2017.

2

General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 16, 2018); Ex. 5, Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019).  Thus, as the next official in line, CBP Commissioner Kevin McAleenan[2] began serving as Acting Secretary of Homeland Security.  And because McAleenan's service was consistent with the operative succession order, he lawfully used his power as Acting Secretary in November 2019 to further amend the succession order.

When Acting Secretary McAleenan resigned, Chad F. Wolf—who had been appointed by the President following confirmation by the Senate to serve as the Under Secretary for DHS's Office of Strategy, Policy and Plans and was the most senior official listed on the new succession order—began serving as Acting Secretary of Homeland Security, per the terms of that November 2019 amended succession order.  *See* Ex. 6, Amendment to the Order of Succession for the Secretary (Nov. 9, 2019).  Mr. Wolf named Joseph Edlow the Deputy Director for Policy of U.S. Citizenship and Immigration Services ("USCIS") effective February 19, 2020.  *See* https://www.uscis.gov/about-us/leadership/joseph-edlow-deputy-director-for-policy-us-citizenship-and-immigration-services.

---

[2] Kevin McAleenan was nominated by the President to serve as the Commissioner of U.S. Customs and Border Protection on May 22, 2017, confirmed by the Senate on March 19, 2018, and sworn into office on March 20, 2018.

On August 27, 2020, the President formally announced his intent to nominate Acting Secretary Wolf to serve as the Secretary of Homeland Security.[3]  On September 10, 2020, the President submitted Mr. Wolf's nomination to the Senate.[4]

As DHS has explained, Acting Secretary Wolf is serving lawfully under the HSA, and under valid orders altering the DHS order of succession issued by Ms. Nielsen and Mr. McAleenan. But DHS recognizes that ongoing challenges to Acting Secretary Wolf's service risk an unnecessary "distraction to the mission of the Department of Homeland Security."  Ex. 7, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020). Under Plaintiffs' theory that the terms of Executive Order 13753 are controlling, the Senate-confirmed Administrator of the Federal Emergency Management Agency (FEMA), Peter T. Gaynor[5], would be the officer next in line to serve as Acting Secretary on the submission of Mr. Wolf's nomination.  Thus, "out of an abundance of caution," Mr. Gaynor issued a new order of succession on September 10, 2020, relying on "any authority vested in [him] as Acting Secretary of Homeland Security."  *Id.*  In other words, although DHS disagrees with the legal theory advanced by plaintiffs in these and other cases, if that theory is correct, the result would be that Mr. Gaynor (not Mr. Wolf) would be the proper Acting Secretary under the Executive Order's order of succession—and thus would be authorized under 6 U.S.C. § 113(g)(2) to alter the order of succession.  And as a result of *that* order approved by Mr. Gaynor—through which the FEMA

---

[3] *Notice of Intent to Nominate*, (Aug. 27, 2020), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-to-nominate-the-following-individual-to-a-key-administration-post-082720/.

[4] *Two Nominations Sent to the Senate* (Sept. 10, 2020), https://www.whitehouse.gov/presidential-actions/two-nominations-sent-senate-091020/.

[5] Gaynor was nominated by the President to serve as FEMA Administrator on October 15, 2019, confirmed by the Senate on January 14, 2020, and sworn into office on January 16, 2020.

Administrator and the Under Secretary for Strategy, Policy, and Plans would become sixth and fourth in line, respectively—Mr. Wolf would then become Acting Secretary, as the most senior official now serving in the line of succession.

On September 17, 2020, Acting Secretary Wolf ratified "each of [his] delegable prior actions as Acting Secretary" "out of an abundance of caution."  Ratification of Department Actions ("Ratification"), 85 Fed. Reg. 59651 (September 23, 2020).  In doing so, he confirmed that he had "full and complete knowledge of the contents and purpose of any and all actions taken by [him] since November 13, 2019."  *Id.*

## II.    Deferred Action for Childhood Arrivals

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the policy known as DACA, or Deferred Action for Childhood Arrivals.  Ex. 8, Napolitano Memo. DACA made deferred action—a practice of individualized enforcement discretion to issue a reversible notification that DHS does not intend to remove an alien for a set period of time— available to "certain young people who were brought to this country as children" and remained here in violation of the immigration laws.  Napolitano Mem. at 1.  Under DHS regulations, aliens granted deferred action may receive certain benefits, including work authorization for the same period if they establish economic necessity.  *See* 8 C.F.R. § 274a.12(c)(14).  The Napolitano Memorandum stated that deferred action pursuant to DACA was an "exercise of prosecutorial discretion."  Napolitano Mem. at 1; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999); *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").  To that end, the Napolitano Memorandum explained that DACA "confer[red] no substantive right,

immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights."  Napolitano Mem. at 3.

On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke rescinded the Napolitano Memorandum in an attempt to wind down DACA in an orderly fashion.  Ex. 9, Duke Memo.  Numerous lawsuits followed, challenging that agency decision on various grounds.

## III.    Litigation History

In five related cases challenging the Duke Memorandum, on January 9, 2018, the U.S. District Court for the Northern District of California granted a motion for a preliminary injunction, and ordered Defendants to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments."  *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018).  That injunction, however, specifically excluded (1) "new applications from applicants who have never before received deferred action" and (2) DACA-based requests for advance parole.  *Id.*  Shortly thereafter, a co-extensive preliminary injunction was issued by this U.S. District Court for the Eastern District of New York.  *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).  And the U.S. District Court for the District of Columbia later issued a final judgment vacating the Duke Memorandum in its entirety, *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018), and also rejected a subsequent agency explanation (the Nielsen Memorandum) on similar grounds, *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018).

The Supreme Court ultimately granted certiorari (or certiorari before judgment) in all of the California, District of Columbia, and New York DACA-rescission cases.  On June 18, 2020, the Supreme Court issued a decision setting aside the Duke Memorandum as arbitrary and

capricious under the APA, and declining to consider the Nielsen Memorandum.  The Court acknowledged that DHS's authority to rescind DACA was undisputed.  *Regents*, 140 S. Ct. at 1905.  Indeed, it recognized that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are left to DHS, *id.* at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id.* at 1914.  Nonetheless, the Court held that the Duke Memorandum failed to consider alternatives to rescinding DACA in its entirety, and failed to adequately address the possibility of legitimate reliance interests related to DACA.  *Id.* at 1912, 1913.  Accordingly, the Supreme Court held that a remand to DHS was appropriate "so that it may consider the problem anew."  *Id.* at 1916.  The Supreme Court also ordered vacatur of both preliminary injunctions, which had required maintaining portions of the DACA policy during the litigation.  *See Regents*, 140 S. Ct. at 1916.

## IV.    The Wolf Memorandum

On July 28, 2020, Acting Secretary Wolf formally rescinded the Duke Memorandum and the Nielsen Memorandum.  Ex. 10, Wolf Memo.  The Wolf Memorandum announced the Acting Secretary's determination, "[i]n accordance with the Supreme Court's decision," "to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified."  Wolf Mem. at 5.  Given the Acting Secretary's serious enforcement policy concerns, the Wolf Memorandum also made certain immediate changes to DACA.  *Id.* at 4-5.

The Wolf Memorandum explains that, until further notice, DHS (1) will not accept first-time DACA requests; (2) will continue to accept renewal requests from DACA recipients, though it will limit the period of any future grants of DACA to one year, rather than the two years provided under the Napolitano Memorandum; and (3) will allow DACA recipients to submit applications for advance parole, to be granted only in "exceptional circumstances."  *See id.* at 5.

7

These changes apply to both pending and prospective requests.  *Id.* at 7.  The Wolf Memorandum noted that "nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted."  *Id.* at 6.  The Wolf Memorandum also reiterates that DHS will "[c]ontinue to comply with the information-sharing policy" regarding information provided by DACA requestors announced in 2012.  *Id.* at 8.

## V.     The Edlow Directive

On August 21, 2020, Deputy Director Edlow signed a directive entitled "Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, 'Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.''"  *See* Ex. 11, Edlow Directive.  The memorandum provided "additional guidance to facilitate implementation of the specific changes to the DACA policy that are within the purview of USCIS."  *Id.*

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  *Taylor v. Small*, 350 F.3d 1286, 1290 (D.C. Cir. 2003) (quoting Fed. R. Civ. P. 56(a)).  Under the Administrative Procedure Act, a reviewing court may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706.

## ARGUMENT

Plaintiffs assert that the Wolf Memorandum and the Edlow Directive are *ultra vires* and

contrary to law[6] on the theory that Acting Secretary Wolf is serving unlawfully and, thus, also unlawfully appointed Deputy Director Edlow.  They rely on three arguments in support of their theory: (1) that Defendant Wolf assumed the title of Acting Secretary in violation of the HSA because then-Secretary Nielsen did not amend the order of succession in case of resignation; (2) that Defendant Wolf assumed office in violation of the FVRA because his predecessor revised the order of succession after being in office for longer than 210 days; and (3) that Defendant Wolf's service violates the Appointments Clause.  *See* Pls.' Mot. 15-16.  Those arguments are meritless.

## I.   Acting Secretary Wolf had lawful authority to issue the Wolf Memorandum under the HSA.

Then-Secretary Nielsen's April 9, 2019 order exercised her authority under the HSA, 6 U.S.C. § 113(g)(2), to designate a new succession order for the office of Secretary of Homeland Security.  This order applied to all vacancies in the office, regardless of the reason.  Secretary Nielsen's resignation triggered application of her succession order, and Mr. McAleenan thus began serving as Acting Secretary.  Acting Secretary McAleenan later relied on Section 113(g)(2) to further amend the succession order.  So, when Acting Secretary McAleenan resigned, Mr. Wolf began serving as Acting Secretary under that amended succession order.

Plaintiffs do not dispute that Section 113(g)(2) of the HSA permits each of those order-of-succession modifications; instead, they simply argue that the succession order issued by then-Secretary Nielsen did not extend to vacancies caused by a Secretary's *resignation*.  Rather, they say that the succession order applied only to Annex A of DHS Delegation 00106, a document that sets an order for delegating authority "during a disaster or catastrophic emergency."  Pls.' Mot. 8-9.  That argument fails.

---

[6] Plaintiffs' Administrative Procedure Act ("APA") claim is identical to its *ultra vires* claims.  *See* Mem. of P.&A. in Supp. of Pls.' Mot. for Summ. J., 24-25, ECF No. 11 ("Pls.' Mot.").  For the same reasons set forth below, Plaintiffs' APA claim is also meritless.

**1.**   Then-Secretary Nielsen's April 2019 order expressly stated *five* times that she was designating a new "order of succession," employing unqualified language.  *See* April 2019 Order. As the Secretary of Homeland Security, Ms. Nielsen was the only person within DHS with the authority to designate an order of succession.  *See* 6 U.S.C. § 113(g)(2).  Thus, her signed order controlled the order of succession when she resigned.  Although Plaintiffs attempt to manufacture a conflict between Secretary Nielsen's signed order and Revision 8.5 to DHS Delegation 00106, Pls.' Mot. 8-9—an administrative document that Ms. Nielsen did not sign—that attempt falls short. An administrative document that *collects* orders from the Secretary cannot override *the Secretary's signed order*.  *Cf. Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (explaining that agency's "formal approval" of a project was the final agency action, not the agency's "subsequent activities in carrying it out").  Even if there were a conflict, or even if the administrative document did not accurately implement the Secretary's change, by function of Section 113(g)(2) of the HSA, any conflict should be resolved in favor of the Secretary's signed order.

Beyond Secretary Nielsen's use of unqualified language, the statutory authority she relied on—Section 113(g)(2) of the HSA—shows that she changed more than just the delegation of authority that applied during a disaster or catastrophic emergency.  Section 113(g)(2) empowers the Secretary to designate an "order of succession" for officers to serve as Acting Secretary in the event of a vacancy.  Ms. Nielsen's order expressly cites this statutory authority three times. Crucially, an *order of succession* is different from a *delegation of authority*.  The HSA reflects this, and a different provision, 6 U.S.C. § 112(b)(1), empowers the Secretary to *delegate* her authority to other officials in the agency, even when the Secretary continues to occupy her office. Plaintiffs cannot explain why Ms. Nielsen would have invoked her Section 113(g)(2) authority to

designate the order of succession—or why she repeatedly stated that she was designating an order of succession—if she was actually doing nothing but amending the order for delegated authority during an emergency, which would invoke a different statutory provision.

**2.** The flaw in Plaintiffs' argument is even clearer when the April 2019 order is read in the context of earlier revisions to DHS Delegation No. 00106. On December 16, 2016, then-Secretary of Homeland Security Jeh Johnson signed Revision 8 to DHS Delegation No. 00106. *See generally* Ex. 12, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) (signed at page 3). This signed revision addressed two different kinds of orders: (1) an order of succession (*i.e.*, a list of officials who could become Acting Secretary in the event of a vacancy); and (2) an order for delegation of authority.

*First*, Section II.A of Revision 8 to DHS Delegation No. 0106 explained that, "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession would be governed by Executive Order 13753. *Id.* This was not an order of the Secretary, and did not invoke any authority vested in the Secretary, because under the previous version of the HSA, the Secretary had no authority to designate an order of succession. At that time, only the President had the authority (under the FVRA) to designate an order of succession. *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official). Section II.A thus expressly tracked the FVRA: it noted that the President's order of succession would apply to a vacancy covered by the FVRA. Section II.A even listed the same triggering events as the FVRA. *Compare* 5 U.S.C. § 3345(a). It was only *after* Mr. Johnson had signed Revision 8 that Congress gave the Secretary the power to designate an order of succession that would apply "[n]otwithstanding" the FVRA. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)).

*Second*, in Section II.B, Mr. Johnson separately exercised his own authority under 6 U.S.C. § 112(b)(1)—authority that the Secretary had long possessed—and delegated the authorities of his office to a list of officials in the event that he was temporarily "unavailable to act during a disaster or catastrophic emergency."  This was not an order of succession—the circumstances addressed by Section II.B are not the kind of vacancy that would trigger the FVRA, and the Section II.B delegation would not make someone exercising that authority an Acting Secretary of Homeland Security.[7]  *Cf. English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018) ("Defendants argue, with some force, that [unavailability to act is] commonly understood to reflect a temporary condition, such as not being reachable due to illness or travel," rather than a permanent condition such as a vacancy.).  And, as explained, the Secretary had no statutory authority to designate an order of succession at that time.

This context, along with the text of Ms. Nielsen's April 2019 order, shows that, when then-Secretary Nielsen changed the list of officers in Annex A—a document setting an order for delegation of authority of the Secretary—she also provided that Annex A would now perform two separate functions.  It would both (1) designate the agency's first order of succession under Section 113(g)(2), and (2) amend the list of officials in the order for delegation of authority.

As to the first function, Ms. Nielsen established the first order of succession under Section 113(g)(2); it would apply in the case of a vacancy that would otherwise have been covered by the FVRA.  Before Ms. Nielsen's order, there was no order of succession under Section 113(g)(2).  Rather, as acknowledged by Section II.A, the President's order of succession under

---

[7] The FVRA is generally the "exclusive means for temporarily authorizing an acting official," unless another statute provides otherwise.  5 U.S.C. § 3347(a).  Until the late 2016 enactment of Section 113(g)(2) of the HSA, there was no other statute providing for the designation of an Acting Secretary of Homeland Security.

Executive Order 13753 governed when the Secretary's office was vacant, because then-Secretary Johnson lacked the statutory authority to create an order of succession. Thus, when Ms. Nielsen invoked Section 113(g)(2)—which she expressly did three times in the April 9, 2019 order—she exercised the Secretary's authority under that statute and designated an order of succession that applied "[n]otwithstanding chapter 33 of title 5," 6 U.S.C. § 113(g)(2). As a matter of law, that order of succession would supersede the order of succession under Executive Order 13753.

The text of Ms. Nielsen's order cited 6 U.S.C. § 113(g)(2), and used that authority to "designate the order of succession for the Secretary of Homeland Security as follows." April 2019 Order. The order that "follows" was the amended list of officials in Annex A. Annex A was also introduced with another clause and title showing that it would simultaneously continue to serve its original function as an order for delegation of authority. But Annex A's amended list was followed by a new provision that had not appeared in the prior, delegation-only version of Annex A. The new provision noted that "[n]o individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation." *Id.* That reference to a "*designation*"—rather than a "delegation"—constitutes yet another textual and structural acknowledgment that Annex A had executed the Secretary's new authority under Section 113(g)(2). *See* 6 U.S.C. § 113(g)(2) (authorizing the Secretary to "designate such other officers . . . in further order of succession to serve as Acting Secretary").[8] Accepting Plaintiffs' suggested reading would thus require the Court to read *out* of Ms. Nielsen's order all three

---

[8] That additional sentence at the conclusion of Annex A is a mainstay in true orders of succession: "[W]hen Presidents issue orders of succession as an advance exercise of their authority to name acting officials under the [FVRA], they often specify that '[n]o individual who is serving in an office . . . in an acting capacity, by virtue of so serving, shall act as [the agency head] pursuant to this order.'" Office of Legal Counsel, *Designating an Acting Director of National Intelligence*, 43 Op. O.L.C. __, *8 (Nov. 15, 2019), https://www.justice.gov/olc/file/1220586/download; 43 Op. O.L.C. ___ at *8 nn.3-4 (citing illustrative orders of succession).

references to 6 U.S.C. § 113(g)(2), to disregard its structure (what introduces and concludes its list of officials), and to read Mr. Johnson's document as creating an order of succession that he lacked the statutory power to set.

As to the second function, Ms. Nielsen's order changed the order for delegation of authority in the case of a disaster or catastrophic emergency by issuing a new version of Annex A.  To do so, Ms. Nielsen did not need to expressly invoke Section 112(b)(1) any more than Mr. Johnson had, because Annex A (through Section II.B) already was, by its terms, a delegation of authority. Thus, by changing the officials listed in Annex A, she changed the delegation order.  But, given her express invocation of Section 113(g)(2), Annex A's list was about to serve two different functions when Ms. Nielsen resigned: both the order of succession *and* the order for delegation of authority.

The official actions Ms. Nielsen took after signing her order confirm that she did not merely alter Mr. Johnson's delegation order in Section II.B, but also designated a new order of succession for vacancies under Section 113(g)(2).  For example, on her last day as Secretary, Ms. Nielsen sent a farewell email to the agency and issued a press release announcing that Mr. McAleenan "will now lead DHS as your Acting Secretary."[9]  The same day, she personally swore Mr. McAleenan in to that role.[10]  Neither act supports Plaintiffs' reading of Ms. Nielsen's order.

---

[9] Email from Kirstjen M. Nielsen, Secretary of Homeland Security (Apr. 10, 2019, 04:35 EST) (attached as Ex. 13); *see also* Press Release, DHS, Kirstjen M. Nielsen, Secretary of Homeland Security, Farewell Message from Secretary Kirstjen M. Nielsen (Apr. 10 2019), https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen.

[10] *CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters*, Border Observer, https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/ (last visited Sept. 24, 2020).

Finally, the Court should defer to DHS's interpretation of Ms. Nielsen's order, because it is the agency's own internal document. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining that the Court "ha[s] deferred to 'official staff memoranda'" (citation omitted)).

In sum, Plaintiffs' reading of Ms. Nielsen's order is at odds with the order's express language designating an unqualified order of succession. It ignores the order's structure, the context provided by the intervening grant of statutory authority, and multiple references to an "order of succession" designated under Section 113(g)(2). And it is inconsistent with the official acts Ms. Nielsen took on her last day as Secretary, and violates basic deference principles. Because Then-Acting Secretary McAleenan lawfully took office as a result of Ms. Nielsen's Order, his November 8, 2019 delegation was lawful, and Defendant Wolf is properly serving as Acting Director pursuant to the HSA.

## II. The plain text of the FVRA and the HSA make clear that the FVRA's 210-day time limit does not apply to designations under the HSA.

Plaintiffs' next argument can be summarized in a single contention: that the FVRA's 210-day post-vacancy time limitation is incorporated into the HSA's succession provision. That contention is incorrect. Under the April 2019 order of succession, Mr. McAleenan validly served as Acting Secretary *pursuant to the HSA*, not the FVRA, on succeeding former Secretary Nielsen. Accordingly, under the plain text of *both* the FVRA *and* the HSA, his service was not subject to the FVRA's time limitation for acting service, 5 U.S.C. § 3346. Thus, the FVRA does not provide a ground for invalidation of Defendants Wolf's and Edlow's service.

**1.** The FVRA generally provides the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a Senate-confirmed office. *Id.* § 3347(a). But it also recognizes exceptions to this general rule of exclusivity. Those exceptions include statutory provisions like 6 U.S.C. § 113(g)(1) that "expressly designate" an acting officer, 5 U.S.C.

§ 3347(a)(1)(B), and statutory provisions like 6 U.S.C. § 113(g)(2) that "authorize[] the President, a court, or the head of an Executive department, to designate" an acting officer, 5 U.S.C. § 3347(a)(1)(A).  Thus, when a vacancy arises in an office with an office-specific vacancy statute, that statute provides an alternate means of designating an acting officer.  *See Hooks v. Kitsap Tenant Support Servs. Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute coexist as "statutory alternatives to designate" acting officer); *see also United States v. Smith*, 962 F.3d 755, 763 n.1 (4th Cir. 2020) (same).

The FVRA imposes an initial 210-day time limit on acting service only on a "person serving as an acting officer *as described under section 3345*."  5 U.S.C. § 3346(a)(1) (emphasis added).[11]  Plaintiffs suggest that the Court simply ignore this language, and apply the 210-day limit not just to acting officers "as described under section 3345" but as to *all* acting officers serving under or "described by" *any* statute.  That suggestion is ill-founded.  When it enacted the FVRA, Congress was aware that "[m]ost" office-specific vacancy statutes "do not place time restrictions on the length of an acting officer."  S. Rep. No. 105-250, at 17 (1998).  Nevertheless, it retained those statutes as an alternative to the FVRA.  *See* 5 U.S.C. § 3347(a)(1)(A)-(B).  And it limited acting service to 210 days *only* for those serving under the FVRA.  *Id.* § 3346(a)(1).  That is, Congress placed no such restriction on acting service under *office-specific vacancy statutes*.  *See id.*; *see also Guedes v. ATF*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (recognizing that unlike the office-specific vacancy statute for Attorney General, acting service under FVRA was subject to "specific time limits"); *United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (Deputy Attorney General could continue serving as Acting Attorney General under office-specific

---

[11] That 210-day period can be extended if the President submits a nomination for the office, or there is a change in presidential administrations.  *See* 5 U.S.C. §§ 3346(a)(2), (b), 3349a(b).

vacancy statute after time limit in pre-FVRA Vacancies Act expired); Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 66-67 & n.3 (Mar. 22, 1999) (FVRA's time limits "do not apply" to office-specific vacancy statutes).

The HSA is one such office-specific vacancy statute. *See* 6 U.S.C. § 113(g)(1)-(2). By § 3346's unambiguous text, the FVRA's 210-day time limit does not apply to designations under the HSA. Nor does the HSA's text provide any basis to read that time limit into it. The statute itself contains no express time limit. Not only that, the Secretary's authority to designate an officer under Section § 113(g)(2) applies "*[n]otwithstanding* chapter 33 of Title 5," which includes the FVRA. The "notwithstanding" phrase makes clear that 6 U.S.C. §113(g)(2)—consistent with 5 U.S.C. § 3347(a)(1)(A)—authorizes the Secretary to designate a line of succession for service under the HSA, distinct from the FVRA. That phrase thus resolves any conflict between the FVRA's 210-day limit and Congress's choice to include no time limit on acting service under the HSA. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'").

**2.** That Congress specifically chose not to impose a time limit on acting service in the HSA finds confirmation in the broader context of office-specific vacancy statutes. When it enacted the FVRA, Congress knew that many office-specific vacancy statutes contained no express time limit, and the Senate Report accompanying the bill that became the FVRA even suggested that Congress "may choose in the future to reexamine" whether to retain such statutes. S. Rep. No. 105-250, at 17. Yet Congress neither superseded these statutes in the FVRA, nor included them in Section 3346's time limit. Unsurprisingly, then, Congress did the same thing in Section 113(g) of the HSA that it has done in numerous office-specific statutes: provide for acting service outside of the strictures of the FVRA, and thus beyond the FVRA's 210-day initial period of acting service.

17

What is more, Congress knew how to include an express time limit in an office-specific vacancy statute. *See, e.g.*, 29 U.S.C. § 153(d) (Acting General Counsel of the NLRB may serve under that office-specific statute only for "forty days when the Congress is in session unless a nomination . . . ha[s] been submitted to the Senate"). But it did not do so when it enacted Section 113(g)(2) in 2016. The Court should not read a time limit into Section 113(g)(2) that Congress itself chose not to include. It is this Court's "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .").

**3.** Plaintiffs argue that the HSA "incorporates" the FVRA's provisions, including the FVRA's time limit, in 6 U.S.C. § 113(g)(2). According to Plaintiffs, incorporating the FVRA time limit is warranted because, otherwise, there would be "irreconcilable tension with other provisions of the HSA that plainly subject Deputy Secretaries and Under Secretaries for Management who become Acting Secretaries and Acting Deputy Secretaries, respectively, to the FVRA's 210-day cap." Pls.' Mot. at 20. That is incorrect.

To be sure, under the plain meaning of Section 113 of the HSA, if the Deputy Secretary office had not been vacant when Ms. Nielsen resigned, the Deputy Secretary of Homeland Security *would* have become the Acting Secretary of Homeland Security, under the FVRA's first-assistant rule. And because the service was authorized under the FVRA, it *would have been* subject to the 210-day limit. But that is because Section 113(g) does not itself designate or authorize the designation of the Deputy Secretary under the HSA. Though Plaintiffs may find this counterintuitive, the Court must "interpret the statute as it was written, not to rewrite it as [Plaintiffs] believe Congress *could have* intended to write it." *Palisades Collections LLC v. Shorts*,

552 F.3d 327, 336 (4th Cir. 2008).[12]

Nor would there be anything illogical about a subordinate officer serving as an acting official in circumstances where her superior may not. *See, e.g.*, 5 U.S.C. § 3345(a)(3) (allowing designation as acting officer of any senior officer or employee who meet certain tenure requirements); *Smith*, 962 F.3d at 763 n.1 (designation of Chief of Staff to Attorney General as Acting Attorney General was lawful despite availability of Deputy Attorney General and other Senate-confirmed officers). Moreover, Plaintiffs' argument comes with no explanation for Congress's decision to restrict 5 U.S.C. § 3346's time limit solely to acting service under the FVRA.[13]

Likewise, Plaintiffs offer no plausible explanation for what the "notwithstanding" clause in Section 113(g)(2) of the HSA means. They argue merely that the clause does not apply because there is no conflict between the FVRA's time limit and the HSA. Pls.' Mot. 19-20. That suggestion is incorrect. The HSA—like many other office-specific vacancy statutes—has no

---

[12] Congress may have had reasons for imposing the FVRA time limit on the Deputy Secretary but not on other officers serving during vacancies in the offices of the Secretary and Deputy Secretary. In such instances, Congress may well have recognized that the absence of the two highest-ranking officials in DHS would justify the need for additional flexibility to ensure the continuing functioning of the department. *Cf.* S. Rep. No. 105-250, at *18 (provisions of the FVRA would ensure that "[a]ll the normal functions of government . . . could still be performed").

[13] Plaintiffs might argue in reply that it would be unusual for the Under Secretary for Management to be able to serve as the Acting Deputy Secretary (or another Senate-confirmed position) for an initial period of only 210 days, but as the Acting Secretary for longer. Again, though, that is the obvious effect of 5 U.S.C. § 3346's plain text. Indeed, that same scenario could occur under any office-specific statute that lists more than one potential acting officer. For example, under 28 U.S.C. § 508(b), which contains no express time limit, the Associate Attorney General serves as the Acting Attorney General when the offices of the Attorney General and the Deputy Attorney General are both vacant. But, if the President were to designate the Associate Attorney General as the Acting Deputy Attorney General, he would need to do so pursuant to the FVRA, 5 U.S.C. § 3345(a)(2), meaning the Associate Attorney General could serve in that capacity for an initial period of only 210 days. To prevent that scenario would presumably require a court to import the FVRA's time limit to 28 U.S.C. § 508, a result that would nullify Congress's specific choice in 5 U.S.C. § 3346 *not* to apply the default FVRA time limit to office-specific statutes.

express time limit.  Congress understood when enacting the FVRA that the lack of an express time limit in an office-specific vacancy meant that the statute did "not place time restrictions on the length of an acting officer."  S. Rep. No. 105-250, at 17.  There is no basis, then, to read Congress's decision *not* to include a time limit in the HSA as anything other than a conscious choice.  On reply, Plaintiffs may argue that 6 U.S.C. § 113(g)(2)'s notwithstanding clause only displaces the President's authority under 5 U.S.C. §§ 3345(a)(2) and (a)(3) to designate an acting official other than the first assistant. If so, that would get them nowhere; the text of the notwithstanding clause is not so limited.

**III.    Acting Secretary Wolf's ratification of the Wolf Memorandum cures the alleged violations of the HSA and FVRA.**

As explained above, Mr. Wolf was serving lawfully under the HSA and the relevant orders of succession when he issued the Wolf Memorandum.  But even if this Court were to find otherwise, Mr. Gaynor, who would be the Acting Secretary under Plaintiffs' reading of Ms. Nielsen's April 9 order and the FVRA, designated an order of succession under § 113(g)(2).  Under that order of succession, Mr. Wolf would become the Acting Secretary under the HSA, and his alternative delegation conferred authority for Mr. Wolf's service.  Mr. Wolf then ratified the issuance of the memorandum.  That ratification cures any alleged deficiencies in his service at the original time of issuance.

On September 10, 2020, the President submitted Mr. Wolf's nomination to serve as the Secretary of Homeland Security to the Senate.  The FVRA imposes an initial 210-day time limit on acting service under the FVRA.  5 U.S.C. § 3346(a)(1).  But "once a first . . . nomination for the office is submitted to the Senate," the FVRA permits acting service to continue while the nomination is pending, even if the initial 210-day period has elapsed.  *Id.* § 3346(a)(2).  Under Plaintiffs' theory that then-Secretary Nielsen in fact did not effectively set an order of succession

under the HSA, EO 13753 would govern the order of succession for the current vacancy in the office of the Secretary.  *See* Pls.' Mot. 17.  EO 13753, in turn, sets the President's order of succession under the FVRA.  *See* 5 U.S.C. § 3345(a)(1)-(3) (allowing the President to designate an acting official).[14]  Thus, the most senior successor listed in EO 13753, the Senate-confirmed Administrator of the Federal Emergency Management Agency, Peter T. Gaynor, was eligible to serve as Acting Secretary under the FVRA, 5 U.S.C. § 3345, when Mr. Wolf's nomination was submitted on September 10, 2020.[15]  And, under Plaintiffs' theory, Mr. Gaynor became the Acting Secretary under the FVRA when Mr. Wolf's nomination was submitted to the Senate.  *See* Mot. 4.  On September 10, 2020, "out of an abundance of caution," Mr. Gaynor exercised "any authority" he might possess as Acting Secretary and designated an order of succession for the office under § 113(g)(2), which applies "[n]otwithstanding" the FVRA.  *See* Ex. 7, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020).  Once Mr. Gaynor set an order of succession, Mr. Wolf, as the Under Secretary for Strategy, Policy, and Plans, was the most senior successor and immediately began serving as Acting Secretary under the HSA.[16]  *See* 6 U.S.C. § 113(g)(2) (empowering the Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary," "[n]otwithstanding" the FVRA).

At the outset, Mr. Wolf was lawfully serving under the HSA and relevant orders of

---

[14] Executive Order 13753, *Amending the Order of Succession in the Department of Homeland Security*, 81 Fed. Reg. 90667 (Dec. 9, 2016) (relying on "the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Vacancies Reform Act of 1998, 5 U.S.C. 3345, *et seq.*," to set the order of succession).

[15] The first two positions listed in EO 13753, the Deputy Secretary of Homeland Security and the Under Secretary for Management, were at the time and still are vacant.

[16] The first three positions in Mr. Gaynor's order of succession, the Deputy Secretary of Homeland Security, the Under Secretary for Management, and the Commissioner of the U.S. Customs and Border Protection, were at the time and still are vacant.

succession when he issued the Wolf Memorandum. But now, under Plaintiffs' own theory, the Gaynor Order provides an alternate basis for Acting Secretary Wolf's current authority. Exercising his authority on that basis, Mr. Wolf then ratified the Wolf Memorandum. *See* Ratification, 85 Fed. Reg. 59651. Thus, even if Plaintiffs are correct that Mr. Wolf was serving unlawfully when he originally issued the memorandum, his ratification cures any alleged defects. *See Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) ("[R]atification is generally treated as a disposition on the legal merits of the appointments challenge."). Because Wolf's service is valid, and the rule has been ratified, this provides an entirely independent basis to decide in favor of Defendants. Thus, even under Plaintiffs' legal theory, the Court need not wade into analyzing Plaintiffs' other statutory arguments.

## IV. Acting Secretary Wolf's service does not violate the Appointments Clause.

In the alternative to their statutory arguments, Plaintiffs argue that Defendant Wolf's service, and thus his appointment of Defendant Edlow, violate the Appointments Clause because he is serving as an acting principal officer without any time limit. Pls.' Mot. 25-27. To be sure, the absence of a statutory time limit for acting service does not mean that an Acting Secretary can serve indefinitely. The Supreme Court has recognized that an acting designation must be "temporary." *United States v. Eaton*, 169 U.S. 331, 343 (1898). But neither the Appointments Clause nor any other provision of the Constitution sets forth an express limit on acting service. Nor is there any reason to believe that 210 days has any constitutional basis. Congress has frequently changed the time limit for acting service under the general vacancies statutes. *See, e.g.*, Act of Feb. 13, 1795, 1 Stat. 415 (six months); 5 U.S.C. § 3348(a) (1994) (120 days). Indeed, the first vacancies statute, enacted shortly after the Founding, had no express time limit. *See* Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281; *see also Alden v. Maine*, 527 U.S. 706, 743-44 (1999)

("[E]arly congressional practice . . . provides contemporaneous and weighty evidence of the Constitution's meaning."). For that matter, the FVRA does not limit acting service to 210 days. The FVRA expressly permits an official acting under its authority to serve beyond the initial 210-day period. For example, officials acting under the FVRA may additionally serve during the pendency of a first Senate nomination; for 210 days following that nomination's rejection, return, or even withdrawal by the President; during the pendency of a second nomination; and for a final 210 days following the second nomination's rejection, return, or withdrawal. *See* 5 U.S.C. § 3346(b)(1)-(2). A Presidential transition affords an acting officer even more time. *See id.* § 3349a(b). The length of acting service permitted under the FVRA is consistent with constitutional limitations and longstanding practice. *See Eaton*, 169 U.S. at 343-44. And without any viable constitutional standard, defining the precise point at which permissible temporary acting service transforms into unconstitutional permanent service is a nonjusticiable political question committed to the political branches. *See Bhatti v. Fed. Hous. Fin. Agency*, 332 F. Supp. 3d 1206, 1218 (D. Minn. 2018).

Further, the specific circumstances here belie any concerns that Acting Secretary Wolf has been serving in his position indefinitely without confirmation—even ignoring the fact that the President recently nominated Mr. Wolf for the Secretary position. Mr. Wolf has been Acting Secretary for approximately ten months. He assumed that role by function of his prior Senate confirmation as the Under Secretary for DHS's Office of Strategy, Policy and Plans, *see* 6 U.S.C. § 113(a)(1)(K), and the duties of the Secretary are "germane" to that position. *See Weiss v. United States*, 510 U.S. 163, 176 (1994) (Appointments Clause permitted commissioned officers, who had received Senate-confirmation for their positions, to serve as military judges without second confirmation because "the role of military judge is 'germane' to that of military officer"). Prior to

Mr. Wolf's November 13, 2019 confirmation, Mr. McAleenan had already amended the Section 113(g)(2) line of succession, and it was widely reported that Mr. Wolf would become Acting Secretary once confirmed.[17]

Thus, the Senate confirmed Mr. Wolf to the Under Secretary position knowing full well that it was vetting him, in part, for the ability to exercise the Secretary's authority.  Nor is there any broader constitutional concern with Mr. Wolf's acting service—in addition to his germane Senate-confirmation, an individual temporarily performing the duties of a principal officer in an acting capacity does not require Senate confirmation.  *See Eaton*, 169 U.S. at 343; *Smith*, 962 F.3d at 764 (same).

## V.    Plaintiffs' Requested Relief is Overbroad.

This court should deny Plaintiffs' motion for summary judgment in its entirety.  If, however, the Court were to disagree and determined that Plaintiffs were correct that Acting Secretary Wolf's service is unlawful, it nevertheless should reject Plaintiffs' request for nationwide relief.  At most, the Court should set aside the Wolf Memorandum under the Administrative Procedure Act, and only as to the plaintiffs.

Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III requires that "a plaintiff must demonstrate standing … for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  The remedy sought must therefore "be limited to the inadequacy that produced the injury in fact."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  And equitable principles

---

[17] *See, e.g.*, Daniel Lippman, Ian Kullgren, & Anita Kumar, *White House plans to name Chad Wolf acting DHS Secretary*, Politico (Oct. 31, 2019), https://www.politico.com/news/2019/10/31/chad-wolf-acting-dhs-secretary-063363;  Zolan Kanno-Youngs & Maggie Haberman, *Trump to Name Chad Wolf as Acting Secretary*, N.Y. Times (Nov. 1, 2019), https://www.nytimes.com/2019/11/01/us/politics/trump-chad-wolf-dhs.html.

independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Moreover, in considering a request for an injunction, the court must determine whether "a less drastic remedy"—here, remand and vacatur—is "sufficient to redress" Plaintiffs' injury.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).  If so, "no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Id.*

Accordingly, any relief the Court enters should thus be limited to relieving the specific injury of those Plaintiffs whom the Court determines have a cognizable claim.

## CONCLUSION

For these reasons, Plaintiffs' motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted.

Dated: September 25, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

*/s/ Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND (Ga. Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov